UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - -x

NELSON QUINTANILLA, ALEJANDRO AMAYA, ALEX
AMIR AREVALO, MAYNOR FAJARDO, WALTER GARCIA,
JOSE L. MARTINEZ, PRACELIS MENDEZ, OSMAR W.
PAGOADA, JAVIER QUINTANILLA, EDWIN RIVERA,
CARLOS ESCALANTE, KEVIN GALEANO, LERLY NOE
RODRIGUEZ, JOSE VEGA CASTILLO, JUAN
QUINTEROS, and MARCOS TULIO PEREZ,

                                Plaintiffs,

                                Case No.:
                                CV-09-5331 (SJF)(WDW)
                    -against-

SUFFOLK PAVING CORP., SUFFOLK ASPHALT CORP.,
LOUIS VECCHIA, CHRISTOPHER VECCHIA, HELENE
VECCHIA and JOHN DOES 1-5,

                                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - -x

                    15 Verbena Avenue
                    Floral Park, New York

                    June 9, 2011
                    10:35 a.m.


        EXAMINATION BEFORE TRIAL of CHRISTOPHER

VECCHIA, one of the defendants in the

above-entitled action, held at the above time and

place, pursuant to Notice, taken before JoAnn

O'Loughlin, a Notary Public of the State of New

York.

## Page 2

APPEARANCES:

LAW OFFICES OF LAUREN GOLDBERG, PLLC
Attorney for Plaintiffs
501 Fifth Avenue
New York, New York 10017

BY: LAUREN GOLDBERG, ESQ.

IAN FRANCIS WALLACE, ESQ.
Attorney for Plaintiffs
501 Fifth Avenue
New York, New York 10017

ZABELL & ASSOCIATES, P.C.
Attorneys for Defendants
SUFFOLK PAVING CORP., LOUIS VECCHIA and
HELENE VECCHIA
4875 Sunrise Highway
Bohemia, New York 11716

BY: SAUL D. ZABELL, ESQ.

THE ZISKIN LAW FIRM
Attorneys for Defendants
SUFFOLK ASPHALT CORP. and
CHRISTOPHER VECCHIA
6268 Jericho Turnpike
Commack, New York 11725

BY: SUZANNE HARMOND ZISKIN, ESQ.

* * *

## Page 3

CHRISTOPHER VECCHIA, the witness
herein, having first been duly sworn by the Notary
Public, was examined and testified as follows:
EXAMINATION BY MR. WALLACE:

Q.    What is your name?

A.    Christopher Vecchia.

Q.    Where do you reside?

A.    Eighteen Bear Street, Selden, New York
11784.

Q.    Mr. Vecchia, my name is Ian Wallace, I
represent the plaintiffs in this action. Before I get
to my questions, I just want to go through preliminary
ground rules, if you like.

     Because this is being transcribed, you're
required to enunciate all responses. Any gesture, it
won't be taken down by the court reporter, do you
understand that?

A    Correct.

Q    Who are you represented by today?

A    Suzanne Ziskin.

Q    When did you hire Suzanne Ziskin?

     MS. ZISKIN: Objection.

     Why is this necessary; is it material, it's
immaterial?

## Page 4

CHRISTOPHER VECCHIA

     MR. WALLACE: Unless you direct him not to
answer, I think it's a proper question, it's not
privileged.

     MS. ZISKIN: He can answer, but . . .

A    You need a specific date?

Q    Yes.

A    I couldn't give you a specific date.

     MR. ZABELL: If you know.

A    I don't know.

Q    Did you hire Ms. Ziskin within the last
month?

A    No.

Q    Did you hire Ms. Ziskin?

A    Yes.

Q    Throughout the deposition today, back to
the ground rules, Ms. Ziskin, your counsel, will be
making numerous objections.

A    Okay.

Q    That is to preserve the record. However,
unless Ms. Ziskin directs you not to answer a question,
you're required by law to answer a question. If you
don't understand a question, please tell me and I will
rephrase it.

A    Okay.

## Page 5

CHRISTOPHER VECCHIA

Q    If you don't hear a question, please tell
me and I'll repeat it.

A    Okay.

Q    If you don't tell me that you don't
understand a question or you didn't hear a question, I
will assume you both understood it and you heard it and
therefore, I will await your response.

A    Okay.

Q    Is this the first deposition you've ever
taken?

A    Yes.

Q    Are you taking any medications today that
might impair your ability to remember things?

A    No.

Q    Do you understand you're under oath?

A    Yes.

Q    Do you understand the concept of perjury?

A    Yes.

Q    Who's your employer?

A    I'm the president, I don't have an
employer.

Q    Are you the president of a company?

A    Yes.

Q    Which company is that?

Page 6

CHRISTOPHER VECCHIA

2  A   Suffolk Asphalt Corp.
3  Q   Is that an incorporated company?
4  A   It's a corporation.
5  Q   Do you know the date of its incorporation?
6  A   2006.
7  Q   Any other titles that you have with respect
8  to Suffolk Asphalt Corp.?
9  A   Operator.
10  Q   Any other titles?
11  A   No.
12  Q   Have you been the president of Suffolk
13  Asphalt Corp. since 2006, since it was formed?
14  A   Yes.
15  Q   Do you own Suffolk Asphalt Corp.?
16  A   Yes.
17  Q   Are you the sole owner?
18  A   Yes.
19  Q   Have you always been the sole owner?
20  A   Yes.
21  Q   Could you list for me the other corporate
22  officers, if any, for Suffolk Asphalt?
23  A   There are none.
24  Q   Is there a treasurer for Suffolk Asphalt?
25  A   No.

Page 7

CHRISTOPHER VECCHIA

2  Q   To shorten it, I will refer to Suffolk
3  Asphalt Corp. from now on as Suffolk Asphalt.
4  A   That's fine.
5  Q   How old are you?
6  A   Twenty-seven.
7  Q   How old were you when Suffolk Asphalt was
8  incorporated?
9     MS. ZISKIN:  Objection.
10    I don't know where you're going with this,
11  I don't know how it's material and I think we all
12  can subtract.
13    MR. WALLACE:  All right.
14    Could I direct counsel that she's entitled
15  to object, but under the federal rules, you're
16  required to state the form of your objection, but
17  any type of narrative that accompanies your
18  objection is improper and I would direct counsel
19  to limit her objections to what is permissible
20  under the federal rules.
21    MS. ZISKIN:  Objection, immaterial.
22    MR. ZABELL:  Ian, I do note that although I
23  don't represent the deponent, I do represent one
24  of the defendants, some of the defendants herein.
25  This is not the first time any of us have been at

Page 8

CHRISTOPHER VECCHIA

2  a deposition.  We all know what we're supposed to
3  do and we talked about this throughout.
4     There's really -- there's only seven hours
5  in a deposition day and I think what counsel is
6  trying to do is trying to get you to move it along
7  so we don't have to be here for seven hours if it
8  really only requires three hours of questioning,
9  whereas lawyers are not particularly known for
10  their mathematical skills.  I think counsel's
11  comment is absolutely appropriate.  We can all do
12  the subtraction.
13    MR. WALLACE:  Fair enough.  I have the
14  mutual interest in moving things along.
15    MR. ZABELL:  Thank you.  To the extent I
16  can help, please ask me.
17    MR. WALLACE:  Okay.
18  Q   What is your current address?
19  A   Eighteen Bear Street, Selden, New York
20  11784.
21  Q   Is that your private address?
22  A   Yes.
23  Q   Do you live there alone?
24  A   No, I live there with my children.
25  Q   Which high school did you attend?

Page 9

CHRISTOPHER VECCHIA

2     MS. ZISKIN:  Objection.  It's immaterial.
3  I'm directing him not to answer.  It's unreal.
4  Just because he's 27 years old doesn't mean he has
5  to tell you where he went to high school.
6     MR. WALLACE:  Are you directing your client
7  not to answer?
8     MS. ZISKIN:  I'm directing my client not to
9  answer where he went to high school and I will
10  suggest that we get back to matters that actually
11  have something to do with this case.
12    MR. WALLACE:  With all respect, I will
13  decide what questions I ask, I'm taking the
14  deposition.
15    MS. ZISKIN:  I will continue to object.
16  This is just silly.
17  Q   Did you attend high school?
18  A   Yes.
19  Q   Did you graduate?
20  A   Yes.
21  Q   Did you attend college?
22  A   No.
23  Q   Is it correct to say your highest level of
24  education is a high school diploma?
25  A   Yes.

Page 10

1        CHRISTOPHER VECCHIA
2    Q    Who's Louis Vecchia?
3    A    He's my father.
4    Q    Is that the correct pronunciation?
5    A    It's Louis.
6    Q    Who is Helene Vecchia?
7    A    That's my stepmother.
8    Q    Do you have any other corporate interests
9  other than your ownership interest in Suffolk Asphalt?
10   A    No.
11   Q    Do you occupy any other corporate positions
12 other than being a president of Suffolk Asphalt?
13   A    No.
14   Q    Where is Suffolk Asphalt located?
15   A    30A North Dunton Avenue in Medford.
16   Q    Has Suffolk Asphalt always been located at
17 30A North Dunton Avenue?
18   A    Yes.
19   Q    What other companies, if any, are located
20 at 30A North Dunton Avenue?
21   A    None.
22   Q    Is it correct to say that Suffolk Asphalt
23 is the only company that occupies the premises located
24 at 30A North Dunton Avenue?
25   A    Yes.

Page 11

1        CHRISTOPHER VECCHIA
2    Q    Has Suffolk Asphalt always been the only
3  company that has occupied that location at 30A North
4  Dunton Avenue?
5        MS. ZISKIN: Objection. Need a time frame,
6    "always" is a very large span of time.
7    Q    Can you answer the question?
8    A    Yes. 30A, it's the only corporation.
9    Q    You've testified -- correct me if I'm
10 wrong -- that Suffolk Asphalt has been there since 2006
11 since its formation, correct?
12   A    Yes.
13       MR. ZABELL: I object to the form of the
14   multiple questions. The answer remains.
15   Q    In 2006, did Suffolk Asphalt share the
16 premises located at 30A North Dunton Avenue with any
17 other entity?
18   A    No.
19   Q    Is it correct to say therefore in 2006,
20 Suffolk Asphalt was the sole occupant of the premises
21 at 30A North Dunton Avenue?
22       MS. ZISKIN: I'm directing him not to
23   answer the question, it's been asked and answered
24   four times.
25       MR. WALLACE: By the way, directing him not

Page 12

1        CHRISTOPHER VECCHIA
2  to answer a question based on asked and answered
3  is an improper direction and --
4        MR. ZABELL: I don't know if I always agree
5    with that statement. There are times when you
6    asked a deponent multiple questions where the
7    repeated asking of questions could be viewed as
8    harassing, so I don't know if that's an absolutely
9    accurate statement, counselor.
10       MR. WALLACE: Okay.
11       MR. ZABELL: But again, to the --
12       MS. ZISKIN: If you have a problem with
13   that, you can feel free to go to the judge, but
14   I'm not going to sit here all day while you ask my
15   client the same question four times over. I am
16   assuming we all have better things to do.
17       MR. WALLACE: I may have to go to the judge
18   if counsel can't refrain from speaking narrative
19   objections and improper directions to her client.
20       MS. ZISKIN: Would you like to go off the
21   record because we can discuss this off the record
22   if you like?
23       MR. WALLACE: No, I don't want to waste
24   time.
25   Q    Prior to 2006, who did you work for, if

Page 13

1        CHRISTOPHER VECCHIA
2  anyone?
3    A    I mean I worked for a private landscaping
4  company, I was a cashier at a supermarket, I detailed
5  cars.
6        (Pause.)
7    A    That's probably about it.
8    Q    Prior to 2006, did you work with your
9  father in any capacity?
10   A    No, not really. I mean it is a family
11 owned and operated company, so I would help.
12   Q    Are you referring to prior to 2006?
13   A    Yes.
14   Q    When you say it's a family owned and
15 operated company, which company are you referring to?
16   A    My father's companies.
17   Q    Could you list those companies?
18   A    Suffolk Paving Corp.
19   Q    Okay.
20   A    And Cross Island Industries.
21   Q    Okay. Any others?
22   A    No.
23   Q    Is it correct to say -- and correct me if
24 I'm wrong -- that prior to 2006, you worked in some
25 capacity in connection with Suffolk Paving Corp.?

Page 14

CHRISTOPHER VECCHIA

2  A    Yeah.
   Q    Is it correct to say that prior to 2006,
4  you worked in some capacity with Cross Island
   Industries?
6  A    Yes.
   Q    Did Suffolk Paving pay you wages prior to
8  2006?
9  A    Yes.
   Q    Did Cross Island Industries pay you wages
11 prior to 2006?
12 A    No.
   Q    After 2006, has Suffolk Paving Corp. paid
14 you wages?
15 A    No.
   Q    After 2006, has Cross Island Industries
17 paid you wages?
18 A    No.
   Q    Is it correct to say that your sole source
20 of income since 2006 has been from Suffolk Asphalt?
21 A    Correct.
22 Q    When did you start working for Suffolk
23 Paving Corp.?
24 A    I couldn't give you an exact date, I'd be
25 lying if I told you.

Page 15

CHRISTOPHER VECCHIA

2  Q    Well, we don't want you to lie.
3  A    Correct. So I couldn't tell you, I don't
4  know.
5  Q    Was it after high school?
6  A    Yes.
7  Q    Did you ever work --
8  A    And during high school.
9  Q    What sort of things did you do for Suffolk
10 Paving?
11 A    I would help in the yard, fix things, clean
12 up, change light bulbs.
13 Q    What duties did you have with Cross Island
14 Industries prior to 2006?
15 A    I would wash and clean trucks, change
16 things mechanically.
17 Q    How many employees does Suffolk Asphalt
18 currently have?
19 A    Suffolk Asphalt?
20 Q    Yes.
21 A    Between 35 and 40 employees.
22 Q    How many managerial employees did you --
   strike that.
24    Would it be correct to say that you employ
25 these 35 to 40 employees?

Page 16

CHRISTOPHER VECCHIA

2  A    Yes.
   Q    Of those 35 to 40 employees, do you employ
4  managerial employees?
5     MR. ZABELL: Objection to the form.
6     You can answer.
7  A    We have one manager.
8  Q    Can you identify that manager?
9  A    Thomas McEvilly.
10 Q    Other than Thomas McEvilly, who has
11 supervisory responsibility?
12 A    No.
13 Q    Is it correct to say that you have
14 managerial responsibility over the 35 to 40 employees?
15 A    Of course.
16 Q    Thomas McEvilly also has managerial
17 supervision over the 35 to 40 employees?
18 A    Correct.
19 Q    Other than you and Thomas McEvilly, there's
20 no other person within Suffolk Asphalt who has
21 managerial responsibilities over your employees?
22    MS. ZISKIN: Objection to the form.
23    MR. ZABELL: Objection.
24    MS. ZISKIN: That's a statement.
25    MR. ZABELL: To which no response is

Page 17

CHRISTOPHER VECCHIA

2  required.
3     MR. WALLACE: JoAnn, could you read back
4  the question?
5     (The pending question was read.)
6  A    No.
7  Q    Who performs the payroll responsibility for
8  Suffolk Asphalt?
9  A    Myself.
10 Q    Okay.
11 A    Thomas McEvilly; my stepmother, Helene
12 Vecchia and my father, Louis Vecchia.
13 Q    Anyone else?
14 A    That's it.
15 Q    Does Suffolk Asphalt have a personnel
16 department?
17 A    I wouldn't understand what that means.
18 Q    Okay, fair enough.
19    Do you understand the term "HR department"?
20 A    No.
21 Q    Do you understand the term "a personnel
22 file"?
23 A    No.
24    MR. ZABELL: Ian, can we take a moment?
25    MR. WALLACE: Off the record, fair enough.

CHRISTOPHER VECCHIA

1
2    (Short recess taken.)
3    MR. WALLACE:  JoAnn, can you read the last
4    question and answer back, please?
5    (The record was read.)
6    Q    Do you understand the term, Mr. Vecchia,
7    "accounts payables"?
8    A    I've heard of it before, but I don't know
9    exactly what it pertains to.
10   Q    How about "accounts receivables," do you
11   understand what that term means?
12   A    Yeah, I guess it's billing, billing terms.
13   Q    Who does billing for Suffolk Asphalt, who
14   does the billing?
15   A    It's a combination of people.  It's my
16   father, my mother, Helene and Thomas McEvilly.
17   Q    If I give you a bit more specific, who
18   compiles the invoices at Suffolk Asphalt for your
19   customers?
20   MR. ZABELL:  Objection to the form.
21   A    Those three people I just listed: my
22   father, my mother and Thomas McEvilly.
23   Q    Are you involved in creating invoices for
24   Suffolk Asphalt?
25   A    No.

CHRISTOPHER VECCHIA

1
2    Q    Are you involved with billing for Suffolk
3    Asphalt?
4    A    No.
5    Q    How about when one of your employees wants
6    to be on disability leave, is there a written procedure
7    as to what that employee should do to request
8    disability leave?
9    A    Of course.
10   Q    There is a written procedure?
11   A    I'm sure there's a procedure, yes.
12   Q    Can you say today whether it's written or
13   not?
14   A    I don't know.
15   Q    Could you tell me the procedure as it is
16   today?
17   A    I personally do not know the procedure.
18   That is all handled by the three individuals I just
19   told you about.
20   Q    Would it be correct to say that's Helene
21   Vecchia, Louis Vecchia and Tom McEvilly?
22   A    Correct.
23   Q    What is Tom McEvilly's title?
24   A    Manager/supervisor.
25   Q    Is it correct to say that's a

CHRISTOPHER VECCHIA

1
2    manager/supervisor for Suffolk Asphalt?
3    A    Correct.
4    Q    Does Tom McEvilly hold any other positions
5    with Suffolk Paving Corp.?
6    A    I don't believe so, no.
7    Q    Does Tom McEvilly hold any positions with
8    Cross Island Industries?
9    A    I don't know.
10   Q    Could you tell me the procedure that one of
11   your employees should follow if they want to request
12   leave of some sort?
13   A    Leave -- any kind of leave?
14   Q    Yes.
15   A    They would discuss it with me or Thomas
16   McEvilly.
17   Q    If you and Tom McEvilly were not available,
18   could that employee discuss it with Louis Vecchia?
19   A    Sure.
20   Q    Could that employee discuss requiring
21   leaving with Helene Vecchia?
22   A    Sure.
23   Q    Any other individuals that that employee
24   could perhaps discuss a leave?
25   A    No, that would probably be it.

CHRISTOPHER VECCHIA

1
2    Q    Do you employ a bookkeeper at Suffolk
3    Asphalt?
4    A    That would be my mother, Helene Vecchia.
5    Q    Anyone else that performs the bookkeeping
6    duties for Suffolk Asphalt?
7    A    Not that I know of, no.
8    Q    Do you perform any bookkeeping duties for
9    Suffolk Asphalt?
10   A    No.
11   Q    Does Suffolk Asphalt pay Helene Vecchia a
12   wage?
13   A    No.
14   Q    Just to clarify for the record, when you
15   state "my mother," you're referring to Helene Vecchia?
16   A    Correct.
17   Q    How about marketing and advertising, who
18   performs those functions for Suffolk Asphalt?
19   A    I do, my father would, my mother would and
20   Thomas McEvilly would.  That's about it.
21   Q    Who pays the bills incurred by Suffolk
22   Asphalt?
23   A    I do.
24   Q    Do you pay all bills for Suffolk Asphalt?
25   A    Yeah.

Page 22

CHRISTOPHER VECCHIA

1
2    Q    Is there a particular day in the week that
you set aside for paying bills or not?
4    A    My company would pay the bills, but my
5    mother does the majority of the billing.
6    Q    She does the majority of the paying of the
7    bills?
8    A    She does the billing and the bookkeeping.
9    Q    But I'm talking about invoices that you
10   incur, that your company incurs for materials, for
11   example.
12   A    I don't handle any of that.
13   Q    Who handles that?
14   A    My mother.
15   Q    Is she the only person that handles that?
16   A    Yeah.
17   Q    Do you oversee the process of Helene
18   Vecchia paying the bills?
19   A    We would have discussions on it, but no,
20   I'm out in the field the majority of the time.
21   Q    When you say when you're out in the field,
22   what do you mean specifically; what does that mean?
23   A    I'm overseeing the company out in the
24   field, on the jobs, you know, out in the field.
25   Q    So like at work sites?

Page 23

CHRISTOPHER VECCHIA

1
2    A    Correct.
3    Q    Do you know if Helene Vecchia pays the
4    bills for Suffolk Paving?
5    A    I don't know.
6    Q    Do you know if Helene Vecchia pays the
7    bills for Cross Island Industries?
8    A    I don't know.
9    Q    Do you know if Helene Vecchia pays the
10   bills for any companies managed by your father, Louis
11   Vecchia?
12   A    I don't know.
13   Q    I may have asked this before, so my
14   apologies if I'm being repetitive, but does Suffolk
15   Asphalt have any other premises where it does business
16   other than the 30 North Dunton Avenue?
17   A    I have a P.O. box where I get other mail,
18   but as far as a premises, I don't believe so.
19   Q    What do you call the premises, do you call
20   it a particular name?
21   A    30A North Dunton Avenue, Medford.
22   Q    Do you call it the plant?
       A    No.
24   Q    Do you call it the office?
25   A    The yard maybe.

Page 24

CHRISTOPHER VECCHIA

1
2    Q    Do you ever call it the office?
3    A    We have offices, yes, but no, I
4    particularly did not call it the office.
5    Q    Could you list the people that work in
6    those offices?
7    A    Thomas McEvilly and Helene Vecchia.
8    Q    Anyone else?
9    A    No.
10   Q    So I'll use your term from now on.  So 30A
11   North Dunton Avenue will be called the yard from now
12   on.
13         MR. ZABELL:  I object.  That is a statement
14   to which no response is required.
15         MR. WALLACE:  Off the record.
16         (Discussion off the record.)
17   Q    Is it correct to say that you spend some of
18   your workday at the yard?
19   A    Yes.
20   Q    Other than at the work sites and other than
21   at the yard, is there any other location where you
22   perform your work?
23   A    No.
24         MR. ZABELL:  I object to the form.  The
25   answer remains.

Page 25

CHRISTOPHER VECCHIA

1
2    Q    Is it correct to say that you spend more
3    time at the work sites than at the yard?
4         MR. ZABELL:  Objection to the form.
5         You can answer.
6    A    Yes.
7    Q    Do you spend a lot more time at the work
8    sites than at the yard?
9    A    Yes.
10   Q    If you could give me a percentage, how much
11   time, how much percentage of time do you spend at the
12   work sites as opposed to at the yard?
13   A    Probably 95 percent.
14   Q    What type of advertising and marketing do
15   you do for Suffolk Paving -- strike that.
16         Suffolk Asphalt, what type of marketing and
17   advertising do you do for Suffolk Asphalt?
18   A    Not much.
19   Q    Of the little you do, what do you do?
20         MR. ZABELL:  Objection to the form.
21         You may answer.
22   A    There's not much advertising for that
23   company at all.  It's all competitive bidding, word of
24   mouth and you know, our work record with certain
25   relationships.

Page 26

CHRISTOPHER VECCHIA

1
2    Q    Do you get involved in the competitive
bidding process for Suffolk Asphalt?
4    A    Yes.
5    Q    What does that competitive bidding entail,
what does that process entail?
7    A    You want the whole process?
8    Q    If you can describe it briefly.
9    A    First you would get information on upcoming
10   bids, then you will receive blueprints and takeoffs for
11   that particular job and then I will sit and go through
12   all the numbers to come up with certain numbers to be a
13   competitive bidder.
14   Q    When performing that function, does anyone
15   else help you?
16   A    Sure.  My father would help me.
17   Q    Does he still help you today?
18   A    Yes.
19   Q    Anyone else?
20   A    My cousin, Joseph Arpino and Thomas
21   McEvilly.
22   Q    Other than those three individuals, does
23   anyone else help you with the competitive bidding
24   process?
25   A    No.

Page 27

CHRISTOPHER VECCHIA

1
2    Q    Who does Joseph Arpino work for?
3    A    Suffolk Asphalt.
4    Q    What title does he hold with Suffolk
5    Asphalt?
6    A    He's an oiler.
7    Q    Assuming that you would be telling somebody
8    who's ignorant about paving much like myself what an
9    oiler is, how would you describe that to that person?
10   MR. ZABELL:  Objection to the form of the
11   several questions posed.
12   Pick one and answer, I guess.
13   A    An oiler shows up to the job in the
14   morning, makes sure all the machines are there, checks
15   the machines that's, you know . . . checks the job,
16   sees what's going on.
17   Q    Does the oiler remain on the job site?
18   A    Yes, for the majority of the day, yes.
19   Q    Is that Joseph Arpino's sole title for
20   Suffolk Asphalt?
21   A    Yes.
22   Q    Is Joseph Arpino employed also by Suffolk
Paving?
24   A    I don't know.
25   Q    How about Cross Island Industries?

Page 28

CHRISTOPHER VECCHIA

1
2    A    I don't know.
3    Q    Any other responsibilities that an oiler
4    performs for you?
5    A    No.
6    Q    How do you get information on upcoming
7    bids?
8    A    There's all different variables to that.
9    Q    What does Joseph Arpino do in connection
10   with the competitive bidding process?
11   A    He'll go -- we'll go through the blueprints
12   and the takeoffs and certain numbers, he's good with
13   numbers.
14   Q    Excuse my ignorance, but what is a
15   blueprint?
16   MR. ZABELL:  Whereas normally I would
17   direct the witness or a deponent not to believe
18   any of the statements made by counsel because
19   counsel is not sworn in at a deposition, I don't
20   have an issue here indicating to you that maybe
21   you should, in fact, excuse his ignorance and
22   explain it to him.
23   THE WITNESS:  Repeat your question, please.
24   MR. WALLACE:  Can we have a discussion off
25   the record quickly?

Page 29

CHRISTOPHER VECCHIA

1
2    (Discussion off the record.)
3    Q    Mr. Vecchia, could you describe what a
4    blueprint is in connection with the competitive bidding
5    process?
6    A    A blueprint is a series of papers or
7    documents with details pertaining to a specific job.
8    Q    How are those blueprints produced?
9    A    I believe an architect and an engineer will
10   go out to the job site and they come up with all these
11   different numbers and elevations and details.
12   Q    Is Suffolk Asphalt involved in the
13   production of those blueprints at all?
14   A    No.
15   Q    Takeoffs, can you briefly describe what a
16   takeoff is in connection with the competitive bidding
17   process?
18   A    A takeoff is information that you will take
19   off from the blueprints.
20   Q    Are you involved in the production of these
21   takeoffs?
22   A    Yes.
23   Q    Is Louis Vecchia involved in the production
24   of those takeoffs?
25   A    He helps, yes.

CHRISTOPHER VECCHIA

2  Q    And the same question for Joseph Arpino.
3  A    Yes.
4  Q    This is all in connection with competitive
5  bidding for Suffolk Asphalt; is that correct?
6  A    Correct.
7  Q    In terms of time keeping for your
8  employees, who performs that function for Suffolk
9  Asphalt?
10  A    As far as time keeping, there would be
11  three of us; I handle a lot of that, Thomas McEvilly
12  and my father, Louis Vecchia.
13  Q    Is it correct to say that Louis Vecchia
14  performs some of the time keeping for Suffolk Asphalt?
15  A    Correct.
16  Q    What is the major corporate expense for
17  Suffolk Asphalt?
18        MR. ZABELL:  Objection.
19  A    Can you repeat your question, please?
20  Q    Sure.
21        What is the biggest cost for Suffolk
22  Asphalt?
23        MR. ZABELL:  Objection.
24  A    I would have to say asphalt at this point.
25  Q    Is it correct to say that all the invoices

1  CHRISTOPHER VECCHIA
2  and bills for asphalt is paid by Helene Vecchia for
3  Suffolk Asphalt?
4  A    Yes.
5  Q    When paying the bills for Suffolk Asphalt,
6  does Helene Vecchia use Suffolk Asphalt's checkbook?
7        MS. ZISKIN:  Objection.
8        I don't know he's the best source, he
9        doesn't know what Helene does.
10  Q    If you know.
11  A    I would have to say yes.
12        MR. ZABELL:  We don't want you to guess.
13        If you know, you know; if not --
14  A    Yes, I would have to say.
15        MR. ZABELL:  -- it's perfectly acceptable
16        to say you're unaware.
17  Q    Have you instructed Helene Vecchia in
18  connection with the paying of the bills from the
19  checkbook, Suffolk Asphalt checkbook?
20  A    Yes.
21  Q    Have you told her to do that?
22  A    Yes.
23  Q    How many bank accounts does Suffolk Asphalt
24  have in its name?
25  A    Suffolk Asphalt?

1  CHRISTOPHER VECCHIA
2  Q    Yes.
3  A    One.
4  Q    Do you know how many bank accounts Suffolk
5  Paving has?
6  A    No.
7  Q    And Cross Island Industries, how many bank
8  accounts?
9  A    No.
10  Q    What does Joseph Arpino do in connection
11  with the competitive bidding process that you just
12  described?
13  A    I believe we went through that already,
14  didn't we?
15  Q    If we did, forgive me, but I can't
16  remember.  Could you briefly just say it again?
17        MR. ZABELL:  You can go ahead and forgive
18        him.
19  A    Well, he would help me sit down and go
20  through the blueprints and the takeoffs.
21  Q    How long has Joseph Arpino been employed by
22  Suffolk Asphalt?
23  A    I believe since '07 or '08.
24  Q    Prior to that date, do you know if Joseph
25  Arpino worked with your father?

1  CHRISTOPHER VECCHIA
2  A    I wouldn't -- I don't know.
3  Q    Did you hire Joseph Arpino?
4  A    Yes.
5  Q    Who does the hiring for Suffolk Asphalt?
6  A    I do.
7  Q    Are you the sole person?
8  A    I would discuss it with my father.
9  Q    Would you say it's your practice to usually
10  discuss it with your father when hiring?
11  A    Sure.
12        MR. ZABELL:  Objection to the form.
13        You can answer.
14  Q    Before making hiring decisions, do you
15  always discuss it with your father?
16  A    No.
17  Q    Is it correct to say that more often than
18  not you discuss it with your father about making hiring
19  decisions?
20        MS. ZISKIN:  Objection.
21        MR. ZABELL:  Objection.
22  A    No.
23  Q    Anyone else involved in hiring for Suffolk
24  Asphalt?
25  A    No.

Page 34

CHRISTOPHER VECCHIA

1
2    Q    How about the firing of employees, do you
fire employees for Suffolk Asphalt?
4    A    Sure.
5    Q    Does anyone else have the power to fire
6    employees for Suffolk Asphalt?
7    A    No.
8    Q    In terms of discipline, I'm assuming you're
9    empowered to discipline your employees?
10   MS. ZISKIN:  Objection.
11   A    Correct.
12   Q    Other than you, is anyone else empowered to
13   discipline employees at Suffolk Asphalt?
14   A    Yes, Thomas McEvilly.
15   Q    Anyone else?
16   A    No.
17   Q    Is it correct to say that other than you
18   and Tom McEvilly, no one else has the power to
19   discipline an employee of Suffolk Asphalt?
20   A    No.
21   Q    It's incorrect to say or it's correct to
22   say?
23   A    No, that's correct to say.
24   Q    So other than you, just for clarity, other
25   than you and Tom McEvilly, no one else has the power to

Page 35

CHRISTOPHER VECCHIA

1
2    discipline your employees?
3    A    Correct.
4    Q    Is it correct to say that Suffolk Asphalt
5    is a seasonal business?
6    A    Correct.
7    MR. ZABELL:  Objection to the form.
8    Q    What do you understand by the term
9    "seasonal"?
10   A    For only certain months out of the year or
11   for a particular time period throughout the course of
12   the year.
13   Q    What is Suffolk Asphalt's off season?
14   A    When?
15   Q    Yes.
16   A    Well, depending on weather, I would have to
17   say from November to March.
18   Q    Is the off season?
19   A    Correct.
20   Q    What does that mean when you say the off
21   season?
22   A    Pertaining to the weather, it's time when
we're not able to work.
24   Q    Do you continue to employ any employees
25   during the off season?

Page 36

CHRISTOPHER VECCHIA

1
2    A    No.
3    Q    What do you personally do during the off
4    season?
5    MR. ZABELL:  Objection to the form.
6    A    What do I personally do in the off season?
7    Q    Yes.
8    A    Tons of things in the off season.
9    Q    Do you work for Suffolk Asphalt in the off
10   season?
11   A    Yes, I'm the president.
12   Q    What do you do for Suffolk Asphalt in the
13   off season?
14   A    I get things prepared for the next season.
15   Q    Is it correct to say then that the on
16   season is April through October?
17   MR. ZABELL:  Objection to the form.
18   A    Pertaining to weather, yes.
19   Q    When do you start to rehire -- strike that.
20   In November, is it Suffolk Asphalt's
21   practice to lay off employees because of the off season
22   or not?
23   MR. ZABELL:  Objection to the form.
24   A    In that particular month, I couldn't tell
25   you, no, I don't know what the weather is in every

Page 37

CHRISTOPHER VECCHIA

1
2    November.
3    Q    But at some point, at some point you get to
4    the off season due to weather conditions, correct?
5    A    Correct.
6    MR. ZABELL:  Objection.
7    Q    At some point, Suffolk Asphalt no longer
8    employs employees during the off season?
9    MR. ZABELL:  Objection.
10   A    Yes, correct.
11   Q    During the off season, do you put those
12   employees on leave; yes or no?
13   MR. ZABELL:  Objection.
14   A    No, they go on unemployment.
15   Q    Is it correct to say, therefore, that you
16   lay off the employees during the off season?
17   MR. ZABELL:  Objection, asked and answered.
18   Objection to the form.
19   A    If that's what you would call it, yes.
20   Q    What would you call it?
21   A    A leave from work.
22   Q    Do all of your employees go on unemployment
23   during the off season?
24   A    Yes.
25   Q    Has it been your practice to contest their

Page 38

CHRISTOPHER VECCHIA

2 application for unemployment?
    MR. ZABELL: Objection to the form.
4    A   I do not contest it, no, personally, no.
5    Q   Does anyone at Suffolk Asphalt contest it?
6    A   That is all handled by my mother, Helene
7 Vecchia.
8    Q   Have you ever attended a hearing for the
9 Department of Labor in connection with an employee's
10 application for employment?
11   A   No, I can't say I have.
12   Q   Is it correct to say that at some point in
13 March, you rehire these employees or these employees
14 come back to you?
15       MR. ZABELL: Objection to the form of the
16    multiple questions.
17    You can pick a question and provide an
18    answer to it.
19   A   Correct. They do come back, yes.
20   Q   In the process of -- strike that.
21    When does the season start in March or
22 April, could you --
23   A   An exact date?
24   Q   Approximation.
25   A   Every year it's different. I couldn't tell

Page 39

CHRISTOPHER VECCHIA

2 you.
3       MR. ZABELL: Before you ask the next
4    question, do you mind if we step outside?
5       MS. ZISKIN: Not at all.
6    (Short recess taken.)
7       MR. WALLACE: Can you read the last
8    question, JoAnn, please?
9    (The record was read.)
10   Q   Is it correct to say, though, at some point
11 when the season picks up again, that you rehire the
12 employees for Suffolk Asphalt?
13   A   I don't necessarily rehire them, but yes,
14 they come back to work for me.
15   Q   How do you get your employees to come back
16 to work for you?
17   A   Phone call.
18   Q   Do you call?
19   A   Yes.
20   Q   Anyone else?
21   A   Thomas McEvilly might call a couple of
22 guys.
    Q   Anyone else?
24   A   No, that's it.
25   Q   Louis Vecchia doesn't call any of your

Page 40

CHRISTOPHER VECCHIA

2 employees?
3   A   No.
4   Q   Is it correct to say that some of your
5 employees were formerly employed by Suffolk Paving?
6   A   Yes.
7   Q   When did they switch from Suffolk Paving to
8 Suffolk Asphalt?
9   A   In 2006.
10   Q   Is it correct to say they were moved over
11 because Suffolk Asphalt was created?
12   A   Yes.
13   Q   What are Suffolk Asphalt's business
14 activities?
15   A   We're a paving company.
16   Q   Anything else?
17   A   Site development.
18   Q   Anything else?
19   A   No, that's it.
20   Q   What do you pave predominantly?
21   A   Roads, parking lots.
22   Q   Anything else?
23   A   Taxiways, runways.
24   (Pause.)
25   A   That's probably about it.

Page 41

CHRISTOPHER VECCHIA

2   Q   Could you tell me what Suffolk Paving
3 Corp.'s business activities are?
4   A   I couldn't tell you.
5       MS. ZISKIN: Objection.
6   Q   You have no idea?
7   A   No.
8       MR. ZABELL: I'm going to object, that's a
9    statement to which no response is required.
10      MR. WALLACE: JoAnn, could you repeat my
11    question?
12    (The record was read.)
13   Q   Is it correct to say you have no idea what
14 Suffolk Paving's business activities are?
15      MR. ZABELL: Objection, asked and answered.
16      MS. ZISKIN: Objection.
17   A   It's a paving company.
18   Q   What sort of things does Suffolk Paving
19 pave?
20      MS. ZISKIN: Objection.
21    If he knows. It's immaterial.
22   Q   If you know.
23   A   Driveways, parking lots.
24   Q   How about roads?
25   A   Private roads maybe.

Page 42

CHRISTOPHER VECCHIA

1
2  Q   As opposed to what?
   A   Like a town, county or state road.
4  Q   Is Suffolk Paving in the business of paving
5  runways?
6  A   No.
7  Q   Does Suffolk Asphalt pave private roads?
8  A   I believe I have, yes, I've paved private
9  roads.
10 Q   Does Suffolk Asphalt still pave private
11 roads to date, to this date?
12 A   If they come about, yes.
13 Q   Does Suffolk Asphalt pave roads for
14 municipalities and townships?
15 A   Yes.
16 Q   If you can give me a percentage, how much
17 of the paving that Suffolk Asphalt does is for a
18 township or municipality?
19 A   A percentage?
20 Q   Yes, if you can give me an approximate
21 percentage.
22 A   I don't know, maybe 50, 60 percent.
23 Q   Does the term "prevailing wage" mean
24 anything to you?
25 A   Prevailing wage?

Page 43

CHRISTOPHER VECCHIA

1
2  Q   Yes.
3  A   Sure.
4  Q   Could you describe to me what that term
5  means to you?
6  A   A set wage that men are supposed to be
7  paid.
8  Q   Is that for all jobs?
9  A   No.
10 Q   Which jobs are the men supposed to be paid
11 the prevailing wage?
12 A   I would have to say any federally
13 governmented (sic) funded job.
14 Q   Is it just federal government jobs?
15 A   Yeah, yeah.  Yes.
16 Q   How about state municipality funded jobs?
17 A   Those are probably prevailing wage as well.
18 Q   How about township funded jobs?
19 A   Yeah, those are probably prevailing wage
20 jobs, too.
21 Q   Can you tell me the business activities of
22 Cross Island Industries?
23 A   No.
24 Q   Do you have any idea what Cross Island
25 Industries does?

Page 44

CHRISTOPHER VECCHIA

1
2  A   No.
3  Q   Do you know where Cross Island Industries
4  is located?
5  A   No.
6  Q   Correct me if I'm wrong, but the premises
7  for Suffolk Asphalt is 30A North Dunton Avenue; is that
8  correct?
9      MR. ZABELL:  Objection, asked and answered.
10 A   Suffolk Asphalt.
11 Q   Are there premises at 30 North Dunton
12 Avenue without the A?
13     MS. ZISKIN:  Objection.
14     If he has knowledge of that.
15 A   I believe Suffolk Paving is, yes.
16 Q   Is it your testimony that Suffolk Paving's
17 premises are located at 30 North Dunton Avenue?
18 A   Yes.
19 Q   Where is 30 North Dunton Avenue premises as
20 it relates to 30A North Dunton Avenue?
21 A   It's two different addresses.
22 Q   Are they adjacent addresses?
23 A   No.
24 Q   How far away are they from each other?
25 A   Not far at all.

Page 45

CHRISTOPHER VECCHIA

1
2  Q   Is it in the same yard?
3      MS. ZISKIN:  Objection.
4  A   Yes.
5  Q   Do they share the same parking lot?
6  A   No.
7  Q   Do you know if Cross Island Industries is
8  located at 30 North Dunton Avenue?
9  A   That I do not know.
10 Q   Does Suffolk Asphalt employ drivers?
11 A   No.
12 Q   No drivers at all?
13 A   When you say "drivers," that's . . . what
14 do you mean by that?
15 Q   Well, when you responded no to my question,
16 what did you mean; what did you understand drivers to
17 mean?
18     MS. ZISKIN:  Objection as to the form of
19 the question.
20     You need to define -- if he's asked you for
21 clarification, you need to tell him what you mean
22 by driver; what kind of driver do you mean, do you
23 mean the guy who drives him around?
24 Q   Mr. Vecchia, ask me the question then.
25     How do you want me to clarify the question?

Page 46

1    CHRISTOPHER VECCHIA
2    A    Just be more specific on a driver.
     Q    Okay.
4         Does Suffolk Asphalt employ forklift
5    drivers?
6    A    No.
7    Q    Where are materials delivered to for
8    Suffolk Asphalt?
9    A    To the job.
10   Q    The supplier delivers the materials
11   directly to the job?
12   A    No, we hire trucks.
13   Q    From which company do you hire trucks?
14   A    All different companies.
15   Q    Do you hire any trucks from Cross Island
16   Industries?
17   A    Yes.
18   Q    Would you say most of the trucks that you
19   hire are from Cross Island Industries?
20   A    The majority of them, sure.
21   Q    The asphalt that's supplied to Suffolk
22   Asphalt, is that delivered to the yard?
23   A    No.
24   Q    Is that delivered directly to the job
25   sites?

Page 47

1    CHRISTOPHER VECCHIA
2    A    Yes.
3    Q    Does Suffolk Asphalt have any need for
4    forklift drivers?
5    A    Suffolk Asphalt?
6    Q    Yes.
7    A    No.
8    Q    Do you employ any drivers that transport
9    machinery for Suffolk Asphalt?
10   A    Yes.
11   Q    Is it correct to say that Suffolk Asphalt
12   personally employs those drivers?
13   A    I don't employ them, no, I hire them.
14   Q    Is it correct to say that you hire the
15   delivery trucks from Cross Island Industries?
16   A    Some of them, yes.
17   Q    Would you say the majority are hired from
18   Cross Island Industries?
19   A    Sure, yes.
20   Q    You began to list a few of the activities
21   of Tom McEvilly, I'm not sure if we really got through
22   all of them, so with that in mind, can you give me an
     exhaustive list of what Tom McEvilly does for Suffolk
24   Asphalt?
25   A    He's a manager/supervisor.

Page 48

1    CHRISTOPHER VECCHIA
2    Q    Does Tom McEvilly spend most of his time at
3    the work sites, also?
4    A    No. No, he's -- no.
5    Q    Where does Tom McEvilly work mostly?
6    A    It's a good separation of both, the office
7    and out in the field.
8    Q    So from office, you're referring to the
9    yard?
10   A    Yeah.
11   Q    Would you say it's 50/50?
12   A    No, I'd probably say it's 60/40.
13   Q    Sixty being in the office?
14   A    No, out in the field, 60 being out in the
15   field.
16   Q    And then 40 percent being in the office?
17   A    Correct.
18   Q    What does Tom McEvilly do when he's in the
19   office the 40 percent of the time?
20   A    Scheduling, some billing.
21        (Pause.)
22   A    Whatever I would ask him to; he's a very
23   fair man.
24   Q    Are all your employees paid on an hourly
25   basis?

Page 49

1    CHRISTOPHER VECCHIA
2    A    Yes.
3    Q    Does that include Tom McEvilly?
4    A    No.
5    Q    Does that include Joseph Arpino?
6    A    Yes.
7    Q    Is it correct to say that other than Tom
8    McEvilly, all your employees are paid on an hourly
9    basis?
10   A    Correct.
11   Q    Are you paid a wage by Suffolk Asphalt?
12   A    Yes.
13   Q    I'm assuming you're not paid on an hourly
14   wage, correct?
15   A    Rephrase that.
16   Q    Yes.
17        You're not paid on an hourly basis,
18   correct, by Suffolk Asphalt?
19   A    No, I am.
20   Q    You are?
21   A    As an operator.
22   Q    Do you receive a corporate dividend?
23   A    No.
24   Q    Does anyone receive Suffolk Asphalt's
25   corporate dividends?

Page 50

CHRISTOPHER VECCHIA

1
2    A    No.
     Q    How about corporate profits --
4    A    No.
5    Q    -- do you receive corporate profits?
6    A    No.
7    Q    Anyone else other than you?
8    A    No.
9    Q    Correct me if I'm wrong, is Tom McEvilly
10   paid on an hourly basis or not?
11   A    No.
12   Q    Is it correct to say that other than Tom
13   McEvilly, all employees employed by Suffolk Asphalt are
14   paid on an hourly basis?
15   A    Yes.
16   Q    With that in mind, how important is time
17   keeping?
18   A    Very important.
19   Q    What procedures do you have in place
20   currently for keeping your employees' hours?
21   A    I document them every day, Thomas McEvilly
22   documents them every day and my father helps and
23   documents them every day.
24   Q    Could you describe how you document your
25   employees' hours every day?

Page 51

CHRISTOPHER VECCHIA

1
2    A    Document them into my phone and then
3    download them into a computer or write them down and
4    record them onto a piece of paper.
5         MR. WALLACE:  JoAnn, could you read
6    Mr. Vecchia's response, last answer back, please?
7         (The preceding answer was read.)
8    Q    Do you have any time keeping software that
9    you use at Suffolk Asphalt?
10   A    Yes, I believe we use like an Excel
11   program.
12   Q    Do you use QuickBooks?
13   A    Yes.
14   Q    Do you use QuickBooks to record your
15   employees' hours?
16   A    I personally don't, no.
17   Q    Who does that?
18   A    Thomas McEvilly, my father and then Helene
19   Vecchia gets reports as well.
20   Q    Does your father, Louis Vecchia, perform
21   the time keeping process for Suffolk Asphalt employees?
22   A    He helps keep track, yes.
23   Q    Is it correct to say that Louis Vecchia
24   inputs Suffolk Asphalt's employees into a computer?
25   A    No, I don't believe he records -- Thomas

Page 52

CHRISTOPHER VECCHIA

1
2    and my mother do.
3    Q    Could you describe what Louis Vecchia does
4    in connection with the recording of your employees'
5    hours?
6    A    He keeps his own documents and then refers
7    to them and looks over everything.
8    Q    What documents are you referring to that
9    Louis Vecchia keeps?
10   A    I don't know, you would have to ask him.
11   Q    Is it correct to say that is a process
12   whereby your employees' hours are put into a computer?
13   A    Sure.
14   Q    Is it correct to say that the program used
15   is either Excel or QuickBooks?
16   A    Yes.
17   Q    Are both used?
18   A    I'm not sure.
19   Q    Is it correct to say that Tom McEvilly and
20   Helene Vecchia are solely responsible for inputting
21   Suffolk Asphalt's employees' hours into the computer?
22   A    Yes.
23   Q    When you record your employees' hours onto
24   a piece of paper, what do you then do with that
25   information?

Page 53

CHRISTOPHER VECCHIA

1
2    A    I transfer them to Thomas McEvilly.
3    Q    You transfer the pieces of paper?
4    A    The information, yes.
5    Q    Then what does Thomas McEvilly do with that
6    information?
7    A    I believe he records them into the
8    computer.
9    Q    Do you ever transfer the pieces of paper to
10   Helene Vecchia?
11   A    No.
12   Q    When you use the method of using your phone
13   to record your employees' hours, do you download the
14   information directly from phone to computer?
15   A    My personal computer.
16   Q    Your personal computer?
17   A    Yes.
18   Q    Where do you keep that personal computer?
19   A    At my house.
20   Q    Is it a laptop?
21   A    Yes.
22   Q    How long have you had that computer?
23   A    Two years.
24   Q    Prior to that computer, did you have
25   another computer that you kept --

14  (Pages 50 to 53)

Page 54

CHRISTOPHER VECCHIA

1
2    A    I personally did not, no.
3    Q    Why did you purchase that computer two
4    years ago?
5    A    Purchased a computer like anybody else
6    would.
7    Q    You stated that you didn't use a personal
8    computer before two years ago, correct?
9         MS. ZISKIN:  Objection.  I don't think
10   that's what he testified to.  I think he said he
11   didn't use that method before two years ago.
12        MR. WALLACE:  Okay.
13   Q    Prior to two years ago, did you use a
14   personal computer for work purposes?
15   A    No.
16   Q    Was there anything that prompted you to
17   adopt a personal computer for work purposes?
18   A    No.
19   Q    Prior to two years ago, was it your
20   practice to record your employees' hours on a phone?
21   A    No, I would document them on a piece of
22   paper.
23   Q    The piece of paper you're referring to in
24   terms of documenting employees' hours, was that a blank
25   piece of paper?

Page 55

CHRISTOPHER VECCHIA

1
2    A    It would be a note pad.
3    Q    A lined note pad?
4    A    Sure.
5    Q    Other than recording your employees' hours
6    on a phone or on a piece of paper, is there any other
7    method that you use currently?
8    A    I don't, no.
9    Q    Using your phone to record your employees'
10   hours, was that something you adopted two years ago?
11   A    Yes.
12   Q    Did you adopt that method at the same time
13   that you bought your personal computer?
14   A    No.
15   Q    Was there any rationale for adopting the
16   phone method of recording your employees' hours?
17   A    It's easier.
18   Q    Did you put it on a phone calendar, the
19   employees' hours?
20   A    No, it's on a memo.
21   Q    What kind of phone do you have?
22   A    BlackBerry.
23   Q    Do you create a new memo for each employee?
24   A    No.
25   Q    How do you create these memos?

Page 56

CHRISTOPHER VECCHIA

1
2    A    By the job, by the day, by the men that I'm
3    working with.
4    Q    At any given time, how many work sites,
5    separate work sites, are in operation?
6    A    On a daily basis?
7    Q    Yes.
8         MR. ZABELL:  Objection to the form.
9    A    One or two jobs.
10   Q    Approximately how many employees are
11   working at each job site?
12   A    On an average or specifics?
13   Q    If you can give me an average.
14   A    I want to say six or seven guys, depending
15   on how big the job is, you know, it varies.
16   Q    Any given time, approximately one or two
17   jobs, correct?
18   A    A day?
19   Q    Yes.
20   A    Correct.
21   Q    Six or seven employees at each job site,
22   correct?
23   A    Correct.
24   Q    So on a daily basis, between approximately
25   six and 13 employees are working for Suffolk Asphalt;

Page 57

CHRISTOPHER VECCHIA

1
2    is that correct?
3    A    What did you say, from six to 13?
4    Q    Yes, approximately.
5    A    Yeah, I guess you could say that.
6    Q    Depending on whether there's one work site
7    or two work sites, correct?
8         MR. ZABELL:  Objection to form.
9    A    Or -- no.  Depending on how big the job is.
10   Q    I believe you testified that Suffolk
11   Asphalt employs between 35 to 40 employees; is that
12   correct?
13   A    Correct.
14   Q    What are the remaining employees doing when
15   they're not at a work site?
16   A    We have different crews; there's a setup
17   crew, there's a paving crew, I have guys out on a
18   milling machine.
19        (Pause.)
20   A    That's about it.
21   Q    Is it correct to say that all of your
22   employees are usually working on any given day?
23   A    The majority, yes.
24   Q    What does the setup crew do?
25   A    They set up a job.

CHRISTOPHER VECCHIA

2   Q   When does the setup crew start working?
    A   Dates or times?
4   Q   Times.
5   A   They start at eight.
6   Q   When does the setup crew finish?
7   A   4:30.
8   Q   Is that every day?
9   A   Yeah, for the most part.
10  Q   Does someone in particular supervise the
11  setup crew?
12  A   Thomas McEvilly.
13  Q   Is he the only one supervising the setup
14  crew?
15  A   No.  I or my father would supervise the
16  setup crew.
17  Q   What does the paving crew do?
18  A   They pave.
19  Q   What are the paving crew's hours?
20  A   Eight to 4:30.
21  Q   Is that currently the case?
22  A   Yeah.
23  Q   Did you mention a milling machine crew; yes
24  or no?
25  A   Sure.

CHRISTOPHER VECCHIA

2   Q   What does the milling machine crew do?
3   A   They mill.
4   Q   What exactly is that?
5   A   It's a process where a machine has a large
6   drum with teeth on it and it grinds up the road and
7   shoots it into a truck.
8   Q   Does the milling machine crew have a set
9   work schedule?
10  A   A set work schedule, yes, eight to 4:30.
11  Q   Is it correct to say that all of your
12  employees have the set work schedule of eight a.m. to
13  4:30 p.m.?
14  A   Correct.
15  Q   When do they have lunch?
16  A   At 12, 12:30.
17  Q   Is lunch set?
18  A   What do you mean is lunch set?
19  Q   Is the lunchtime set?
20  A   Sure.
21  Q   Is there anyone that supervises the paving
22  crew?
    A   I do.
24  Q   Is there anyone who supervises the milling
25  machine crew?

CHRISTOPHER VECCHIA

2   A   Yes, Thomas McEvilly or my father.
3   Q   You testified the setup crew set up the
4   job, correct?
5   A   Correct.
6   Q   How long does setting up the job take,
7   approximately?
8   A   It all depends on the job, every job is
9   different.
10  Q   Can they take up to three hours?
11  A   Depending on the job, yeah.  If it's a
12  small job.
13  Q   Once the job is set up by the setup crew,
14  what does the setup crew then do?
15  A   Go to another job.
16  Q   Is it correct to say that the first crew at
17  a particular job site is the setup crew?
18  A   For the most part, yes or depending on the
19  job, maybe the milling crew would be there before.
20  Q   Once the setup crew sets up the job, then
21  they move onto the next work site; is that correct?
22  A   Correct.
23  Q   Is the paving crew at the job site when the
24  setup crew arrives at the job site?
25  A   No.

CHRISTOPHER VECCHIA

2   Q   Is it correct to say that the paving crew
3   only arrives when the setup crew had performed their
4   job?
5   A   Correct.
6   Q   Other than the setup crew, the paving crew
7   and the milling machine crew, are there any other crews
8   within Suffolk Asphalt?
9   A   No.
10  Q   Do the crews overlap in any given work
11  site?
12  A   No.
13  Q   While the setup crew is setting up a job,
14  what is the paving crew doing?
15  A   Depends on -- it depends on the job.  While
16  they're setting up a job, I'm paving another job.
17  Q   Is it correct to say that the milling
18  machine crew actually breaks up a particular road ready
19  for paving?
20  A   Yeah, it grinds it up.
21  Q   It grinds the old tarmac up?
22  A   Correct.
23  Q   Who is responsible for coordinating with
24  the paving crew to tell them the setup crew has now set
25  up the job and we need you at the work site?

CHRISTOPHER VECCHIA

2  A   Thomas McEvilly, my father or I.
     Q   Once you assign a particular employee to a
4  particular crew, is that assignment good for the year?
5  A   No, no, jobs change, things change out in
6  the field.
7  Q   Is it correct to say there's a lot of
8  flexibility between who works on which particular crew?
9     MR. ZABELL:  Objection to the form.
10 A   To some extent.
11 Q   On a daily basis, do you supervise more
12 than one crew?
13 A   No.
14 Q   Is it correct to say that on a daily basis,
15 you are assigned to one crew and supervise that crew
16 throughout the day?
17 A   For the majority of the time, yes.
18 Q   Is it correct to say that you record the
19 hours at the end of the day of that particular crew
20 that you are assigned to that day?
21 A   I record the hours before and at the end of
22 the day, from start to finish.
23 Q   For one crew, correct?
24 A   Correct.
25 Q   For the other crews, who records their

CHRISTOPHER VECCHIA

2  hours at the beginning and at the end?
3  A   Thomas McEvilly or my father.
4  Q   Is it correct to say that the person
5  assigned to that particular crew would record the hours
6  of that crew at the beginning and at the end of the
7  day, correct?
8  A   Yes.
9  Q   Is there a particular day of the week that
10 the employees' hours are put into the computer?
11 A   I believe Thomas will do it every day.
12 Q   Do you report the employees' hours for your
13 particular crew at the end of the day to Tom McEvilly
14 every day?
15 A   Yes.
16 Q   How do you report that?
17 A   Over the phone or in person.
18 Q   How about Louis Vecchia, does he report the
19 hours of that particular crew that he's assigned to
20 that day to Tom McEvilly at the end of the day?
21 A   I believe so, yes.
22 Q   How about when you record the hours on your
23 phone and you transfer it to your personal computer, do
24 you do that on a daily basis?
25 A   No.

CHRISTOPHER VECCHIA

2  Q   How often do you do that?
3  A   Once a week.
4  Q   Correct me if I'm wrong, but the process
5  that you just described in terms of keeping employees'
6  hours, that is a process you currently employ, correct?
7  A   Yes.
8  Q   Was there a time that that process was
9  different to what you've just described?
10 A   Prior to my -- using my phone, it was
11 always recorded on a time sheet or a piece of paper.
12 Q   Is it correct to say that employees' hours
13 are reported to Tom McEvilly, correct?
14 A   Yes.
15 Q   And that either Tom McEvilly or Helene
16 Vecchia are then responsible for inputting the
17 employees' hours onto a computer, correct?
18 A   Correct.
19 Q   Is it your practice to ever report the
20 employees' hours to Helene Vecchia?
21 A   Directly?
22 Q   Yes.
23 A   No.
24 Q   Why not?
25 A   Because I handle that with Thomas McEvilly.

CHRISTOPHER VECCHIA

2  Q   When you report your employees' hours for
3  that particular day, where is Tom McEvilly usually when
4  you report that?
5  A   At the yard or the office.
6  Q   Is Tom McEvilly to be found in the yard or
7  the office at the end of the day every day?
8  A   The majority of the time, yes.
9  Q   Was there ever a process whereby employees
10 recorded their own hours?
11 A   Yes, for a period of time, yes, they were
12 recording their own hours.
13 Q   Can you tell me what period of time,
14 approximately, that was?
15 A   I believe it was from '07 until now.  I
16 mean they still record their own hours.
17 Q   How do the employees record their own
18 hours?
19 A   I don't know, you'd have to ask them.
20 Q   Prior to '07, did the employees record
21 their own hours?
22 A   I wouldn't -- I don't know.  I don't know.
23 Q   From 2006 when Suffolk Asphalt was created,
24 were you similarly responsible then for supervising a
25 particular crew on a different day?

CHRISTOPHER VECCHIA

2  A    Yes.
        MR. ZABELL:  Objection to the form.
4  Q    Were you assigned the setup crew in 2006?
5  A    At that particular time, I was assigned
6  to -- I would overlook all crews.
7  Q    How would you overlook all crews?
8  A    Through the course of the day I would drive
9  to each job site and check up on each crew.
10  Q    Is that correct to say prior to 2006 you
11  did that?
12  A    No, you said from 2006.
13  Q    Okay, I apologize.
14        When did that change that you were assigned
15  to supervise all crews?
16  A    When did it change?
17  Q    Yes.
18  A    When I started operating the pave crew.
19  Q    In 2006, did you operate the paving crew?
20  A    No, I overlooked the paving crew.
21  Q    What does it mean to operate the paving
22  crew?
23  A    You're operating the machine and the job.
24  Q    When did you start operating the paving
25  crew?

CHRISTOPHER VECCHIA

2  A    In 2009.
3        (Pause.)
4  A    '08 into '09.
5  Q    What is your title?
6  A    President, operator.
7  Q    Is the title of operator a unionized title?
8  A    Yes.
9  Q    Are you part of a union?
10  A    Yes.
11  Q    Which union?
12  A    138, operators union.
13  Q    Correct to say that you started off
14  operating the paving crew in 2009, correct?
15  A    2008, 2009.  The season of '08 and '09.
16  Q    Do you still operate the paving crew?
17  A    Yes.
18  Q    Is it correct to say that prior to 2008,
19  you supervised all the crews on a daily basis?
20  A    Yes.
21  Q    Did you report the crews' hours on a daily
22  basis then prior to 2008?
23  A    Yes, but not on my phone.
24  Q    How did you report the hours?
25  A    On a piece of paper or time sheet.

CHRISTOPHER VECCHIA

2  Q    Did you transfer that piece of paper or
3  time sheet to Tom McEvilly?
4  A    Yes.
5  Q    When was Tom McEvilly hired?
6  A    Exact date I don't remember.  Year, I
7  believe it's '08, 2008.
8  Q    When were you first given the
9  responsibility of supervising all the crews prior to
10  2008?
11        MR. ZABELL:  Objection to the form.
12  A    2006 when I started the company.
13  Q    Prior to 2006, you didn't have that
14  responsibility?
15  A    No.
16  Q    You referred to a time sheet that you would
17  fill out; is that correct?
18  A    Yes.
19  Q    What was the form of that time sheet?
20  A    What was the form of it?
21  Q    Could you describe the time sheet?
22        MR. ZABELL:  Are you withdrawing the
23  previous question?
24        MR. WALLACE:  Yes.
25  A    It was a simple time sheet with hours,

CHRISTOPHER VECCHIA

2  names, job specifics; you know, where we are, what
3  location.
4  Q    You would personally fill out that time
5  sheet, correct?
6  A    Yes.
7  Q    That time sheet would contain all of the
8  employees on that time sheet?
9  A    No, mostly whatever crew I was overlooking
10  that day.
11        MR. ZABELL:  Off the record.
12        (Lunch recess taken.)
13  Q    Mr. Vecchia, you mentioned you had a
14  personal computer which you purchased in 2008, I
15  believe?
16  A    '09.
17  Q    '09, I apologize.
18        Correct me if I'm wrong, that's the same
19  one you have today, correct?
20  A    Correct.
21  Q    The hourly information, the information
22  about your employees' hours that's contained on that
23  computer, where do you put that?
24  A    All it is is just a back-up in case my
25  phone crashes or breaks or something like that, so I

Page 70

CHRISTOPHER VECCHIA

1
2    upload or download the information to the computer.
3        Q    Is that a BlackBerry back-up process you
4    use?
5        A    Yes.
6        Q    Do you keep your back-ups, do you retain
7    them?
8        A    On my computer?
9        Q    Yes.
10       A    Yeah.
11       Q    Other than containing the employees' hours
12   on these back-ups, is there any other process you
13   employ to store information regarding employees' hours?
14       A    No.
15       Q    Have you accessed those back-ups on your
16   laptop during this litigation?
17       A    No, I haven't gone into the computer to use
18   them at all.
19       Q    The paper documents that you testified
20   about using for your employees' hours, do you retain
21   those?
22       A    Yes.
23       Q    Where do you keep those paper copies?
24       A    At my house.
25       Q    Have you retained all of the paper

Page 71

CHRISTOPHER VECCHIA

1
2    documents regarding employees' hours ever since 2006?
3        MR. ZABELL:  Objection to the form.
4        A    Since 2006, no.
5        Q    What have you done -- strike.
6        The documents that you've retained
7    regarding employees' hours, from what date have you
8    retained them?
9        A    From '07 and '08 until '09.
10       Q    If you were to look for those documents
11   today, where would you look?
12       A    They're in various files in the office.
13       Q    At home or --
14       A    In the office.
15       Q    Do you retain any of those papers at home?
16       A    Might be a few at home.
17       Q    I ask that you look for all documents
18   regarding your employees' hours in your possession.
19       A    Okay.
20       Q    And that you retrieve those and we may be
21   requesting those from your counsel.
22       A    Okay.
** INFORMATION REQUESTED AND/OR DOCUMENTS TO BE
     SUPPLIED:
25       MR. ZABELL:  Ian, do not tell the deponent

Page 72

CHRISTOPHER VECCHIA

1
2    what to do.  If you have a request for documents,
3    you know exactly who to direct that to; are we
4    clear?
5        MR. WALLACE:  Yes.
6        Q    I also ask that you retain the back-ups,
7    BlackBerry back-up, on your laptop.
8        A    Okay.
9    ** INFORMATION REQUESTED AND/OR DOCUMENTS TO BE
10   SUPPLIED:
11       MR. ZABELL:  Mr. Vecchia, to the extent
12   that counsel is asking you for items that are
13   within the purview of myself or your attorney, you
14   may disregard his request.  If he is looking for
15   something, he knows exactly who to direct his
16   requests to.
17       THE WITNESS:  Okay.
18       Q    Did you look for the paper documents
19   containing your recordings of your employees' hours
20   during this litigation?
21       MR. ZABELL:  Objection to the form.
22   A    No, I have not looked for them.
23       Q    Is it your practice to retain documentation
24   regarding your employees' hours?
25   A    Yes.

Page 73

CHRISTOPHER VECCHIA

1
2        Q    Why do you retain those documents?
3        A    Good information to retain.
4        Q    Do you believe you're legally obligated to
5    maintain documentation regarding your employees' hours?
6        A    I would imagine, yes.
7        Q    How about documentation regarding your
8    employees' wages, are you legally obligated to retain
9    those for a certain period of time?
10       MR. ZABELL:  Objection to the form.
11       A    Yes.
12       Q    Do you know what the legal requirement is?
13       A    No.
14       Q    Does Suffolk Asphalt have any rules
15   regarding the retention of employee hour documents?
16       A    Any policies?
17       Q    Yes.
18       A    Not that I know of, no.
19       Q    How about does Suffolk Asphalt have any
20   policies regarding the storage of documents pertaining
21   to employees' hours?
22       A    I wouldn't know.
23       Q    Who would know, if anyone?
24       A    Probably Helene Vecchia, my mother or my
25   father, Louis Vecchia.

CHRISTOPHER VECCHIA

2 Q Before lunch, you described the various
crews that operate for Suffolk Asphalt --
4 A Okay.
5 Q -- and I'm going to direct your attention
to those crews and my question is, are those crews
composed of any employees of Suffolk Paving?
8 A No.
9 Q Were the Suffolk Asphalt crews composed
10 ever of employees employed by Suffolk Paving?
11 A Yes, in the beginning the pave crew came
12 from Suffolk Paving.
13 Q All of the paving crew?
14 MR. ZABELL: Objection to the form.
15 A The majority of them, yes.
16 Q When you say "the beginning," you're
17 referring to from 2006?
18 A Correct.
19 Q Did there come a time when that changed?
20 A When what changed?
21 Q Good question.
22 When the paving crew was solely composed of
23 employees of Suffolk Paving.
24 MR. ZABELL: Objection to the form.
25 A No, it was just that particular crew.

CHRISTOPHER VECCHIA

2 Q Today, the paving crew are now composed of
employees that are employed by Suffolk Asphalt,
correct?
5 A Suffolk Asphalt, correct.
6 Q When did the paving crew change from
employees employed by Suffolk Paving to employees
employed by Suffolk Asphalt?
9 A In 2006 when I started the company.
10 Q Correct me if I'm wrong, but I believe you
11 testified that up to 2008 to 2009, you were responsible
12 for supervising all the crews on any given day; is that
13 correct?
14 A Correct.
15 Q Is it correct to say that you would report
16 the hours of those crews that you supervised at the end
17 of the day to Tom McEvilly?
18 A Correct.
19 Q How did you know when each crew ended their
20 day when you supervised all crews?
21 A Well, I would be with them.
22 Q Is it your testimony today --
23 A Each day, I would stay with -- at the end
24 of the day with a particular crew and then, you know,
25 report it to Thomas McEvilly.

CHRISTOPHER VECCHIA

2 Q I believe you testified, however, that you
supervised all crews until you became a machine
operator; is that correct?
5 A Correct.
6 Q It was your responsibility to report the
end time of all crews, correct?
8 A And start time.
9 Q And start time.
10 Is that correct?
11 A Yes.
12 Q It's also your testimony -- correct me if
13 I'm wrong -- that you would only stay with one crew
14 until the end of the day?
15 A Depending on the day of the job.
16 Q If you were with one crew until the end of
17 the day, how would you know the end time of the other
18 crews that you were not with?
19 A Either Thomas McEvilly will be with a
20 different crew or my father would be with a particular
21 crew.
22 Q Is it correct to say that none of the crews
23 currently operating for Suffolk Asphalt have employees
24 of Suffolk Paving working in them?
25 MR. ZABELL: Objection to the form.

CHRISTOPHER VECCHIA

2 Q Do you want me to repeat --
3 A Yes, I'm confused by that question.
4 Q Sure, sure.
5 (Pause.)
6 Q Currently, are all crews in operation, are
7 they staffed exclusively by employees of Suffolk
8 Asphalt?
9 A Yes, Suffolk Asphalt, the crews that I
10 oversee are Suffolk Asphalt, that's correct.
11 Q Are there any employees of Suffolk Paving
12 within those crews that you supervise today?
13 A No.
14 Q What is Louis Vecchia's formal title?
15 MR. ZABELL: Objection to the form.
16 Beyond Louis Vecchia?
17 MR. WALLACE: Correct, beyond his name.
18 A President of Suffolk Paving.
19 Q Does Louis Vecchia have any titles for
20 Suffolk Asphalt?
21 A No.
22 Q The work schedule of eight a.m. to
23 4:30 p.m., when was that work schedule set in place?
24 A Since I started the company, 2006.
25 Q Do any of your employ -- strike that.

Page 78

CHRISTOPHER VECCHIA

2  Do any of your employees ever start work
before 8:00 in the morning?
4  A  Very rarely.
5  Q  Do any of your employees ever stop work
6  beyond 4:30 p.m.?
7  A  Very rarely.
8  Q  What days of the week do your employees
9  work?
10  A  Monday through Friday.
11  Q  Do they ever work during the weekends?
12  A  Very rarely.
13  Q  Do you use a GPS system in Suffolk Asphalt?
14  A  We have GPS systems on a lot of our
15  equipment, yes, so we use GPS systems.
16  Q  What equipment is that?
17  A  The paver has a GPS system, some of the
18  pickup trucks. There's even rollers and compressors
19  with GPS systems on them, different sort of tracking
20  devices.
21  Q  The equipment you've just listed, is that
22  equipment under the name of Suffolk Asphalt?
23  A  Yes.
24  Q  Do you employ employees to drive that
25  equipment you just listed?

Page 79

CHRISTOPHER VECCHIA

2  A  No, I do.
3  Q  You drive all the equipment?
4  A  For the most part, yes.
5  Q  Why do you have GPS systems installed on
6  your equipment?
7  A  It's to track to see where they're going;
8  theft reasons, insurance reasons. It also helps in the
9  breakdown of bidding to figure out time traveled and
10  things of that nature.
11  Q  Any other uses for the GPS system that you
12  use?
13  A  Off the top of my head, no, that's pretty
14  much it.
15  Q  Do you ever use the GPS system to track
16  your employees' hours?
17  A  Occasionally, yes.
18  Q  When would you do that?
19  A  When there would be some sort of . . . how
20  would I say?
21  (Pause.)
22  A  Just to compare hours, you know, if they
23  came in and said something, we would date back to the
24  GPS systems to -- as a reference.
25  Q  If there's a question on an employee's

Page 80

CHRISTOPHER VECCHIA

hours, why do you not ask the supervisor to verify
their hours?
4  A  Oh, we would. You asked about the GPS
5  systems.
6  Q  Right. And so when would you use the GPS
7  system -- strike that.
8  Your first port of call when verifying an
9  employee's hours is to ask the supervisor; is that
10  correct or not?
11  MR. ZABELL: I have to object to the form
12  of that question, you know that, right?
13  Port of call is not a -- although it's a
14  nautical term, it's not a term that's used in
15  everyday vernacular.
16  Q  Do you understand the term "port of call"?
17  A  No.
18  MS. ZISKIN: Off the record.
19  (Discussion off the record.)
20  Q  Is it correct to say that there is a
21  supervisor supervising every crew?
22  A  Yes, somebody is supervising every crew.
23  Q  Is it correct to say that at no point in
24  time is a crew ever devoid of a supervisor?
25  A  No.

Page 81

CHRISTOPHER VECCHIA

2  Q  A crew is always supervised?
3  A  Correct.
4  Q  Okay.
5  A  By somebody.
6  Q  So if there's a question mark about the
7  employee's hours, is it correct to say that you would
8  check with their supervisor as to when they came in or
9  left?
10  A  Sure, yes.
11  Q  And that being said, when would you use the
12  GPS system to verify that employee's hours?
13  A  It's just another form of reference.
14  Q  I see.
15  How often do you use the GPS system to
16  track an employee's hours?
17  A  Very rarely, only when there's a
18  disgruntled employee that doesn't, you know, believe
19  what we're telling him or has an issue with his hours.
20  Q  Do your employees work overtime?
21  A  Sure.
22  Q  Do you pay them for that overtime?
23  A  Of course.
24  Q  What do you pay them for the overtime?
25  A  Whatever the wages are.

Page 82

CHRISTOPHER VECCHIA

2  Q   What would be the overtime rate?
3  A   Everybody's overtime rate is different.
4  Q   Do you know the plaintiffs in this lawsuit?
5  A   Of course.
6  Q   Previously you testified that some of the
7  employees recorded their own hours; is that correct?
8  A   Correct.
9  Q   Where would they record their own hours?
10 A   Where would they record them?
11 Q   Yes.
12 A   I don't know, you'd have to ask them.
13 Q   You never saw paperwork filled out by an
14 employee regarding their hours?
15     MR. ZABELL:  Objection.
16     That's a statement to which no response is
17 required.  You don't have to answer it.
18     MR. WALLACE:  Let me rephrase the question.
19     MR. ZABELL:  Are you withdrawing your
20 previous statement?
21     MR. WALLACE:  Yes.
22 Q   Have you ever reviewed documents with hours
23 filled out by any particular employee?
24 A   Yes.
25 Q   How often have you reviewed those

Page 83

CHRISTOPHER VECCHIA

2  documents?
3  A   Not often.
4  Q   Can you describe the types of documents
5  that you reviewed?
6  A   They were basic time sheets.
7  Q   Were those time sheets produced by Suffolk
8  Asphalt?
9  A   The time sheets of themselves, yes, as they
10 were filled out by the employees, the employees filled
11 them out.
12 Q   But the employees would fill out their
13 hours on sheets that were created by Suffolk Asphalt?
14 A   Correct.
15 Q   Do you know who created those time sheets?
16 A   Helene Vecchia or Thomas McEvilly.
17 Q   Do you know if Helene Vecchia still creates
18 those time sheets?
19 A   I believe so, yes.
20 Q   What is the purpose of why Suffolk Asphalt
21 creates those time sheets?
22 A   For records.
23 Q   Do you know what happens to those time
24 sheets?
25 A   No.

Page 84

CHRISTOPHER VECCHIA

2  Q   Do you require your employees to hand those
3  time sheets to you?
4  A   No.
5  Q   Do you require them to hand their time
6  sheets to somebody?
7  A   I believe they hand them to Thomas
8  McEvilly.
9  Q   What does Thomas McEvilly do with the time
10 sheets?
11 A   I have no idea.
12 Q   Do you know what a union pay scale is?
13 A   Sure.
14 Q   What is it?
15 A   It is . . . it's a scale and wages that
16 pertain to a specific job title.
17 Q   How were those union pay scales set?
18 A   I don't know, you'd have to ask the unions.
19 Q   Are they contained within a collective
20 bargaining agreement?
21 A   I have no idea.
22 Q   Who in Suffolk Asphalt classifies each
23 employee in terms of their union pay scale?
24 A   I, myself, would come up with or Thomas
25 McEvilly or my father.

Page 85

CHRISTOPHER VECCHIA

2  Q   In order to classify a particular employee
3  in a particular pay scale, what process do you use?
4  A   Their experience and what they've done
5  prior.
6  Q   What is your union pay scale?
7  A   To this date?
8  Q   Currently, yes.
9  A   For myself?
10 Q   Yes.
11 A   I believe it's $51 and some change.
12 Q   Is that the pay scale contained within this
13 collective bargaining agreement somewhere?
14 A   I don't know.  I don't know how they come
15 up with that.
16 Q   Are most of your employees unionized?
17 A   Yes.
18 Q   Are any nonunionized currently?
19 A   No.
20 Q   Was that always the case?
21 A   Yes.
22 Q   Nelson Quintanilla, do you know who that
23 is?
24 A   Yes.
25 Q   Is he currently employed by you?

22  (Pages 82 to 85)

CHRISTOPHER VECCHIA

1
2   A    Yes.
    Q    Do you know his union pay scale?
4   A    Off the top of my head, no.
5   Q    Where would you look to get that
6   information?
7   A    In our records or in our -- I could
8   probably call the union hall and get it.
9   Q    Who would you call in the union?
10  A    Chris Duffy.
11  Q    Which records would you use to retrieve
12  that information?
13  A    I don't know, I'd have to ask my mother to
14  help me find it.
15  Q    Is it your testimony today, though, that if
16  you looked in the office somewhere with your mother's
17  help, you could find that information?
18  A    Yes.
19  Q    How important is timeliness in your
20  business?
21  A    How important is what?
22  Q    Timeliness.
23  A    Timeliness?
24  Q    Yes.  Punctuality.
25  A    It's very important.

CHRISTOPHER VECCHIA

1
2   Q    If any of your employees are ten minutes
3   late, is that an issue?
4   A    Yeah.
5   Q    If they're late 20 minutes, is that an
6   issue?
7   A    Sure.
8   Q    Is it your practice to discipline an
9   employee for being tardy?
10  A    Yes.
11  Q    Do you discipline them when they're ten
12  minutes tardy?
13  A    Sure.
14  Q    What does that discipline entail?
15  A    It would be either you would write them up
16  with some sort of report or sheet and . . . or a simple
17  conversation; everybody's a man.
18  Q    What if you have a simple conversation and
19  they're late the week after, what would you do then?
20  A    Maybe consider firing.
21  Q    Have you personally fired anyone for being
22  tardy or late?
23  A    No, I have not.
24  Q    Do you know if Louis Vecchia has?
25  A    I don't know, you'd have to ask him.

CHRISTOPHER VECCHIA

1
2   Q    Is it correct to say that more often than
3   not you would write up an employee for being late?
4   A    Yes.
5   Q    Does Tom McEvilly have the power to write
6   an employee up for being late?
7   A    Yes.
8   Q    Has he always had that power?
9   A    Yes.
10  Q    How about Louis Vecchia, does he have that
11  power?
12  A    No, I don't believe so.
13  Q    When you write an employee up, what do you
14  do with that write-up?
15  A    It's put into a file somewhere, I believe.
16  Q    Would it be put into their particular
17  employee's personnel file?
18  A    Yes.
19  Q    Are those write-ups kept indefinitely?
20  A    Yes.
21  Q    Is it Suffolk Asphalt's practice ever to
22  dispose of a personnel file?
23  A    Dispose of?
24       No, why would we dispose of it?
25  Q    If an employee was no longer -- strike

CHRISTOPHER VECCHIA

1
2   that.
3       How about an employee that hadn't worked
4   with you since 2005?
5   A    Well, I didn't start my company in 2005.
6   Q    2006.
7       MR. ZABELL:  I'm going to object to the
8   form of that question.
9   Q    Okay, 2006.
10      MR. ZABELL:  I don't think that's an actual
11  question that can be answered, so, counsel, I'm
12  going to ask that you rephrase it.
13      MR. WALLACE:  Strike that question.
14      MR. ZABELL:  What did you want her to do
15  with it?
16      MR. WALLACE:  Strike the question.
17      MR. ZABELL:  Oh.
18  Q    How long do you retain personnel files for
19  Suffolk Asphalt employees?
20  A    Since we started in 2006.
21  Q    For what period of time will you retain in
22  your possession a personnel file?
23      (No response.)
24  Q    Maybe I can be more specific.
25      Will there ever come a period of time where

CHRISTOPHER VECCHIA

1  you will dispose of a personnel file because that
2  person no longer --
4      A    No, we don't dispose of anything.
5      Q    You don't dispose of personnel files?
6      A    No.
7      Q    Do you dispose of time records?
8      A    No.
9      Q    Do you dispose of wage documents?
10     A    I don't know, you have to ask Helene
11 Vecchia or Thomas McEvilly.
12     Q    Alejandro Amaya, do you know who that is?
13     A    No.
14     Q    Alex Amir Arevalo, do you know who that is?
15     A    No.
16     Q    Maynor Fajardo, do you know who that is?
17     A    Yes.
18     Q    Is Maynor Fajardo also known by the name
19 Renato?
20     A    Renato, yes.
21     Q    Is he currently employed by you?
22     A    No.
23     Q    Do you know when he left the company?
24     A    He didn't show up for work in . . . I want
25 to say '09, '08 and '09.

CHRISTOPHER VECCHIA

2      Q    Did anyone make any efforts to call him to
3  show up for work?
4      A    Yes, I believe Thomas McEvilly did.
5      Q    Do you know what number he called?
6      A    I have no idea.
7      Q    Did you make any efforts to contact Maynor
8  Fajardo?
9      A    No.
10     Q    Do you know what union pay scale Maynor
11 Fajardo had when he was employed by you?
12     A    No, I don't know.
13     Q    Was he formerly employed by Suffolk
14 Asphalt?
15     A    Yes.
16     Q    At some point prior to that, was he also
17 employed by Suffolk Paving?
18     A    Yes.
19     Q    When did Maynor Fajardo transfer from
20 Suffolk Paving to Suffolk Asphalt?
21     A    In 2006 when I started.
22     Q    Walter Garcia, does that ring a bell?
23     A    Yes.
24     Q    Is he currently employed by you?
25     A    No.

CHRISTOPHER VECCHIA

2      Q    Why is not employed by you?
3      A    He did not show up for work.
4      Q    Did you try to contact Walter Garcia --
5      A    Thomas McEvilly did.
6      Q    Anyone else?
7           MR. ZABELL:  Object to the form.
8      A    Anybody else what?
9      Q    Try to contact him to get him back to work.
10     A    I believe I tried calling his radio and it
11 was turned off.
12     Q    Do you know Walter Garcia's pay rate when
13 he worked for you?
14     A    No.
15     Q    Where would you look for that information
16 today?
17     A    In his file.
18     Q    That would have his union pay rate?
19     A    Yes, I believe so, yes.
20     Q    Same question for Maynor Fajardo, where
21 would you look for his union pay scale?
22     A    I'd have to discuss it with my mother and
23 I'm sure in a file or in a computer somewhere we'd have
24 that documented.
25     Q    I ask that you look for the union pay scale

CHRISTOPHER VECCHIA

2  documents and I will be requesting --
3           MR. ZABELL:  Do not direct it to him.
4  You've asked me about that, I've given you an
5  answer, you have our answer, you know what you can
6  do from that point forward.  Do not direct the
7  deponent.
8           I asked you if you were clear with that
9  direction before and you nodded in the affirmative
10 that you were clear.
11          MR. WALLACE:  Like you said, I'm not under
12 oath and the record speaks for itself.
13          MR. ZABELL:  Records don't speak for
14 themselves.
15          MR. WALLACE:  If my direction is improper,
16 there are remedies for that.  I'm just advising
17 the witness that --
18          MR. ZABELL:  I'm advising you, do not
19 direct the witness to do anything.
20          (No response.)
21          MR. ZABELL:  Are we clear?
22          MR. WALLACE:  I'm sure you're aware of your
23 obligation under the law, so I will take that
24 under advisement.
25          MR. ZABELL:  With regard to this

CHRISTOPHER VECCHIA

1
2 litigation, I am well aware of what our
3 obligations are with regard to the Federal Rules
4 of Civil Procedure. I am advising you again, do
5 not direct the deponent to do anything. That is
6 beyond your ability here. If you would like
7 something or if you would like to revisit
8 something, you bring that up with the attorneys.
9     MR. WALLACE: For the record, do you
10 represent the deponent?
11     MS. ZISKIN: Ian, I represent the deponent.
12     MR. WALLACE: Okay.
13     MS. ZISKIN: I prefer that if you need
14 something, you speak to me and you're certainly
15 aware of --
16     MR. WALLACE: What's your position on me
17 directing him?
18     MS. ZISKIN: Do not direct him. I'm just
19 not going to speak over Saul. It's virtually
20 impossible to speak over Saul anyways.
21     MR. WALLACE: That's true.
22     MR. ZABELL: Thank you both for that
23 comment. I appreciate it.
24     MR. WALLACE: Off the record.
25     (Discussion off the record.)

CHRISTOPHER VECCHIA

1
2     Q     Jose L. Martinez, does that name ring a
3 bell?
4     A     No, that does not ring a bell.
5     Q     You don't know if he's a current employee
6 of yours?
7     A     No, he's definitely not.
8     Q     Pracelis Mendez, does that name ring a
9 bell?
10    A     Yes.
11    Q     Who is that?
12    A     He was part of the setup crew.
13    Q     Is he currently employed by you?
14    A     No.
15    Q     Was he formerly employed by Suffolk
16 Asphalt?
17    A     Yes.
18    Q     Do you know why Pracelis Mendez is no
19 longer working for Suffolk Asphalt?
20    A     He did not return for work as well as the
21 other plaintiffs.
22    Q     Did you try to contact Pracelis Mendez to
23 get him to return to work?
24    A     Yes.
25    Q     How many times did you try to contact

CHRISTOPHER VECCHIA

1
2 Mr. Mendez?
3     A     I called his phone, it was off and I
4 believe Thomas McEvilly tried contacting him as well.
5     Q     How many times did you try contacting
6 Mr. Mendez?
7     A     Twice.
8     Q     Osmar Pagoada, does that name ring a bell?
9     A     I don't know who that is.
10    Q     Javier Quintanilla, does that name ring a
11 bell?
12    A     No.
13    Q     Edvin Rivera?
14    A     Yes.
15    Q     Is he currently employed by Suffolk
16 Asphalt?
17    A     No.
18    Q     Was he formerly employed by Suffolk
19 Asphalt?
20    A     Yes.
21    Q     Why is he no longer employed by Suffolk
22 Asphalt?
23    A     He did not show up for work as well.
24    Q     Did you try to contact him?
25    A     I personally did not, no. I believe Thomas

CHRISTOPHER VECCHIA

1
2 McEvilly did.
3     Q     Carlos Escalante, does that ring a bell?
4     A     Yes.
5     Q     Is he currently employed by Suffolk
6 Asphalt?
7     A     No.
8     Q     Was he formerly employed by Suffolk
9 Asphalt?
10    A     Yes.
11    Q     Was he formerly employed by Suffolk Paving?
12    A     Yes, I believe so.
13    Q     Why is he no longer employed by you?
14    A     He did not show up for work as well.
15    Q     Did you try to contact Mr. Escalante?
16    A     Yes, I did.
17    Q     How many times?
18    A     For about a week.
19    Q     How did you try?
20    A     I had his radio which was turned off and
21 Thomas McEvilly had, I believe, his home number that he
22 tried contacting him with.
23    Q     Edvin Rivera, do you know his union pay
24 scale?
25    A     Who?

Page 98

CHRISTOPHER VECCHIA

1
2    Q    Edvin Rivera.
     A    No.
4    Q    Could you find that information?
5    A    Sure.
6    Q    Where would you look?
7    A    In his file or in a computer.
8    Q    Carlos Escalante, do you know his union pay
9    scale?
10   A    No.
11   Q    Could you find that information?
12   A    Yes.
13   Q    Would that be in his personnel file as
14   well?
15   A    I would imagine, yes.
16   Q    Kevin Galeano, is he currently employed by
17   you?
18   A    No.
19   Q    Was he formerly employed by Suffolk
20   Asphalt?
21   A    No.
22   Q    Do you know who that is?
23   A    I'm trying to put a face to a name.
24        (Pause.)
25   A    I believe he was employed by Suffolk

Page 99

CHRISTOPHER VECCHIA

1
2    Paving.
3    Q    Do you know when he left Suffolk Paving?
4    A    I don't.
5    Q    Lerly Noe Rodriguez?
6    A    Yes.
7    Q    You know who that is?
8    A    Yes.
9    Q    Who is he?
10   A    He is a roller operator.
11   Q    Is he currently employed by Suffolk
12   Asphalt?
13   A    He is.
14   Q    How long has he been employed by Suffolk
15   Asphalt?
16   A    Since 2006, I believe.
17   Q    What is his union pay scale?
18   A    I think it's 47 and some change, I believe.
19   I'd have to look that up as well.
20   Q    You're quite confident you can verify that
21   information?
22   A    Oh, yes.
     Q    Jose Vega Castillo, who is that?
24   A    Say it again.
25   Q    Jose Vega Castillo.

Page 100

CHRISTOPHER VECCHIA

1
2    A    Yes, I know who he is.
3    Q    Is he currently employed by Suffolk
4    Asphalt?
5    A    No, he's not.
6    Q    Why is he no longer?
7    A    He did no show up for work as well.
8    Q    Can you give me an approximate time period?
9    A    When he did not show up?
10        MR. ZABELL:  Objection to the form of the
11   question.
12        Why don't you rephrase, counselor?
13   A    I believe it was the summer of 2009 or
14   2010, I'm not sure.
15   Q    Do you know his union pay scale?
16   A    No.
17   Q    Could you find that information?
18   A    Yes.
19   Q    Juan Quinteros, does his name ring a bell?
20        MR. ZABELL:  Objection to the form.
21   A    Yes.
22   Q    Is he currently employed by Suffolk
23   Asphalt?
24   A    Yes, he is.
25   Q    Was he formerly employed by Suffolk Paving?

Page 101

CHRISTOPHER VECCHIA

1
2    A    No, he was not.
3    Q    What is his union pay rate?
4    A    I'd have to look it up.
5    Q    Are you quite confident you could get that
6    information?
7    A    Definitely.
8    Q    Marcos Tulio Perez, does that ring a bell?
9    A    No.
10        MR. ZABELL:  Objection to the form.
11        MR. WALLACE:  Off the record.
12        (Short recess taken.)
13        MR. WALLACE:  What was the last question
14   and answer?
15        (The record was read.)
16   Q    Marcos Tulio Perez, do you know that
17   person?
18   A    I do not.
19   Q    What do you understand by the term
20   "foreman"?
21   A    Foreman?
22   Q    Yes.
23   A    The term "foreman" would be an employee who
24   has enough responsibility to help run a job.
25   Q    Do you currently employ any foremen?

26  (Pages 98 to 101)

Page 102

CHRISTOPHER VECCHIA

2  A   No, not really.  Maybe one or two.
3  Q   Could you list them?
4      (Pause.)
5  A   Guy Finn.  I have another employee, I'm not
6  exact on his last name, but his first name is Gordon.
7  Q   Have you ever applied for loans on behalf
8  of Suffolk Asphalt?
9      MR. ZABELL:  Objection.
10 A   No.
11 Q   Have any loans been applied for on behalf
12 of Suffolk Asphalt?
13     MS. ZISKIN:  Objection, relevance.
14 A   No.
15 Q   How many people does Suffolk Asphalt employ
16 during the off season, if any?
17     MR. ZABELL:  Objection, asked and answered.
18 A   Say your question again.
19 Q   Sure.
20     How many people does Suffolk Asphalt employ
21 during the off season, if any?
22 A   There is none.
23 Q   The 8:30 start time that you testified
24 about --
25 A   Eight o'clock.

Page 103

CHRISTOPHER VECCHIA

2  Q   I apologize, 8:00 start time.
3      Are your employees required to be at the
4  work site at 8:00?
5      MR. ZABELL:  Objection to the form of the
6  question.
7  A   Yes, they are to report to the work site at
8  8:00.
9  Q   Was there ever any time that your employees
10 had report to the yard at the beginning of the workday?
11 A   No.
12 Q   At the end of the workday, do any of your
13 employees report back at the yard?
14 A   What is grease time?
15 Q   Does Tom McEvilly report back at the yard
16 at the end of the workday?
17 A   If he chooses to.
18 Q   He's not required to?
19 A   No, but I'm sure he does.
20 Q   Has Suffolk Asphalt ever had a card swipe
21 process for its employees?
22     MR. ZABELL:  Objection to the form.
23     Let the record reflect that counsel was
24 moving his left hand in kind of like a circulation
25 in and out method; is that a fair representation,

Page 104

CHRISTOPHER VECCHIA

2  counselor?
3      MR. WALLACE:  I would say more linear.
4  I'll strike it.  The objection is taken.
5      MR. ZABELL:  Is it well taken?
6      MR. WALLACE:  Well taken.
7  Q   Have you ever had a punch in time system
8  for your employees?
9  A   No.
10     MR. ZABELL:  Objection to the form.
11 Q   How about a punch out time system?
12     MR. ZABELL:  Same objection.
13 A   No.
14 Q   Is it correct to say that Suffolk Asphalt
15 has a self-reporting mechanism for employees' hours?
16     MR. ZABELL:  Objection to the form.
17 A   No, it's not a self-reporting.
18 Q   You testified about certain time sheets
19 that the employees filled out, correct?
20 A   Yes.
21 Q   That's what I mean by "self-reporting."
22 A   They weren't required to do that.
23 Q   Did they do it more often than not?
24 A   Yes.
25     MR. ZABELL:  Objection to the form.

Page 105

CHRISTOPHER VECCHIA

2  Q   If they're not required, then why does
3  Suffolk Asphalt create these time sheets in the first
4  place?
5  A   We create them for ourselves; they would
6  ask for them, we would give it to them.
7  Q   For what purpose would Suffolk Asphalt have
8  for those time sheets?
9  A   For our records, to record time.
10 Q   In addition to that, you've testified about
11 these supervisors at each crew calling in the hours for
12 the employees, correct?
13 A   On some occasions, yes.
14 Q   What is grease time?
15 A   Grease time is . . . it's about a half hour
16 out of the day where an operator would take the time to
17 grease his machine, look through his machine, make sure
18 the oil's checked and things like that.
19 Q   Are employees paid a separate rate for
20 grease time?
21 A   Yes.
22 Q   How is that rate established?
23 A   The unions establish those rates.
24 Q   The vehicles you testified about earlier
25 being in Suffolk -- strike that.

CHRISTOPHER VECCHIA

1
2      The equipment you testified about earlier,
the paver, the pickup trucks and the rollers, are those
4  solely in Suffolk Asphalt's name?
5      A   Yes.  Yes, some of the pickup trucks are, I
6  believe . . . are under Suffolk Paving, but yes, the
7  equipment is Suffolk Asphalt.
8      Q   How did Suffolk Asphalt come to acquire
9  that equipment?
10     A   Rephrase that.
11     Q   The equipment that you referenced earlier,
12  how did Suffolk Asphalt come to acquire that equipment?
13     A   We bought it.
14     Q   Who did you buy it from?
15     A   A company called Ehrbar.
16     Q   When did you purchase the equipment?
17     A   We've purchased equipment from them through
18  the course of the years, from when I started till
19  present day.
20     Q   Where did the initial capital injection
21  come from for Suffolk Asphalt?
22         MS. ZISKIN:  Objection.
23         MR. ZABELL:  Objection.
24     A   I have no idea what that means.
25     Q   Okay, fair enough.

CHRISTOPHER VECCHIA

1
2      Did you invest any personal funds into
3  Suffolk Asphalt when it was set up?
4      A   No.
5      Q   Where did the initial funding come from, if
6  anywhere?
7      A   Funding as far as what, you know, there's a
8  lot of different funding, be more specific?
9      Q   The initial corporate investment.
10     A   My father helped me.
11     Q   Anyone else?
12     A   No.
13     Q   Are you your father's only offspring?
14     A   No.
15     Q   How many other children does he have?
16         MS. ZISKIN:  Objection to relevance.
17     A   I have a younger brother and a younger
18  sister.
19     Q   Do you personally use QuickBooks?
20     A   Do I personally use it, no.
21     Q   How was Suffolk Asphalt affected during the
22  recession of 2008, 2009?
23         MR. ZABELL:  Objection to the form.
24     A   Everybody was affected by the recession.
25     Q   How was your company in particular

CHRISTOPHER VECCHIA

1
2  affected?
3      A   It was tough.  Diesel prices were horrible,
4  price of oil went up; we were affected.
5      Q   How many employees did Suffolk Asphalt
6  employ in 2009?
7      A   I'd have to go through those records and
8  check.
9      Q   Where would you look to check?
10     A   In our computers that are in the offices,
11  employee files, pay stubs.  I'm sure there's many
12  different ways to find that information.
13     Q   Was it less than 35 employees?
14     A   I wouldn't -- I'd have to look it up, like
15  I said.
16     Q   Could you give me an approximation of how
17  many employees you employed in 2009?
18     A   Probably from 30 to 40.
19     Q   Can you give me an approximation of how
20  many employees Suffolk Asphalt employed in 2010?
21     A   Probably be the same.
22     Q   Thirty to 40 employees?
23     A   Yeah, give or take.
24     Q   How many employees, approximately, did
25  Suffolk Asphalt employ in 2008?

CHRISTOPHER VECCHIA

1
2      A   Probably be around the same numbers.
3      Q   Thirty to 40 employees?
4      A   Yeah, give or take.
5      Q   In 2007, how many employees did Suffolk
6  Asphalt employ?
7      A   Maybe a little less, you know, maybe 20 to
8  30.
9      Q   Why less if there's --
10     A   Because we were just starting, you know, we
11  . . . probably didn't have as many jobs from 2006 and
12  seven from now.  Simple growth of a company.
13     Q   How many of your current employees would
14  you say were initially employed by Suffolk Paving?
15     A   To this day?
16     Q   Currently.
17     A   Currently?
18     Q   Yes.
19     A   That came from Suffolk Paving?
20     Q   Yes.
21     A   Only like two or three.
22     Q   Do you ever pay your employees in cash for
23  their hours?
24     A   I have not paid them cash personally.
25  There's been a couple incidents where we maybe missed a

Page 110

CHRISTOPHER VECCHIA

1
2    day on a guy's pay and he would come to me and you
3    know, say he needed to pay his mortgage or his children
4    didn't have food, so I might have taken it if I had it
5    in my pocket, I would take it out and give it to him.
6    But a majority, no, we wouldn't -- I would not pay them
7    cash.
8        Q    Could you approximate how many times you've
9    paid an employee in cash for their hours?
10        A    A handful, four to five.
11        Q    For the period 2006 to the current, a
12    handful?
13        A    Correct.
14        Q    Do you record those cash payments anywhere?
15        A    At those particular times, I didn't. But,
16    you know, after experience and things like that, yeah,
17    I would record it.
18        Q    Is it your practice now to record cash
19    payments?
20        A    I don't do that anymore.
21        Q    You don't give cash payments?
22        A    Not anymore.
23        Q    Is it your father's practice to give cash
24    payments to his employees for their hours worked?
25        A    You'd have to ask him, I don't know.

Page 111

CHRISTOPHER VECCHIA

1
2        Q    You're unable to say one way or the other?
3        A    I don't know.
4        Q    Did you ever see your father giving his
5    employees cash payments for hours worked?
6        A    Very rarely. You know, he'd be in the same
7    boat; if an employee came to him and would, you know,
8    cry broke or explain that he couldn't pay his mortgage
9    or you know, had to feed his children, had no money, we
10    missed a day, on a handful of times, yes, I've seen him
11    do that, yeah.
12        Q    Would it be your testimony, though, that
13    Louis Vecchia rarely paid his employees in cash for
14    their hours?
15        A    That I've seen personally, yes.
16        Q    Correct me if I'm wrong, but I believe you
17    testified that the employees filled out time sheets,
18    correct?
19        A    Yes.
20        Q    You also -- correct me if I'm wrong --
21    recorded employees' hours onto your phone?
22        A    Correct.
23        Q    And correct me if I'm wrong, but you also
24    testified that you hand wrote those hours onto
25    documents?

Page 112

CHRISTOPHER VECCHIA

1
2        A    Correct.
3        Q    Those documents you would give to Tom
4    McEvilly, correct?
5        A    Correct.
6        Q    Other than those methods, were there any
7    other methods of recording employees' hours that you
8    haven't testified about to currently today?
9        A    Any other methods of recording time? No,
10    that's pretty much it.
11        Q    Between 2006 to the current time, has any
12    employee ever complained that they were owed overtime
13    to you?
14        A    Oh, sure.
15        Q    How often do they complain?
16        A    From what time period?
17        Q    Well, currently do they complain?
18        A    Currently they don't complain about it at
19    all.
20        Q    How about last year, 2010, did they
21    complain?
22        A    No.
23        Q    2009 did they complain?
24        A    No.
25        Q    How about 2008?

Page 113

CHRISTOPHER VECCHIA

1
2        A    2008, yes.
3        Q    Who complained?
4        A    Renato would complain, Mendez would
5    complain, I believe they would influence other men to
6    complain.
7        Q    How about 2007, did they complain?
8        A    I don't remember.
9        Q    And 2006?
10        A    I don't remember.
11        Q    How often did they complain?
12        A    They would complain at least once a week.
13        Q    Do you ever pay for things for Suffolk
14    Asphalt business in cash?
15        A    No, not really.
16        Q    Is there a method in Suffolk Asphalt for
17    recording petty cash disbursements?
18        A    Not that I'm aware of.
19        Q    Do you know how many drivers are employed
20    by Cross Island Industries?
21        A    No.
22        Q    Do you know what these drivers drive, what
23    vehicles?
24        A    Be more specific.
25        Q    Do they drive trucks?

CHRISTOPHER VECCHIA

2  A    Be more specific.  For Cross Island, I'm
confused on who you're talking about?
4  Q    Yes.
5       MR. ZABELL:  In their personal life or in
6  business?
7       MR. WALLACE:  In general.
8       MR. ZABELL:  In general.
9  A    That's a very wide question.  I wouldn't
10 know where to start.
11 Q    Do you know where drivers report to in the
12 beginning of the workday for Cross Island Industries?
13      MR. ZABELL:  Objection to the form of that
14 question.
15      Ian, you may just want to start over.
16      MR. WALLACE:  Okay.
17      JoAnn, can you repeat the question?
18      (The pending question was read.)
19 A    I believe they would report to Cross Island
20 Industries' yard.
21 Q    Where is that located?
22 A    I don't know, I don't have that address.
23 Q    Do you know how many drivers are employed
24 by Cross Island Industries?
25 A    No.

CHRISTOPHER VECCHIA

2  Q    Do you know the name L&V Site Development;
3  is that name familiar to you?
4  A    I've heard of it, yes.
5  Q    What is that?
6  A    I believe it was a site development company
7  that my father owned, I believe.
8  Q    Does he still own it?
9  A    I don't know.
10 Q    Do you know how many employees that company
11 had?
12 A    No.
13 Q    Who's Dominic Testa?
14 A    Dominic Testa was an old manager or
15 supervisor that worked for my father.  He was . . . he
16 kind of had the same job title as Thomas McEvilly.
17 Q    Did Dominic Testa work for Suffolk Paving?
18 A    I believe so.
19 Q    Was Dominic Testa still working for Suffolk
20 Paving in 2006?
21 A    I don't know.
22 Q    Is your father winding down his business
23 with Suffolk Paving?
24      MR. ZABELL:  Objection to the form of the
25 question.

CHRISTOPHER VECCHIA

2       You can answer.
3  A    I don't know what that relates to, so I
4  don't know.  You'd have to ask him.
5  Q    You've never had any conversations with
6  your father about winding down Suffolk Paving?
7       MR. ZABELL:  Objection.
8       That's a statement to which no response is
9  required.
10 Q    Yes or no.
11 A    No.
12 Q    Do you know if the Department of Labor has
13 ever investigated Suffolk Asphalt for alleged wage and
14 hour violations?
15 A    Suffolk Paving?
16 Q    Suffolk Asphalt.
17 A    Yeah, I believe we were.
18 Q    Do you know how many times?
19 A    Just once.
20 Q    What was your involvement in that
21 investigation?
22 A    I was actually out in the field when they
23 did that investigation.
24 Q    Do you have any particulars about that
25 investigation?

CHRISTOPHER VECCHIA

2  A    No.
3  Q    Do you know who instigated the
4  investigation?
5  A    No.
6  Q    Do you know the resolution of that
7  investigation, if any?
8  A    No.
9  Q    You've never been personally interviewed by
10 anyone from the Department of Labor?
11 A    No.
12 Q    Do you maintain customer lists for Suffolk
13 Asphalt?
14 A    Personally?
15 Q    Yes.
16 A    No.
17 Q    Does anyone maintain customer lists for
18 Suffolk Asphalt?
19 A    I believe Helene Vecchia does, my father
20 does and Thomas McEvilly might.
21 Q    Have you seen those documents before?
22 A    No.
23 Q    If we were to request those documents,
24 where would we look?
25      MR. ZABELL:  Objection to the form.

Page 118

CHRISTOPHER VECCHIA

1     If you were to request those documents,
2  you'd request them of counsel.
4     Q    If you were to look for those documents,
5  where would you look?
6     A    They'd probably be in the office somewhere
7  in a file, I'd have to discuss it with my mother.
8     Q    Do you know if it's Suffolk Asphalt's
9  practice to maintain customer lists?
10    A    I would imagine, yes.
11    Q    I may have asked this before, I apologize
12 if I have.
13       Does Suffolk Asphalt have a treasurer?
14    A    No.
15    Q    Does Suffolk Asphalt hold shareholders
16 meetings?
17    A    No.
18    Q    Does Suffolk Asphalt file separate tax
19 returns to Suffolk Paving?
20       MR. ZABELL:  Objection to the form of the
21 question.
22       You may answer.
23    A    I have no idea.
24    Q    Who would know that?
25    A    I don't know.

Page 119

CHRISTOPHER VECCHIA

1
2     Q    Who is responsible for filing the corporate
3  tax returns of Suffolk Asphalt?
4     A    Helene Vecchia.
5     Q    Do you know if Helene Vecchia's responsible
6  for filing the corporate tax returns for Suffolk
7  Paving?
8     A    Can you slow down?
9     Q    Yes, of course.  I'll repeat it.
10       Do you know if Helene Vecchia's responsible
11 for filing the corporate annual tax returns for Suffolk
12 Paving?
13    A    Yes, she helps in that field.
14    Q    Do you know if Helene Vecchia files the
15 corporate tax returns for Cross Island Industries?
16    A    I have no idea.
17    Q    Do you have an accountant?
18    A    Of course.
19    Q    Who's your accountant?
20    A    Kreitzman & Kreitzman, I believe.
21    Q    Do you know if Suffolk Paving used the same
22 accountant?
23    A    I have no idea.
24    Q    Who's the union shop steward at Suffolk
25 Asphalt?

Page 120

CHRISTOPHER VECCHIA

1
2     A    We don't have union shop stewards.
3       MS. ZISKIN:  Objection.
4       You have to specify which union because we
5  have more than one collective bargaining agreement
6  or just one.
7       THE WITNESS:  What's that?
8       MS. ZISKIN:  For which union?
9     Q    How many unions are in operation in Suffolk
10 Asphalt?
11    A    Two.
12    Q    I think you already --
13    A    It's an operators union, 138 and there's a
14 laborers union, 1298.
15    Q    Thank you.
16       Is there a union shop steward representing
17 union 138 in your work site?
18    A    No.
19    Q    How about a union shop steward representing
20 the laborers union 1298?
21    A    No.
22    Q    Is there any union delegate for either
23 union in Suffolk Asphalt?
24    A    No.
25       MR. ZABELL:  Objection to the form.

Page 121

CHRISTOPHER VECCHIA

1
2     Q    Is there a written procedure in place at
3  Suffolk Asphalt whereby an employee who has a complaint
4  about overtime follows?
5     A    Is there a procedure when an employee
6  complains about overtime?
7     Q    Right.
8     A    Yeah, we would go through the time sheets
9  and look for it.
10    Q    Is it your practice to look at the time
11 sheets when they have a complaint about overtime?
12    A    If it's the specific job that I was on or
13 if I have information on that particular incident, then
14 yes, I would go over it.
15    Q    If it wasn't a work site where you were
16 working on, what would your procedure be in
17 investigating that complaint?
18    A    Thomas McEvilly would handle it or my
19 father would handle it because they would keep records
20 of that.
21    Q    Mr. Vecchia, I'm just handing you what's
22 been premarked as Exhibit 1.
23       Can you review that document and let me
24 know when you're done?
25       (Handing.)

Page 122

CHRISTOPHER VECCHIA

1
2      (Witness reviewing document.)
3      Q    Mr. Vecchia, have you finished reviewing
4  Exhibit 1?
5      A    Sure.
6      Q    What company is listed at the top of that
7  exhibit?
8      A    Well, it's kind of chopped in half and I
9  don't believe it's spelled correctly, but it looks like
10  Suffolk Asphalt Paving, so -- okay.
11      Q    Is Exhibit 1 the time sheets that you
12  referenced earlier that were filled out by the
13  employees?
14      A    Yeah, I believe this is a time sheet that
15  is filled out by one of the employees, yes.
16      Q    You can see the date there is filled out in
17  October 2009, correct?
18      A    Correct.
19      Q    Is that the form that's still being filled
20  out by employees?
21      A    No.
22      Q    How does that form differ to the form
23  that's currently being filled out by employees?
24      A    I'm actually -- currently the employees
25  don't fill out time sheets, to my knowledge, they fill

Page 123

CHRISTOPHER VECCHIA

1  out whatever piece of paper or piece of technology that
2  they use for themselves, so I don't know how they fill
3  out their own time schedules anymore.
4      Q    Is it correct to say that in 2009 employees
5  filled out a time sheet like Exhibit 1?
6      MR. ZABELL:  Objection to the form.
7      A    Yeah, I believe so, yes.
8      Q    Do you know when that practice stopped?
9      A    No, I couldn't give you an exact date.
10      Q    Did your employees fill out time sheets in
11  2011?
12      A    No.
13      Q    Did they fill out time sheets in 2010, to
14  the best of your recollection?
15      A    No.
16      Q    Did they fill out time sheets in 2009?
17      A    Yeah.  Yeah, they filled out these
18  obviously, it says 2009.
19      Q    What total hours appears there in the
20  bottom section of that table?
21      A    I believe that's 44.
22      Q    Do you know what that 44 represents?
23      A    Says total hours.
24      Q    For that given week; is that correct?

Page 124

CHRISTOPHER VECCHIA

1
2      A    Yes.
3      Q    Is it correct to say that this form or
4  forms like this would be given to Tom McEvilly?
5      A    Yes.
6      Q    Would that be given to Tom McEvilly on a
7  daily basis or weekly basis?
8      A    I believe it was weekly.
9      Q    Mr. Vecchia, I'm handing you what has been
10  premarked Exhibit 2.
11      (Handing.)
12      Q    Could you review that and let me know when
13  you're done?
14      (Witness reviewing document.)
15      A    Okay.
16      Q    Have you reviewed what's been premarked as
17  Exhibit 2?
18      A    Yes, I have.
19      Q    Have you seen that document before today?
20      A    No, I have not.
21      Q    Have you seen a document that resembles
22  that document prior to today?
23      MR. ZABELL:  Objection to the form.
24      A    No, I don't believe I have, no.
25      Q    Could you identify that document?

Page 125

CHRISTOPHER VECCHIA

1
2      A    Do you want me to guess?
3      Q    Don't guess.
4      A    No.  It's a time sheet from Suffolk Asphalt
5  for Noe.  Lerly Noe Rodriguez.
6      Q    Do you know who was responsible for
7  compiling that document?
8      A    Yes, either Thomas McEvilly or my father,
9  Louis Vecchia.
10      Q    What was Helene Vecchia's involvement, if
11  you know, in compiling this document?
12      A    She would receive these documents, I
13  believe, from one of those two individuals, process
14  them into her computer or whatever form of technology
15  that she uses and then conducts payroll probably from
16  these sheets.
17      Q    The handwriting in the middle of that
18  document, do you see where I'm referring to?
19      A    Okay.
20      Q    Do you recognize that handwriting?
21      A    No.
22      Q    Is it your handwriting?
23      A    No.
24      Q    Do you understand what the handwriting
25  signifies?

CHRISTOPHER VECCHIA

1
2    A    It says 32 and that's all I could
understand.  Hourly maybe.
4    Q    How do you know -- strike that.
5         How do you know what Helene Vecchia does
6    with this document, Exhibit 2?
7    A    How do I know?
8    Q    Yes.
9    A    I had conversations or I've heard
10   discussions about it.
11   Q    Did you see Helene Vecchia doing anything
12   with this document?
13   A    No.
14   Q    Mr. Vecchia, I'm handing you what's been
15   premarked as Plaintiff's Exhibit 3, could you let me
16   know when you're done?
17        (Handing.)
18   A    Exhibit 3 is this whole packet?
19   Q    Yes.
20        (Witness reviewing document.)
21   Q    I'm actually only going to ask you a
22   question on the first two or three pages.
23   A    So none of this other stuff is --
24   Q    I won't be asking questions about that.
25   Actually, the first four pages and that's it.

CHRISTOPHER VECCHIA

1
2    A    The first four pages.  Okay.  Go ahead.
3    Q    Mr. Vecchia, do you recognize what's been
4    marked as Plaintiff's Exhibit 3?
5    A    I don't recognize them, no.  I've never
6    seen these before.
7    Q    The employees indicated on the first page
8    of that exhibit, do you recognize any of those names?
9    A    I recognize a few of them, yes.
10   Q    Are any of those people former employees of
11   Suffolk Asphalt?
12   A    Yes.
13   Q    Are any of those employees current
14   employees of Suffolk Asphalt?
15   A    Through the course of the first four pages?
16   Q    Yes.
17   A    Yes, there's a couple of them.
18   Q    Which ones?
19   A    Victor and Noe.
20   Q    Are you referring to the second page of the
21   exhibit?
22   A    The second, the third and the fourth.
23   Q    On the first page, do you recognize the
24   name Renato?
25   A    Yes.

CHRISTOPHER VECCHIA

1
2    Q    Is that Maynor Fajardo?
3    A    Correct.
4    Q    Is it your testimony that you never saw
5    these types of documents prior to today?
6    A    No, I have not.  These particular I have
7    not seen before.
8    Q    Do you know who filled the first page of
9    that document out?
10   A    I don't know, no.
11   Q    Excepting the handwritten annotations on
12   the document, did Suffolk Asphalt create the template
13   for this document?
14   A    I don't believe so, no.  I don't know who
15   created it.
16   Q    Do you have any idea for what purpose this
17   document was created?
18   A    Probably as a reference to record time.
19   Q    Do you know who received these documents as
20   Plaintiff's Exhibit 3?
21   A    No, I do not.
22   Q    Is it correct to say that you were not
23   involved in the retrieval of these documents at any
24   point?
25   A    That is correct.

CHRISTOPHER VECCHIA

1
2    Q    If you know, do you know if these documents
3    are being filled out today, Plaintiff's Exhibit 3?
4         MR. ZABELL:  Objection to the form of the
5    question.
6    A    No, these are not filled out in present
7    day.
8    Q    Could you turn to the fourth page Bates
9    stamped P 1009?
10        (Witness complies.)
11   A    Okay.
12   Q    Again, you've never seen this document
13   prior to today?
14   A    No.
15   Q    Do you recognize the handwriting on the top
16   of that document?
17   A    No, I do not.
18   Q    Could you review Plaintiff's Exhibit 4 and
19   let me know when you're done?
20        (Handing.)
21        (Witness reviewing document.)
22   A    Okay.
23   Q    Have you seen this -- strike that.
24        Could you identify Plaintiff's Exhibit 4?
25   A    It's a pay stub.

CHRISTOPHER VECCHIA

2    Q    Is it a pay stub for Suffolk Asphalt
Corporation?
4    A    Correct.
5    Q    The pay stubs for Suffolk Asphalt
Corporation are created by whom?
7    A    Helene Vecchia.
8    Q    Did Helene Vecchia create this document,
9 Exhibit 4?
10    A    I would imagine, yes.
11    Q    Anyone else involved in the creation of
12 these pay stubs?
13    MR. ZABELL:  Objection.
14    That is a statement to which no response is
15    required.
16    Q    If anyone.
17    MR. ZABELL:  If anyone what?
18    MR. WALLACE:  Involved in the creation of
19    Exhibit 4.
20    A    No, she's the only one.
21    Q    Based on this document, Exhibit 4, could
22 you tell me how many hours Mr. Rodriguez was paid for
23 this particular period?
24    A    It shows 32 hours and it shows two hours of
25 grease time.

CHRISTOPHER VECCHIA

2    Q    Is it correct to say that he was paid for
3 34 hours in total for this period of time?
4    A    Yeah, I'm pretty sure that's what it would
5 indicate.
6    Q    If you wanted to verify whether or not
7 Mr. Rodriguez had, in fact, worked 32 hours during this
8 particular period of time, would you have a method to
9 verify whether he had?
10    MR. ZABELL:  Objection to the form of the
11    question.
12    Q    In fact, whether or not he had worked these
13 same hours?
14    MR. ZABELL:  Same objection to the form of
15    the question.
16    A    I'd have to check files and time sheets
17 that we recorded for that time period.
18    Q    What files would you check?
19    A    Employee files or company files.
20    Q    What time sheets would you check?
21    A    I would check the files -- I mean the time
22 sheets that either Thomas McEvilly filled out, I could
23 have filled out a time sheet for this particular week
24 or person or day or my father could have filled out a
25 time sheet for that particular incident.

CHRISTOPHER VECCHIA

2    Q    Had you filled out a time sheet for this
3 particular period of time, what would that time sheet
4 resemble?
5    MR. ZABELL:  Objection to the form of the
6    question.
7    A    Like I said, I had a note pad that I would
8 fill out.
9    Q    The note pad that you filled out, did that
10 resemble Plaintiff's Exhibit 1?
11    A    No.
12    Q    Could you review what's been premarked as
13 Plaintiff's Exhibit 5 and let me know when you're done?
14    (Handing.)
15    (Witness reviewing document.)
16    A    Okay.
17    Q    The time sheets that you just referenced
18 that you would review, is Plaintiff's Exhibit 5 such a
19 time sheet?
20    A    No, I personally did not fill out these
21 particular time sheets.  I don't know who would fill
22 this out.
23    Q    You don't recognize the handwriting?
24    A    No, the handwriting, no.
25    Q    In the section entitled CREW NAME:, it says

CHRISTOPHER VECCHIA

2 Chris pave crew.
3    A    Correct.
4    Q    Do you know who the Chris is who's being
5 referenced?
6    A    I would hope it would be me.
7    Q    Is it your practice ever to fill out these
8 daily crew sheets?
9    A    No, I would not fill these out.
10    Q    Who would normally fill these crew sheets
11 out?
12    A    I believe Thomas McEvilly would, my father
13 might have.
14    Q    Why wouldn't you fill out those crew
15 sheets?
16    A    Because these aren't the documents I would
17 use.
18    Q    For what purpose are these crew sheets
19 filled out?
20    A    To record job specifications, time,
21 employees and where they went for the day.
22    Q    Would it be correct to say these daily crew
23 sheets are a mechanism whereby to record employees'
24 hours?
25    MR. ZABELL:  Objection to the form.

CHRISTOPHER VECCHIA

2      You can answer.
       A    Yes.
4      Q    Are these daily crew sheets still in
5  operation today, still used today?
6           MR. ZABELL:  Objection to the form.
7  Objection to the compound nature of the question.
8           To the extent you can, you may pick a
9  question and provide an answer to that.
10     A    I would imagine yes.  I'm not sure what
11 time sheets he fills out.  I know he uses a time sheet,
12 but I don't know if he still uses this one.
13     Q    Is there a daily crew sheet for your paving
14 crew for that particular time?
15     A    That's what it states.
16     Q    Do you know independently whether that is
17 correct?
18     A    I'd have to check my documents, but I would
19 have to say it's probably pretty close.
20     Q    If Tom McEvilly did indeed fill out this
21 daily crew sheet, do you know what information he would
22 base it on?
23          MR. ZABELL:  Objection to the form.
24     A    No, I wouldn't know, you'd have to ask him.
25     Q    Plaintiff's Exhibit 6, can you let me know

CHRISTOPHER VECCHIA

2  when you've reviewed that?
3           (Handing.)
4           (Witness reviewing document.)
5      A    Okay.
6      Q    Have you reviewed it?
7      A    Yes.
8      Q    Do you recognize the document, the two
9  documents?
10     A    Yes.
11     Q    What are they?
12     A    It's a daily schedule that is printed out,
13 I believe, by Thomas McEvilly.
14     Q    Did Thomas McEvilly compile this document?
15     A    You'd have to ask him.  I believe so.
16     Q    Were you ever involved in compiling these,
17 what was the term you described this document?
18     A    A daily schedule.
19          MR. ZABELL:  Objection to the form of the
20 question.
21     Q    Were you ever involved in compiling these
22 daily schedules?
23     A    No, I did not compile this particular piece
24 of paper, no.
25     Q    The employees listed on page one, are any

CHRISTOPHER VECCHIA

of those employees employed by Suffolk Asphalt?
3      A    Currently to this present day or have they
4  been?
5      Q    To this present day.
6      A    Two of them are.
7      Q    Which two?
8      A    Noe and Victor.
9      Q    As of June 29, 2009, were any of those
10 employees employed by Suffolk Asphalt?
11     A    Yes, they were employed by Suffolk Asphalt,
12 yes.
13     Q    All of those employees on page one?
14     A    Some of them I don't recognize.  Marcos, I
15 don't remember who that is and Kevin, I don't remember
16 who Kevin is.  But the rest of them I'm aware of who
17 they are, yes.
18     Q    It's correct to say that other than Marcos
19 and Kevin, the employees listed on page one were
20 employed by Suffolk Asphalt as of June 29, 2009?
21     A    Correct.
22     Q    On the top of this daily schedule, the name
23 Suffolk Paving Corp. appears above the words Daily
24 Schedule, can you see that?
25     A    Yes.

CHRISTOPHER VECCHIA

2      Q    Why does Suffolk Paving Corp. appear on
3  this daily schedule?
4      A    I'm not sure, maybe that's the -- maybe
5  that's a typo.
6      Q    The middle of the section it says 5:30 a.m.
7  on job, do you see that writing?
8      A    Okay.
9      Q    Was this your crew, if you remember, on
10 June 29, 2009?
11     A    I'd have to check where I was that day, but
12 no, I do not know if I was with this particular crew
13 that day.
14     Q    Do you see the words must be paving by six
15 a.m.?
16     A    Okay.
17     Q    Was that a common start time?
18     A    No, it's not a common start time.
19     Q    The employees listed in the second column
20 starting with Kenny and ending in Junior on the first
21 page, do you see that column?
22     A    Yes.
23     Q    Can you identify any of those employees?
24     A    Those employees seem to be drivers that
25 were hired from a different company.

CHRISTOPHER VECCHIA

1
2    Q    Would that different company be Cross
Island Industries?
4    A    Correct.
5    Q    Are those employees of your father, Louis
6 Vecchia?
7    A    I believe so, yes.
8    Q    Do you recognize the handwriting in the
9 middle of the document, the first page of Exhibit 6,
10 Bill D. not in out?
11    A    No, I do not recognize that.
12    Q    Do you know what that means?
13    A    I do not know what that means.
14    Q    The final column on the first page, first
15 line, 5:30 at plant, do you see those words?
16    A    This is on the first page?
17    Q    Yes.
18    A    Okay.
19    Q    Do you see 5:30 at plant?
20    A    Correct.
21    Q    What does that mean; do you know?
22    A    It's probably referring to the driver to be
23 at the plant at 5:30.
24    Q    Can you please look at Exhibit 7 and let me
25 know when you're done?

CHRISTOPHER VECCHIA

1
2        (Handing.)
3        (Witness reviewing document.)
4    Q    Mr. Vecchia, could you quickly review
5 what's been premarked as Exhibit 7 and let me know when
6 you're done?
7    A    Okay. The first couple of pages or the
8 whole thing?
9    Q    The whole thing.
10        (Witness reviewing document.)
11    A    Okay.
12    Q    Have you reviewed what's been premarked as
13 Plaintiff's Exhibit 7?
14    A    Okay.
15    Q    Referring to the first page of that
16 exhibit, do you know the person that's responsible for
17 compiling this document?
18    A    I believe Helene Vecchia is.
19    Q    Can you identify what this document is?
20    A    Payroll.
21    Q    Is that your signature on page three of
22 that document?
23    A    Yes.
24    Q    Bates stamped 4125?
25    A    Yes.

CHRISTOPHER VECCHIA

1
2    Q    Can you refer to the last page of that
3 packet of material?
4    A    Yes.
5    Q    Is that your signature?
6    A    Yes.
7    Q    Why are you signing these documents?
8    A    Because I am the president.
9    Q    For what purpose -- I'm sorry, I
10 interrupted you.
11    A    I'm president, it's asking for my
12 signature.
13    Q    Do you know for what purpose these
14 documents are compiled?
15    A    For payroll records.
16    Q    Any type of payroll records?
17        MR. ZABELL:  Objection.  That's a statement
18 to which no response is required.
19    Q    Are they compiled for any type of payroll
20 record?
21        MR. ZABELL:  I'm going to object.
22        MR. WALLACE:  Withdraw the prior question.
23        MR. ZABELL:  Go ahead, start over.
24    Q    Is this payroll document compiled for all
25 types of payroll?

CHRISTOPHER VECCHIA

1
2        MR. ZABELL:  Objection, asked and answered.
3    A    No, it's not all payroll.  It's union
4 payroll or prevailing payroll.
5    Q    What does prevailing payroll mean?
6    A    We went through that before.
7    Q    Just in connection with your testimony now.
8    A    It's a prevailing wage, a specific wage
9 that certain individuals are supposed to get paid.
10    Q    Would it be correct to say that these
11 payroll documents are generated for jobs involving
12 municipalities?
13        MR. ZABELL:  Objection to the form of the
14 question.
15        You may answer.
16    A    Correct.
17    Q    On the first page of Exhibit 7, there's
18 payroll number, there's a box top left corner, payroll
19 number, number one.
20        Do you know what that number one refers to?
21    A    No.
22    Q    On the second page in the section payroll
23 number and it's payroll number two top left.
24    A    Okay.
25    Q    Do you know what that number two refers to?

Page 142

CHRISTOPHER VECCHIA

1
2    A    I guess they're numbers to specific, you
know, specific -- to specify each page, I guess.
4    Q    Okay.
5    A    One, two.
6    Q    The employees listed on the first page of
7  Exhibit 7, during the time period in question, are
8  these employees all part of one crew?
9        MR. ZABELL: Objection to the form.
10   Q    If you know.
11       MR. ZABELL: Objection, compound question.
12   A    Yeah, I believe this is all one crew.
13       (Witness reviewing document.)
14   A    No, it can't be all one crew.
15   Q    Why is that?
16   A    Like, for instance, Mendez was part of the
17 setup crew, so . . . I mean unless he was out helping
18 us that particular day.
19   Q    As you sit here today, do you know why
20 these employees listed on page one are included on that
21 payroll?
22   A    Why they're included on this payroll sheet?
23   Q    Why they are.
24   A    I would imagine they worked at this
25 particular job, Dune Road.

Page 143

CHRISTOPHER VECCHIA

1
2    Q    Did you work at that particular job during
3  this time period?
4    A    Yes.
5    Q    Were you the supervisor of that site during
6  this period?
7        MR. ZABELL: Objection to form.
8    A    Not necessarily, no.
9    Q    Okay.
10   A    Was one of.
11   Q    Who was the other supervisor?
12   A    Thomas McEvilly and my father would come
13 out and help.
14   Q    Do you recollect whether the employees
15 listed on page one were working with you at this job
16 site?
17   A    Yes.
18   Q    Can you direct your attention to the fifth
19 column, the first page and it's entitled TOT HRS; do
20 you see at the top there?
21   A    Okay.
22   Q    Do you see it?
23   A    Yes.
24   Q    What do the letters TOT mean?
25   A    Total overtime hours, I would have to say

Page 144

CHRISTOPHER VECCHIA

1
2  that's what it probably means.
3    Q    Is it correct to say that there are some
4  employees appearing on the first page who were
5  indicated as having worked no hours during this
6  particular time period?
7    A    That's what it shows, yes.
8    Q    Can you explain why that is the case?
9    A    I have no idea.
10   Q    For example, you're shown as not having
11 worked any hours during this time period; can you
12 account for why that is?
13   A    Yeah, because I probably finished my day's
14 work in a correct amount of time.
15   Q    Can you be a bit more specific?
16   A    I finished my workday from the specific
17 hours of you, you know, an eight-hour day, so I probably
18 had no overtime.
19   Q    In the column hours worked for each day,
20 the section (4), DAY AND DATE, do you know what those
21 columns signify?
22   A    Says HOURS WORKED EACH DAY.
23   Q    Correct.
24       MR. ZABELL: There's no question pending
25 right now, right?

Page 145

CHRISTOPHER VECCHIA

1
2        MR. WALLACE: Right.
3        MR. ZABELL: So we're going to take a
4  two-minute break.
5        (Short recess taken.)
6    Q    Mr. Vecchia, I'm going to direct your
7  attention to your name on this payroll record on page
8  one.
9    A    Correct.
10   Q    Correct me if I'm wrong, but it's
11 indicating that you did not work any hours during this
12 week; is that what it indicates?
13   A    That's what it shows.
14   Q    Do you recognize --
15   A    On this particular job.
16   Q    Right.
17       As you sit here today, do you know one way
18 or another whether you worked on this particular job
19 during this period of time?
20   A    During this particular week or day, I
21 believe I did not as it shows.
22   Q    In order to concretely verify whether you
23 did, in fact, work during this period, would there be
24 any documents that you could look for in your office
25 that would verify whether you had worked on this job

Page 146

CHRISTOPHER VECCHIA

1  during this period?
2      MR. ZABELL: I'm going to --
3      MS. ZISKIN: Objection.
4      Can we go off the record for just a minute?
5      (Discussion off the record.)
6  A    I'm sure there's documents somewhere in the
7  office that I could refer to.
8  Q    Could you describe those documents?
9  A    A daily schedule or a time sheet or
10 something of that nature.
11 Q    Is it your practice to retain your daily
12 schedules and time sheets?
13 A    Yes, yeah.
14 Q    Prior to signing these documents, did you
15 look at any documents?
16 A    What do you mean?
17 Q    I'll be more specific.
18     Prior to signing these payroll records, did
19 you look at any record of hours to verify the
20 information contained on this payroll sheet?
21 A    Yes, we checked time sheets and daily work
22 schedules.
23 Q    When you say "time sheets," which time
24 sheets are you referring to?

Page 147

CHRISTOPHER VECCHIA

1  A    The ones that either I filled out or Thomas
2  McEvilly filled out or my father filled out.
3  Q    Was it ever your practice to review the
4  time sheets filled out by the employees, themselves?
5      MR. ZABELL: Objection to the form.
6  Objection, asked and answered.
7      You can answer.
8  A    No, I would not look over them unless there
9  was an issue.
10 Q    I show you what's been marked as Exhibit 8.
11     Could you review that and let me know when
12 you're done, please?
13     (Handing.)
14 A    Whole packet?
15     MR. ZABELL: Yes.
16 Q    Yes.
17     (Witness reviewing document.)
18 A    Okay.
19 Q    Do you recognize the documents that have
20 been marked as Exhibit 8?
21 A    No, I don't recognize it.
22 Q    Do you know who filled out these documents?
23 A    No, I don't.
24 Q    Do you know for what purpose these

Page 148

CHRISTOPHER VECCHIA

1  documents were compiled?
2  A    Looks like a daily attendance sheet.
3  Q    Is it correct to say that in the ordinary
4  course of business, it was not your responsibility to
5  receive these daily attendance sheets?
6  A    No, I did not personally receive these, no.
7  Q    Do you recognize the signatures on the
8  bottom of that document, page one?
9  A    No, I can't make that out.
10 Q    Do you know why these documents are
11 compiled?
12 A    To keep track of who's on the job.
13 Q    Are these compiled for an internal
14 corporate purpose or some other purpose?
15 A    I'm not sure.
16 Q    What do you understand by the title of this
17 document on the top of it, TOWN OF BABYLON; does that
18 indicate one way or the other the role of this
19 document?
20     MR. ZABELL: Objection to the form.
21 A    No, it states TOWN OF BABYLON CONTRACTOR
22 EMPLOYEE DAILY ATTENDANCE. I guess the Town of Babylon
23 is keeping track of who's on their jobs.
24     MR. ZABELL: Babylon's an actual town, Ian.

Page 149

CHRISTOPHER VECCHIA

1      MR. WALLACE: I understand that.
2      MR. ZABELL: Oh.
3  Q    Can you review Exhibit 9 and let me know
4  when you're done?
5      (Handing.)
6      (Witness reviewing document.)
7  A    Okay.
8  Q    Mr. Vecchia, have you reviewed what's
9  Exhibit 9?
10 A    Yes, I have.
11 Q    Can you describe what that is?
12 A    Counseling notice or like a write-up on
13 Nelson Quintanilla not doing his job to the
14 specifications of his job title.
15 Q    Did you fill out this document, this
16 notice?
17 A    No, I don't believe I did.
18 Q    Do you know who did fill it out?
19 A    No, I can't make out the handwriting.
20 Q    What date was this document filled out?
21 A    Shows 12/18 of 2009.
22 Q    Is this counseling notice the form used at
23 Suffolk Asphalt for writing people up?
24 A    I guess it is.

CHRISTOPHER VECCHIA

1
2    MR. ZABELL:  Objection to the form.
3    Q    Do you recognize the signature of the
4  employee -- strike that.
5        Do you recognize the signature of the
6  person who issued the warning, it's on the second to
7  bottom line?
8    A    No.
9    Q    Is that your signature?
10   A    No, I can't say it is.
11   Q    The signature of the supervisor, do you
12 recognize that signature?
13   A    No.
14   Q    Is it your testimony?
15   A    No.
16   Q    Were you involved at all in issuing this
17 counseling notice to Nelson Quintanilla?
18   A    No, I did not.
19   Q    Could you review Exhibit 10, Mr. Vecchia,
20 please?
21       (Handing.)
22       (Witness reviewing document.)
23   A    Okay.
24   Q    Do you recognize that document?
25   A    Yeah, it looks like the one I just read.

CHRISTOPHER VECCHIA

1
2    Q    Do you recognize the name of the employee?
3    A    I don't recognize the name; maybe he went
4  by a different name or alias, I don't know.
5    Q    Do you know who Alejandro Amaya is?
6    A    No.  Off the top of my head, no.
7    Q    Was Nelson Quintanilla employed by Suffolk
8  Asphalt in December of 2009?
9    A    December of 2009.
10       (Pause.)
11   A    Possibly, I'm not sure.
12   Q    The signature of the person issuing the
13 warning, do you see the signature there?
14   A    Okay.
15   Q    Do you know whose signature it is?
16   A    It looks like McEvilly.
17   Q    Do you recognize that to be Tom McEvilly's
18 signature?
19       MR. ZABELL:  He just said it looks like
20   McEvilly.
21   A    Yes.
22   Q    You recognize his signature?
23   A    Yes, looks like McEvilly.  I don't know
24 exactly how he signs his name, but that's what it looks
25 like.

CHRISTOPHER VECCHIA

1
2    Q    Could you review Exhibit 11, Mr. Vecchia
3  and let me know when you're done?
4        (Handing.)
5        (Witness reviewing document.)
6    A    Okay.
7    Q    In 2009, December of 2009, was Edvin Rivera
8  your employee?
9    A    I believe so.  That's what it states.
10   Q    Did you fill out this document?
11   A    I did not, no.
12   Q    Do you recognize the signature of the
13 person who is signing as issuing the warning?
14   A    It looks like Thomas McEvilly again.
15   Q    Did you ever issue Edvin Rivera with a
16 counseling notice?
17   A    I did not, no.
18   Q    Did you issue that notice?
19   A    I did not, no.
20   Q    I'm just handing you what's been marked as
21 Exhibit 12, can you let me know when you're done
22 reviewing that document?
23       (Handing.)
24       (Witness reviewing document.)
25   A    Okay.

CHRISTOPHER VECCHIA

1
2    Q    In March of 2010, was Edvin Rivera your
3  employee?
4    A    That's what it shows.
5    Q    Do you know that to be the case?
6    A    I believe so, yes.
7    Q    Did you issue this warning?
8    A    I did not, no.
9    Q    Do you know who did?
10   A    It looks likes McEvilly, Thomas McEvilly
11 again.
12   Q    Can you review what has been marked as
13 Exhibit 14 and let me know when you're done?
14       (Handing.)
15       (Witness reviewing document.)
16   A    Okay.
17   Q    Have you seen that document before today?
18   A    No.
19   Q    Did you issue this document?
20   A    No, I did not.
21   Q    The person signing as issuing the warning,
22 do you recognize that signature?
23   A    Yeah, I believe that's my father's
24 signature.
25   Q    Louis Vecchia?

Page 154

CHRISTOPHER VECCHIA

2  A    Yes.
Q    As of December 2009, was Jose Vega Castillo
4  your employee?
5  A    That's what it shows, yes.
6  Q    I'm going to show you a series of documents
7  that have been marked as Exhibit 15, can you let me
8  know when you're done reviewing those?
9      (Handing.)
10     (Witness reviewing document.)
11 A    Okay.
12 Q    Do you recognize the first page of Exhibit
13 15?
14 A    Looks like a time sheet, weekly time sheet.
15 Q    Correct me if I'm wrong, but is it correct
16 to say that you were not responsible for collecting
17 these time sheets on a weekly basis?
18 A    No, I was not.
19 Q    Can you turn to the second page?
20     (Witness complies.)
21 A    Okay.
22 Q    Do you recognize that document?
23 A    Okay.
24 Q    Have you seen that document prior to today?
25 A    No.

Page 155

CHRISTOPHER VECCHIA

2  Q    Do you recognize the handwriting in the
3  middle of that document?
4  A    No, I do not.
5  Q    Is it correct to say that in the ordinary
6  course of business, you would not receive these time
7  sheets?
8  A    No, I would not.
9  Q    Do you know why the handwriting is there?
10 A    I do not, no.
11 Q    Do you know who compiled the second page of
12 Exhibit 15?
13 A    Maybe Thomas McEvilly or my father.
14 Q    Do you know who would receive the second
15 page of Exhibit 15?
16 A    Thomas McEvilly.
17 Q    For what purpose would they receive that
18 document?
19 A    For records and payroll.
20 Q    Turning to the last page of Exhibit 15, can
21 you identify that document?
22 A    Yes.  Pay stub.
Q    It's for Lerly Rodriguez, correct?
24 A    Correct.
25 Q    What does that pay stub indicate to you?

Page 156

CHRISTOPHER VECCHIA

2  A    It indicates his pay.
3  Q    In particular, what does it indicate in
4  terms of his pay?
5  A    It shows 40 hours, it shows four hours of
6  double time and it shows two and a half hours of grease
7  time.
8  Q    What does double time mean; do you know?
9  A    Double time would probably be an indication
10 of overtime.
11 Q    Exhibit 48, could you review that?
12     (Handing.)
13     (Witness reviewing document.)
14 A    Okay.
15 Q    Can you direct your attention to the first
16 page of Exhibit 48?
17 A    Okay.
18 Q    In the "To" line, do you recognize that
19 email address?
20 A    Yes, that looks like my mother's email
21 address.
22 Q    That's Helene Vecchia, correct?
23 A    Helene Vecchia, yes, lucky number seven.
24 Q    Was it a standard practice to communicate
25 with each other via email in Suffolk Asphalt?

Page 157

CHRISTOPHER VECCHIA

2  A    As far as who, who communicating with who?
3  Q    Well, you communicating with Helene.
4  A    No, we would not use email.
5  Q    How about you communicating with Louis
6  Vecchia, your father?
7  A    No, we do not use email.
8  Q    And Tom McEvilly?
9  A    No.
10 Q    Did anyone use email to communicate with
11 each other at Suffolk Asphalt?
12 A    Not that I know of, no.
13 Q    I show you Exhibit 49, can you let me know
14 when you're done reviewing those documents, please?
15     (Handing.)
16     (Witness reviewing document.)
17 A    Okay.
18 Q    Have you seen the documents exhibited as
19 Exhibit 49 prior to today?
20 A    No, I have not.
21 Q    Do you know what these documents are?
22 A    No, I don't know what they are, but if I
23 was to read them and go through it, it looks like
24 unemployment.
25 Q    Is it correct to say that Suffolk Asphalt

CHRISTOPHER VECCHIA

2   Corp. contested Mr. Vega's application for
unemployment?
4       A    That's what it looks like, yes.
5       Q    Did you personally contest Mr. Vega's
6   application?
7       A    No, it looks like Helene Vecchia did.
8       Q    Was she solely responsible for contesting
9   unemployment?
10      A    Yes, she is.
11      Q    Do you know if Mr. Vega was ever awarded
12  unemployment benefits?
13      A    I don't know.
14      Q    Do you know Jose Vega?
15      A    Yes.
16      Q    How long did he work for Suffolk Asphalt?
17      A    This is Castillo, Jose Castillo?
18           (Witness reviewing document.)
19      A    Oh, no, this is Jose Vega.
20           I don't remember who that is actually.
21           Is that maybe the same guy?
22      Q    Quite possibly.
23           (Witness reviewing document.)
24      Q    How long did Jose Castillo work for Suffolk
25  Asphalt?

CHRISTOPHER VECCHIA

2       A    For specifics I would have to look that up,
3   but I want to say for a few years.
4       Q    Was this the first time that Mr. Vega had
5   failed to report to work?
6       A    No, he was known for not showing up or for
7   having legal troubles.
8       Q    Is there a reason that Helene Vecchia is
9   filling out these forms and not yourself?
10      A    I would ask her for help, she's very
11  knowledgeable about these type of things, so she would
12  handle it.
13      Q    Did Helene Vecchia attempt to call Mr. Vega
14  to ask him to return to work?
15      A    That's what it says and if she didn't, I'm
16  sure Thomas McEvilly did.
17      Q    Do you know if your father ever made any
18  loan payments to any of his employees?
19           MR. ZABELL: Objection to the form.
20           You can answer.
21      A    I don't know, you have to ask him about it.
22      Q    Could you review what's been marked as
Exhibit 55 and let me know when you're done, please?
           (Handing.)
25           (Witness reviewing document.)

CHRISTOPHER VECCHIA

2       A    Okay.
3       Q    Have you seen the document Exhibit 55 prior
4   to today?
5       A    Prior to today, no.
6       Q    Can you identify what Exhibit 55 is?
7       A    Yeah, it looks like an acknowledgment
8   stating that they've been paid properly.
9       Q    Is it your practice to obtain these signed
10  statements from people within your employ?
11      A    Yes, we would, on occasion.
12      Q    What would be those occasions?
13      A    I don't know, maybe once or twice a year we
14  would do it.
15      Q    For what purpose?
16      A    Just to make sure everybody's on the same
17  page and they understand that we've been paying them
18  properly.
19      Q    Do you recognize the employee's signature
20  on this document?
21      A    Yes, looks like Renato.
22      Q    Is that Maynor Renato?
23      A    That's what it looks like.
24      Q    Is that your signature on the line
25  Contractor/Subcontractor Signature?

CHRISTOPHER VECCHIA

2       A    Yes.
3            MR. WALLACE: JoAnn, could you mark this as
4   the next exhibit?
5            (Plaintiff's Exhibit 58, copy of Fasco
6   Asphalt & Paving, Inc. pay stubs Bates stamped
7   18303, 18341, 18417 and P 0303, was marked for
8   identification. Exhibit retained by counsel.)
9            (Handing.)
10           (Witness reviewing document.)
11      A    Okay.
12      Q    Mr. Vecchia, have you finished reviewing
13  what's been marked as Exhibit 58?
14      A    Yes.
15      Q    Can you identify those documents or that
16  document?
17      A    It looks like copies of pay stubs for Juan
18  Quinteros.
19      Q    Is Juan Quinteros employed by Suffolk
20  Asphalt?
21      A    Yes, he is.
22      Q    Do you recognize what Fasco Asphalt &
23  Paving, Inc. is, that company?
24      A    To my knowledge, it's a competitor.
25           MR. WALLACE: Would you mark that, please?

Page 162

```
1           CHRISTOPHER VECCHIA
2           (Plaintiff's Exhibit 59, copy of Suffolk
3      Paving Corp. daily schedules Bates stamped P
4      004937, P 004938, P 004941, P 004836, P 004843, P
5      004848, P 004859, P 004865, P 004879 and P 004883,
6      was marked for identification.  Exhibit retained
7      by counsel.)
8           (Handing.)
9      Q    Mr. Vecchia, you've just been handed
10     Exhibit 59.
11          Could you review those documents briefly
12     and let me know when you're done?
13          (Witness reviewing document.)
14     A    Okay.
15     Q    Do you recognize these documents?
16     A    Sure.  They're daily worksheets.
17     Q    Were you involved in compiling these?
18     A    No, I was not.
19     Q    For what purpose were these compiled?
20     A    Just a daily worksheet so men knew where
21     they were going or what job they needed to go to or
22     what they needed to do for that particular day.
23     Q    Who were these daily schedules provided to?
24     A    They're provided to drivers or a foreman or
25     supervisor.
```

Page 163

```
1           CHRISTOPHER VECCHIA
2      Q    Did you ever receive these daily schedules?
3      A    Yes, I receive them every day.
4      Q    What time do you receive these daily
5      schedules?
6      A    Oh, depends on when I get to the office.
7      Sometimes 4:30 in the morning, sometime 5:30, sometimes
8      6:30.
9      Q    Is it correct to say that on every day you
10     receive a daily schedule?
11     A    Correct.
12     Q    Did you ever receive the daily schedule the
13     day prior?
14     A    They're always prepared the night prior.
15     If you choose to take it the night prior, that's up to
16     whoever is receiving them.
17     Q    Who prepares the daily schedules?
18     A    Thomas McEvilly.
19     Q    If you refer to the first page of that
20     exhibit, the employees listed on the first column, are
21     those employees of Suffolk Asphalt?
22     A    Yes.
23     Q    Were they employees of Suffolk Asphalt as
24     of April 7, 2009?
25     A    I believe so, yes.
```

Page 164

```
1           CHRISTOPHER VECCHIA
2      Q    For this first document, this crew, who is
3      the supervisor of that crew?
4      A    I would be, Thomas McEvilly might have came
5      out that day or my father might have came out that day.
6      Q    Is the Chris listed on the first column
7      you, referring to you?
8      A    I believe it would be, yes.
9      Q    Do you know if your crew started at five
10     a.m. on this day?
11     A    No, I believe that five a.m. start was for
12     the drivers to be at the plant maybe.
13     Q    If you know, do you know when your crew
14     started working on that day?
15     A    I have to check time schedules.
16     Q    Would you still have those time schedules
17     today?
18     A    Yes, they're in files or in the office
19     somewhere.
20     Q    You're sure that you still have those time
21     sheets?
22     A    Oh, I would imagine yes.
23     Q    That would be time schedules for 2009?
24     A    Correct.
25     Q    The whole of 2009?
```

Page 165

```
1           CHRISTOPHER VECCHIA
2      A    Correct.
3      Q    How about the whole of 2010?
4      A    Yes.
5      Q    How about time schedules for the whole of
6      2008, would you still retain those?
7      A    Yes, I'm sure we have them.
8      Q    If indeed the drivers were directed to have
9      a five a.m. start as appears on this first document,
10     would that indicate to you when your crew would have to
11     start?
12     A    No, no.
13     Q    When you pick up these daily schedules,
14     where do you receive them?
15     A    I receive them in the office.
16     Q    Is it correct to say that beginning in 2009, you
17     would go to the office the beginning of the day to pick
18     up a daily schedule?
19     A    I would, yes.
20     Q    Would it be fair to say that you still do
21     that?
22     A    Correct.
23     Q    Have you picked up your daily schedule
24     daily from 2006 to the current date?
25     A    Yes.
```

CHRISTOPHER VECCHIA

2  Q    Once you pick up your daily schedule, what
do you then do?
4  A    I would call, which I still do to this day,
Victor, I attempt to explain to him where the job is,
what time we're going to start and then he will meet me
there.
8  Q    Has that been your practice from 2006 until
the present?
10  A    Yes.
11  Q    Do you only call one person on your crew to
tell them the location of the work site?
13  A    Depending on who I'm with and what guys are
reporting to the job, yeah, for the most part I call
Victor and they all kind of carpool together.
16  Q    You're referring to Victor, which Victor
are you referring to?
18  A    That's Nelson Quintanilla.
19  Q    When you tell Nelson Quintanilla about the
work site, is it correct to say that Nelson Quintanilla
is then responsible for calling the other members of
the crew?
23  A    For the most part, yes, he will get in
touch with the other members.
25  Q    Have you ever required your employees to

CHRISTOPHER VECCHIA

2  meet you at the plant at the beginning of the workday?
3  A    Never.
4  Q    Does Suffolk Asphalt retain all of these
daily schedules in its possession?
6  A    Does Suffolk Asphalt?
7  Q    Retain all of the daily schedules in its
possession.
9  A    Yes.
10  MR. ZABELL: Objection to the form.
11  Q    Is it kept in the office somewhere?
12  A    Yes.
13  MR. ZABELL: Objection to the form.
14  A    Yes.
15  Q    Can you refer to the second page of Exhibit
59?
17  A    Okay.
18  Q    Do you see in the middle of the document
there five a.m. start?
20  A    Okay.
21  Q    Do you know what that refers to?
22  A    Like I said earlier, that could pertain to
the drivers being at the plant at five a.m.
24  Q    Could the five a.m. start also pertain to
when your crew starts?

CHRISTOPHER VECCHIA

2  A    I would want to say no.
3  Q    What basis do you have for saying no?
4  A    Because you have to consider travel time
from the plant to the job, so there would be no reason
for us to be there at five a.m.
7  Q    Can you indicate where the work site is for
document Bates stamped P 4938?
9  A    Yes, it shows asphalt patch in Montauk,
which is (indicating) . . .
11  Q    Given the location in Montauk, could that
explain why there was a five a.m. start?
13  A    For the trucks?
14  Q    Yes.
15  A    Yes.
16  Q    How about for the -- strike that.
17  Do your employees also receive a copy of
this daily schedule?
19  MR. ZABELL: Objection, asked and answered.
20  A    No, they do not.
21  MR. WALLACE: I'm getting ready to wrap up,
if we can take a quick two-minute break.
23  (Short recess taken.)
24  Q    Briefly just review Exhibit 32.
25  (Handing.)

CHRISTOPHER VECCHIA

2  (Witness reviewing document.)
3  A    Okay.
4  Q    The time sheet on the first page of Exhibit
32.
6  A    Okay.
7  Q    Is it correct to say that your practice was
never to receive those time sheets and annotate on
them?
10  A    Please state your question again.
11  Q    Sure.
12  Is it correct to say that you never
received those time sheets during your -- strike the
question.
15  Is it correct to say that it was not your
practice to receive Exhibit 32, the first page?
17  A    Correct, correct.
18  MR. ZABELL: I'm going to object to the
form of that question.
20  You can answer.
21  A    Correct. I would not receive these.
22  Q    Is it correct to say that it wasn't your
practice to receive time sheets upon which you would
hand write notes?
25  A    No, no, no, I would not --

Page 170

1    CHRISTOPHER VECCHIA
2        MR. ZABELL: Objection to the form.
3        A    I would not particularly get these time
4    sheets.
5        Q    Was it ever your practice to receive time
6    sheets upon which you would make handwritten
7    annotations?
8        MS. ZISKIN: Objection.
9        Are you asking if this is his handwriting?
10        MR. WALLACE: No.
11        MR. ZABELL: Objection.
12        A    Received from where?
13        MR. ZABELL: I object to the form.
14        MR. WALLACE: I'll ask a different
15    question.
16        MR. ZABELL: Are you withdrawing the
17    previous question?
18        MR. WALLACE: Yes.
19        Q    Is that your handwriting?
20        A    No, that is not my handwriting.
21        Q    During the ordinary course of business,
22    would you receive time sheets such as Exhibit 32?
23        A    No, I would not.
24        MR. ZABELL: Objection.
25        Q    During your ordinary course of business,

Page 171

1    CHRISTOPHER VECCHIA
2    would you receive any type of time sheet upon which you
3    would hand write notes?
4        A    I would conduct my own time sheets and hand
5    write my own time sheets for my particular crew or
6    specific day.
7        MR. WALLACE: All right, thank you.
8        That's all I have. Thank you.
9        MR. ZABELL: So you're concluding the
10    deposition?
11        MR. WALLACE: That's right.
12        (Time noted: 4:45 p.m.)
13
14    _____
15        CHRISTOPHER VECCHIA
16    Subscribed and sworn to before me
17    this _____ day of _____, 2011
18
        _____
        NOTARY PUBLIC
19
20
21
22
24
25

Page 172

EXHIBITS

PLAINTIFF'S EXHIBITS:

| EXHIBIT NUMBER | EXHIBIT DESCRIPTION | PAGE |
|---|---|---|
| 58 | Copy of Fasco Asphalt & Paving, Inc. pay stubs Bates stamped 18303, 18341, 18417 and P 0303 | 161 |
| 59 | Copy of Suffolk Paving Corp. daily schedules Bates stamped P 004937, P 004938, P 004941, P 004836, P 004843, P 004848, P 004859, P 004865, P 004879 and P 004883 | 162 |

Page 173

INDEX

| EXAMINATION BY | PAGE |
|---|---|
| MR. WALLACE | 3 |

| | PAGE |
|---|---|
| INFORMATION REQUESTED | 71 |
| INFORMATION REQUESTED | 72 |

Page 174

1
2          C E R T I F I C A T E

4    STATE OF NEW YORK   )
                   : SS.:
5    COUNTY OF SUFFOLK  )
6
7
8          I, JOANN O'LOUGHLIN, a Notary Public for
9    and within the State of New York, do hereby
10   certify:
11         That the witness whose examination is
12   hereinbefore set forth was duly sworn and that
13   such examination is a true record of the testimony
14   given by that witness.
15         I further certify that I am not related
16   to any of the parties to this action by blood or
17   by marriage and that I am in no way interested in
18   the outcome of this matter.
19         IN WITNESS WHEREOF, I have hereunto set
20   my hand this 30th day of June, 2011.
21
22         _____
                   JOANN O'LOUGHLIN
23
24
25

## A

ability 5:14 94:6
able 35:23
above-entitled 1:21
absolutely 8:11 12:8
acceptable 31:15
accessed 70:15
accompanies 7:17
account 144:12
accountant 119:17,19,22 31:23 32:4,8
accurate 12:9
acknowledgment 160:7
acquire 106:8,12
action 1:21 3:12 174:16
activities 40:14 41:3,14 43:21 47:20
actual 89:10 148:25
addition 105:10
address 8:18,21 114:22 156:19 156:21
addresses 44:21 44:22
adjacent 44:22
adopt 54:17 55:12
adopted 55:10
adopting 55:15
advertising 21:17 25:14,17,22
advisement 93:24
advising 93:16 93:18 94:4
affirmative 93:9
ago 54:4,8,11,13 54:19 55:10
agree 12:4
agreement 84:20 85:13 120:5
ahead 32:17 127:2 140:23
Alejandro 1:4 90:12 151:5

Alex 1:4 90:14
alias 151:4
alleged 116:13
Amaya 1:4 90:12 151:5
Amir 1:4 90:14
amount 144:14
AND/OR 71:23 72:9
annotate 169:8
annotations 128:11 170:7
annual 119:11
answer 4:3,5,21 4:22 9:3,7,9 11:7,14,23 12:2 16:6 18:4 24:25 25:5,21 27:12 33:13 38:18 51:6,7 82:17 93:5,5 101:14 116:2 118:22 134:2,9 141:15 147:8 159:20 169:20
answered 11:23 12:2 37:17 41:15 44:9 89:11 102:17 141:2 147:7 168:19
anybody 54:5 92:8
anymore 110:20 110:22 123:4
anyways 94:20
apologies 23:14
apologize 66:13 69:17 103:2 118:11
appear 137:2
appearing 144:4
appears 123:20 136:23 165:9
application 38:2 38:10 158:2,6
applied 102:7,11
appreciate 94:23
appropriate 8:11
approximate 42:20 100:8 110:8
approximately 56:10,16,24 57:4 60:7 65:14

108:24
approximation 38:24 108:16 108:19
April 36:16 38:22 163:24
architect 29:9
Arevalo 1:4 90:14
Arpino 26:20 27:2,22 28:9 30:2 32:10,21 32:25 33:3 49:5
Arpino's 27:19 61:3
aside 22:3
asked 11:23 12:2 12:6 23:13 37:17 41:15 44:9 45:20 80:4 93:4,8 102:17 118:11 141:2 147:7 168:19
asking 12:7 72:12 126:24 140:11 170:9
asphalt 1:11 2:18 6:2,8,13,15,22 6:24 7:3,3,7 10:9,12,14,16 10:22 11:2,10 11:15,20 14:20 15:17,19 16:20 17:8,15 18:13 18:18,24 19:3 20:2 21:3,6,9 21:11,18,22,24 23:15 25:16,17 26:3 27:3,5,20 29:12 30:5,9,14 30:17,22,24 31:2,3,5,19,23 31:25 32:22 33:5,24 34:3,6 34:13,19 35:4 36:9,12 37:7 38:5 39:12 40:8 40:11 42:7,10 42:13,17 44:7 44:10 45:10 46:4,8,21,22 47:3,5,9,11,24 49:11,18 50:13 51:9,21 56:25

57:11 61:8
65:23 73:14,19
74:3,9 75:3,5,8
76:23 77:8,9,10
77:20 78:13,22
83:8,13,20
84:22 89:19
91:14,20 95:16
95:19 96:16,19
96:22 97:6,9
98:20 99:12,15
100:4,23 102:8
102:12,15,20
103:20 104:14
105:3,7 106:7,8
106:12,21
107:3,21 108:5
108:20,25
109:6 113:14
113:16 116:13
116:16 117:13
117:18 118:13
118:15,18
119:3,25
120:10,23
121:3 122:10
125:4 127:11
127:14 128:12
130:2,5 136:2
136:10,11,20
149:24 151:8
156:25 157:11
157:25 158:16
158:25 161:6
161:20,22
163:21,23
167:4,6 168:9
172:7
Asphalt's 31:6
35:13 36:20
40:13 49:24
51:24 52:21
88:21 106:4
118:8
assign 62:3
assigned 62:15
62:20 63:5,19
66:4,5,14
assignment 62:4
ASSOCIATES 2:12
assume 5:7
assuming 12:16
27:7 34:8 49:13
attempt 159:13

166:5
attend 8:25 9:17 9:21
attendance 148:3 148:6,23
attended 38:8
attention 74:5 143:18 145:7 156:15
attorney 2:4,9 72:13
attorneys 2:12,18 94:8
available 20:17
Avenue 1:15 2:5 2:9 10:15,17,20 10:24 11:4,16 11:21 23:16,21 24:11 44:7,12 44:17,19,20 45:8
average 56:12,13
await 5:8
awarded 158:12
aware 93:22 94:2 94:15 113:18 136:16
a.m 1:17 59:12 77:22 137:6,15 164:10,11 165:9 167:19 167:23,24 168:6,12

## B

B 172:2
Babylon 148:18 148:22,23
Babylon's 148:25
back 4:16 9:10 17:3 18:4 38:14 38:19 39:14,15 51:6 79:23 92:9 103:13,15
back-up 69:24 70:3 72:7
back-ups 70:6,12 70:15 72:6
bank 31:23 32:4 32:7
bargaining 84:20 85:13 120:5
base 134:22
based 12:2 130:21

basic 83:6
basis 48:25 49:9 49:17 50:10,14 56:6,24 62:11 62:14 63:24 67:19,22 124:7 124:7 154:11 168:3
Bates 129:8 139:24 161:6 162:3 168:8 172:7,9
Bear 3:9 8:19
began 47:20
beginning 63:2,6 74:11,16 103:10 114:12 165:17 167:2
behalf 102:7,11
believe 20:6 23:18 28:17 29:9 32:13,23 42:8 44:15 51:10,25 53:7 57:10 63:11,21 65:15 68:7 69:15 73:4 75:10 76:2 81:18 83:19 84:7 85:11 88:12,15 91:4 92:10,19 96:4 96:25 97:12,21 98:25 99:16,18 100:13 106:6 111:16 113:5 114:19 115:6,7 115:18 116:17 117:19 119:20 122:9,14 123:8 123:22 124:8 124:24 125:13 128:14 133:12 135:13,15 138:7 139:18 142:12 145:21 149:18 152:9 153:6,23 163:25 164:8 164:11
bell 91:22 95:3,4 95:9 96:8,11 97:3 100:19 101:8
benefits 158:12

best 31:8 123:15
better 12:16
  beyond 77:16,17
  78:6 94:6
bidder 26:13
bidding 25:23
  26:3,5,23 28:10
  29:4,16 30:5
  32:11 79:9
bids 26:10 28:7
big 56:15 57:9
biggest 30:21
Bill 138:10
billing 18:12,12
  18:13,14 19:2
  22:5,8 48:20
bills 21:21,24
  22:3,4,7,18
  23:4,7,10 31:2
  31:5,18
bit 18:17 144:15
BlackBerry
  55:22 70:3 72:7
blank 54:24
blood 174:16
blueprint 28:15
  29:4,6
  blueprints 26:10
  28:11 29:8,13
  29:19 32:20
boat 111:7
Bohemia 2:14
bookkeeper 21:2
bookkeeping
  21:5,8 22:8
bottom 123:21
  148:9 150:7
bought 55:13
  106:13
box 23:17 141:18
break 145:4
  168:22
breakdown 79:9
breaks 61:18
  69:25
briefly 26:8
  29:15 32:16
  162:11 168:24
bring 94:8
broke 111:8
brother 107:17
  bulbs 15:12
  business 23:15
  35:5 40:13 41:3
  41:14 42:4

43:21 86:20
  113:14 114:6
  115:22 148:5
  155:6 170:21
  170:25
buy 106:14

## C

C 2:2 3:2,2,2
  174:2,2
calendar 55:18
call 23:19,19,22
  23:24 24:2,4
  37:19,20 39:17
  39:18,21,25
  80:8,13,16 86:8
  86:9 91:2
  159:13 166:4
  166:11,14
called 24:11 91:5
  96:3 106:15
calling 92:10
  105:11 166:21
capacity 13:9,25
  14:4
capital 106:20
card 103:20
Carlos 1:6 97:3
  98:8
carpool 166:15
cars 13:5
case 1:9 9:11
  58:21 69:24
  85:20 144:8
  153:5
cash 109:22,24
  110:7,9,14,18
  110:21,23
  111:5,13
  113:14,17
cashier 13:4
Castillo 1:6
  99:23,25 154:3
  158:17,17,24
certain 25:24
  26:12 28:12
  35:10 73:9
  104:18 141:9
certainly 94:14
certify 174:10,15
change 15:12,15
  62:5,5 66:14,16
  75:6 85:11
  99:18
changed 74:19

74:20
check 66:9 81:8
  108:8,9 131:16
  131:18,20,21
  134:18 137:11
  164:15
checkbook 31:6
  31:19,19
checked 105:18
  146:22
checks 27:14,15
children 8:24
  107:15 110:3
  111:9
choose 163:15
chooses 103:17
chopped 122:8
Chris 86:10
  133:2,4 164:6
Christopher 1:11
  1:19 2:19 3:7
  4:1 5:1 6:1 7:1
  8:1 9:1 10:1
  11:1 12:1 13:1
  14:1 15:1 16:1
  17:1 18:1 19:1
  20:1 21:1 22:1
  23:1 24:1 25:1
  26:1 27:1 28:1
  29:1 30:1 31:1
  32:1 33:1 34:1
  35:1 36:1 37:1
  38:1 39:1 40:1
  41:1 42:1 43:1
  44:1 45:1 46:1
  47:1 48:1 49:1
  50:1 51:1 52:1
  53:1 54:1 55:1
  56:1 57:1 58:1
  59:1 60:1 61:1
  62:1 63:1 64:1
  65:1 66:1 67:1
  68:1 69:1 70:1
  71:1 72:1 73:1
  74:1 75:1 76:1
  77:1 78:1 79:1
  80:1 81:1 82:1
  83:1 84:1 85:1
  86:1 87:1 88:1
  89:1 90:1 91:1
  92:1 93:1 94:1
  95:1 96:1 97:1
  98:1 99:1 100:1
  101:1 102:1
  103:1 104:1

105:1 106:1
  107:1 108:1
  109:1 110:1
  111:1 112:1
  113:1 114:1
  115:1 116:1
  117:1 118:1
  119:1 120:1
  121:1 122:1
  123:1 124:1
  125:1 126:1
  127:1 128:1
  129:1 130:1
  131:1 132:1
  133:1 134:1
  135:1 136:1
  137:1 138:1
  139:1 140:1
  141:1 142:1
  143:1 144:1
  145:1 146:1
  147:1 148:1
  149:1 150:1
  151:1 152:1
  153:1 154:1
  155:1 156:1
  157:1 158:1
  159:1 160:1
  161:1 162:1
  163:1 164:1
  165:1 166:1
  167:1 168:1
  169:1 170:1
  171:1,14
circulation
  103:24
Civil 94:4
clarification
  45:21
clarify 21:14
  45:25
clarity 34:24
classifies 84:22
classify 85:2
clean 15:11,15
clear 72:4 93:8
  93:10,21
client 9:6,8 12:15
  12:19
close 134:19
collecting 154:16
collective 84:19
  85:13 120:5
college 9:21
column 137:19

137:21 138:14
  143:19 144:19
  163:20 164:6
columns 144:21
combination
  18:15
come 26:12 29:10
  38:14,19 39:14
  39:15 42:12
  74:19 84:24
  85:14 89:25
  106:8,12,21
  107:5 110:2
  143:12
Commack 2:20
comment 8:11
  94:23
common 137:17
  137:18
communicate
  156:24 157:10
communicating
  157:2,3,5
companies 10:19
  13:16,17 23:10
  46:14
company 5:23,25
  6:3 10:23 11:3
  13:4,11,15,15
  22:4,10,23
  25:23 40:15
  41:17 46:13
  68:12 75:9
  77:24 89:5
  90:23 106:15
  107:25 109:12
  115:6,10 122:6
  131:19 137:25
  138:2 161:23
compare 79:22
competitive
  25:23 26:2,5,13
  26:23 28:10
  29:4,16 30:4
  32:11
competitor
  161:24
compile 135:14
  135:23
compiled 140:14
  140:19,24
  148:2,12,14
  155:11 162:19
compiles 18:18
compiling 125:7

125:11 135:16
  135:21 139:17
  162:17
complain 112:15
  112:17,18,21
  112:23 113:4,5
  113:6,7,11,12
complained
  112:12 113:3
complains 121:6
complaint 121:3
  121:11,17
complies 129:10
  154:20
composed 74:7,9
  74:22 75:2
compound 134:7
  142:11
compressors
  78:18
computer 51:3
  51:24 52:12,21
  53:8,14,15,16
  53:18,22,24,25
  54:3,5,8,14,17
  55:13 63:10,23
  64:17 69:14,23
  70:2,8,17 92:23
  98:7 125:14
computers
  108:10
concept 5:18
concluding 171:9
concretely
  145:22
conditions 37:4
conduct 171:4
conducts 125:15
confident 99:20
  101:5
confused 77:3
  114:3
connection 13:25
  28:9 29:4,16
  30:4 31:18
  32:10 38:9 52:4
  141:7
consider 87:20
  168:4
contact 91:7 92:4
  92:9 95:22,25
  96:24 97:15
contacting 96:4,5
  97:22
contain 69:7

contained 69:22 84:19 85:12 146:21
containing 70:11 72:19
contest 37:25 38:4,5 158:5
contested 158:2
contesting 158:8
continue 9:15 35:24
CONTRACTOR 148:22
Contractor/Su... 160:25
conversation 87:17,18
conversations 116:5 126:9
coordinating 61:23
copies 70:23 161:17
copy 161:5 162:2 168:17 172:7,9
corner 141:18
‾orp 1:11,11 2:13,18 6:2,8 6:13,15 7:3 13:18,25 14:13 14:23 20:5 41:3 136:23 137:2 158:2 162:3 172:9
corporate 6:21 10:8,11 30:16 49:22,25 50:3,5 107:9 119:2,6 119:11,15 148:15
corporation 6:4 11:8 130:3,6
correct 3:19 9:23 10:4,22 11:9,11 11:19 13:23,23 14:3,19,21 15:3 15:24 16:13,18 19:20,22,25 20:3 21:16 23:2 24:17 25:2 30:5 30:6,13,15,25 33:17 34:11,17 34:21,23 35:3,4 35:6,19 36:15 37:4,5,10,15

38:12,19 39:10 40:4,10 41:13 44:6,8 47:11,14 48:17 49:7,10 49:14,18 50:9 50:12 51:23 52:11,14,19 54:8 56:17,20 56:22,23 57:2,7 57:12,13,21 59:11,14 60:4,5 60:16,21,22 61:2,5,17,22 62:7,14,18,23 62:24 63:4,7 64:4,6,12,13,17 64:18 66:10 67:13,14,18 68:17 69:5,18 69:19,20 74:18 75:4,5,10,13,14 75:15,18 76:4,5 76:7,10,12,22 77:10,17 80:10 80:20,23 81:3,7 82:7,8 83:14 88:2 104:14,19 105:12 110:13 111:16,18,20 111:22,23 112:2,4,5 122:17,18 123:5,25 124:3 128:3,22,25 130:4 131:2 133:3,22 134:17 136:18 136:21 138:4 138:20 141:10 141:16 144:3 144:14,23 145:9,10 148:4 154:15,15 155:5,23,24 156:22 157:25 163:9,11 164:24 165:2 165:16,22 166:20 169:7 169:12,15,17 169:17,21,22
correctly 122:9
cost 30:21
counsel 4:17 7:14 7:18 8:5 12:18

28:18,19 71:21 72:12 89:11 103:23 118:3 161:8 162:7
counseling 149:13,23 150:17 152:16
counselor 12:9 100:12 104:2
counsel's 8:10
county 42:3 174:5
couple 39:21 109:25 127:17 139:7
course 16:15 19:9 35:11 66:8 81:23 82:5 106:18 119:9 119:18 127:15 148:5 155:6 170:21,25
court 1:2 3:17
cousin 26:20
crashes 69:25
create 55:23,25 105:3,5 128:12 130:8
created 40:11 65:23 83:13,15 128:15,17 130:6
creates 83:17,21
creating 18:23
creation 130:11 130:18
crew 57:17,17,24 58:2,6,11,14,16 58:17,23 59:2,8 59:22,25 60:3 60:13,14,16,17 60:19,20,23,24 61:2,3,6,6,7,13 61:14,18,24,24 62:4,8,12,15,15 62:19,23 63:5,5 63:13,19 65:25 66:4,9,18,19,20 66:22,25 67:14 67:16 69:9 74:11,13,22,25 75:2,6,19,24 76:13,16,20,21 80:21,22,24 81:2 95:12

105:11 132:25 133:2,8,10,14 133:18,22 134:4,13,14,21 137:9,12 142:8 142:12,14,17 164:2,3,9,13 165:10 166:11 166:22 167:25 171:5
crews 57:16 61:7 61:10 62:25 66:6,7,15 67:19 67:21 68:9 74:3 74:6,6,9 75:12 75:16,20 76:3,7 76:18,22 77:6,9 77:12
crew's 58:19
Cross 13:20 14:4 14:10,16 15:13 20:8 23:7 27:25 32:7 43:22,24 44:3 45:7 46:15 46:19 47:15,18 113:20 114:2 114:12,19,24 119:15 138:2
cry 111:8
current 8:18 95:5 109:13 110:11 112:11 127:13 165:24
currently 15:18 50:20 55:7 58:21 64:6 76:23 77:6 85:8 85:18,25 90:21 91:24 95:13 96:15 97:5 98:16 99:11 100:3,22 101:25 109:16 109:17 112:8 112:17,18 122:23,24 136:3
customer 117:12 117:17 118:9
customers 18:19
CV-09-5331 1:9
——————
**D**
D 2:15 138:10 173:2

daily 56:6,24 62:11,14 63:24 67:19,21 124:7 133:8,22 134:4 134:13,21 135:12,18,22 136:22,23 137:3 146:10 146:12,22 148:3,6,23 162:3,16,20,23 163:2,4,10,12 163:17 165:13 165:18,23,24 166:2 167:5,7 168:18 172:9
date 4:6,8 6:5 14:24 32:24 38:23 42:11,11 68:6 71:7 79:23 85:7 122:16 123:10 144:20 149:21 165:24
Dates 58:3
day 8:5 12:14 22:2 27:18 50:21,22,23,25 56:2,18 57:22 58:8 62:16,19 62:20,22 63:7,9 63:11,13,14,20 63:20 65:3,7,7 65:25 66:8 69:10 75:12,17 75:20,23,24 76:14,15,17 105:16 106:19 109:15 110:2 111:10 129:7 131:24 133:21 136:3,5 137:11 137:13 142:18 144:17,19,20 144:22 145:20 162:22 163:3,9 163:13 164:5,5 164:10,14 165:17 166:4 171:6,17 174:20
days 78:8
day's 144:13
December 151:8 151:9 152:7 154:3

decide 9:13
decisions 33:14 33:19
defendants 1:13 1:20 2:12,18 7:24,24
define 45:20
definitely 95:7 101:7
delegate 120:22
delivered 46:7,22 46:24
delivers 46:10
delivery 47:15
department 17:16,19 38:9 116:12 117:10
depending 35:16 56:14 57:6,9 60:11,18 76:15 166:13
depends 60:8 61:15,15 163:6
deponent 7:23 12:6 28:17 71:25 93:7 94:5 94:10,11
deposition 4:16 5:10 8:2,5 9:14 28:19 171:10
describe 26:8 27:9 29:3,15 43:4 50:24 52:3 68:21 83:4 146:9 149:12
described 32:12 64:5,9 74:2 135:17
DESCRIPTION 172:6
detailed 13:4
details 29:7,11
development 40:17 115:2,6
devices 78:20
devoid 80:24
Diesel 108:3
differ 122:22
different 28:8 29:11 38:25 44:21 46:14 57:16 60:9 64:9 65:25 76:20 78:19 82:3 107:8 108:12

137:25 138:2
151:4 170:14
\,ploma 9:24
direct 4:2 7:14,18
  28:17 72:3,15
  74:5 93:3,6,19
  94:5,18 143:18
  145:6 156:15
directed 165:8
directing 9:3,6,8
  11:22,25 94:17
direction 12:3
  93:9,15
directions 12:19
directly 46:11,24
  53:14 64:21
directs 4:21
disability 19:6,8
disbursements
  113:17
discipline 34:8,9
  34:13,19 35:2
  87:8,11,14
discuss 12:21
  20:15,18,20,24
  33:8,10,15,18
  92:22 118:7
\,iscussion 24:16
  28:24 29:2
  80:19 94:25
  146:6
discussions 22:19
  126:10
disgruntled
  81:18
dispose 88:22,23
  88:24 90:2,4,5
  90:7,9
disregard 72:14
DISTRICT 1:2,2
dividend 49:22
dividends 49:25
document 50:21
  50:24 51:2
  54:21 121:23
  122:2 124:14
  124:19,21,22
  124:25 125:7
  125:11,18
  126:6,12,20
  128:9,12,13,17
  129:12,16,21
  130:8,21
  132:15 135:4,8
  135:14,17

138:9 139:3,10
139:17,19,22
140:24 142:13
147:18 148:9
148:18,20
149:7,16,21
150:22,24
152:5,10,22,24
153:15,17,19
154:10,22,24
155:3,18,21
156:13 157:16
158:18,23
159:25 160:3
160:20 161:10
161:16 162:13
164:2 165:9
167:18 168:8
169:2
documentation
  72:23 73:5,7
documented
  92:24
documenting
  54:24
documents 29:7
  50:22,23 52:6,8
  70:19 71:2,6,10
  71:17,23 72:2,9
  72:18 73:2,15
  73:20 82:22
  83:2,4 90:9
  93:2 111:25
  112:3 117:21
  117:23 118:2,4
  125:12 128:5
  128:19,23
  129:2 133:16
  134:18 135:9
  140:7,14
  141:11 145:24
  146:7,9,15,16
  147:20,23
  148:2,11 154:6
  157:14,18,21
  161:15 162:11
  162:15
doing 57:14
  61:14 126:11
  149:14
Dominic 115:13
  115:14,17,19
double 156:6,8,9
download 51:3
  53:13 70:2

drive 66:8 78:24
  79:3 113:22,25
driver 45:22,22
  46:2 138:22
drivers 45:10,12
  45:13,16 46:5
  47:4,8,12
  113:19,22
  114:11,23
  137:24 162:24
  164:12 165:8
  167:23
drives 45:23
Driveways 41:23
drum 59:6
due 37:4
Duffy 86:10
duly 3:3 174:12
Dune 142:25
Dunton 10:15,17
  10:20,24 11:4
  11:16,21 23:16
  23:21 24:11
  44:7,11,17,19
  44:20 45:8
duties 15:13 21:6
  21:8

                E
E 2:2,2 3:2,2
  172:2 173:2
  174:2,2
earlier 105:24
  106:2,11
  122:12 167:22
easier 55:17
EASTERN 1:2
education 9:24
Edvin 96:13
  97:23 98:2
  152:7,15 153:2
EDWIN 1:5
efforts 91:2,7
Ehrbar 106:15
eight 58:5,20
  59:10,12 77:22
  102:25
Eighteen 3:9
  8:19
eight-hour
  144:17
either 52:15
  64:15 76:19
  87:15 120:22
  125:8 131:22

147:2
elevations 29:11
email 156:19,20
  156:25 157:4,7
  157:10
employ 15:24
  16:3 21:2 35:24
  45:10 46:4 47:8
  47:13 64:6
  70:13 77:25
  78:24 101:25
  102:15,20
  108:6,25 109:6
  160:10
employed 27:22
  32:21 40:5
  50:13 74:10
  75:3,7,8 85:25
  90:21 91:11,13
  91:17,24 92:2
  95:13,15 96:15
  96:18,21 97:5,8
  97:11,13 98:16
  98:19,25 99:11
  99:14 100:3,22
  100:25 108:17
  108:20 109:14
  113:19 114:23
  136:2,10,11,20
  151:7 161:19
employee 19:7
  20:18,20,23
  34:19 55:23
  62:3 73:15
  81:18 82:14,23
  84:23 85:2 87:9
  88:3,6,13,25
  89:3 95:5
  101:23 102:5
  108:11 110:9
  111:7 112:12
  121:3,5 131:19
  148:23 150:4
  151:2 152:8
  153:3 154:4
employees 15:17
  15:21,22,25
  16:3,4,14,17,21
  19:5 20:11 30:8
  34:2,3,6,9,13
  35:2,24 36:21
  37:8,12,16,22
  38:13,13 39:12
  39:15 40:2,5
  48:24 49:8

50:13,20,25
  51:15,21,24
  52:4,12,21,23
  53:13 54:20,24
  55:5,9,16,19
  56:10,21,25
  57:11,14,22
  59:12 63:10,12
  64:5,12,17,20
  65:2,9,17,20
  69:8,22 70:11
  70:13,20 71:2,7
  71:18 72:19,24
  73:5,8,21 74:7
  74:10,23 75:3,7
  75:7 76:23 77:7
  77:11 78:2,5,8
  78:24 79:16
  81:20 82:7
  83:10,10,12
  84:2 85:16 87:2
  89:19 103:3,9
  103:13,21
  104:8,15,19
  105:12,19
  108:5,13,17,20
  108:22,24
  109:3,5,13,22
  110:24 111:5
  111:13,17,21
  112:7 115:10
  122:13,15,20
  122:23,24
  123:5,11 127:7
  127:10,13,14
  133:21,23
  135:25 136:2
  136:10,13,19
  137:19,23,24
  138:5 142:6,8
  142:20 143:14
  144:4 147:5
  159:18 163:20
  163:21,23
  166:25 168:17
employee's 38:9
  79:25 80:9 81:7
  81:12,16 88:17
  160:19
employer 5:20,22
employment
  38:10
employs 37:8
  47:12 57:11
empowered 34:9

34:12
ended 75:19
engineer 29:9
entail 26:5,6
  87:14
entitled 7:14
  132:25 143:19
entity 11:17
enunciate 3:16
equipment 78:15
  78:16,21,22,25
  79:3,6 106:2,7
  106:9,11,12,16
  106:17
Escalante 1:6
  97:3,15 98:8
ESQ 2:6,8,15,21
establish 105:23
established
  105:22
Everybody
  107:24
everybody's 82:3
  87:17 160:16
everyday 80:15
exact 14:24 38:23
  68:6 102:6
  123:10
exactly 18:9 59:4
  72:3,15 151:24
examination
  1:19 3:5 173:4
  174:11,13
examined 3:4
example 22:11
  144:10
Excel 51:10
  52:15
Excepting 128:11
exclusively 77:7
excuse 28:14,21
exhaustive 47:23
exhibit 121:22
  122:4,7,11
  123:6 124:10
  124:17 126:6
  126:15,18
  127:4,8,21
  128:20 129:3
  129:18,24
  130:9,19,21
  132:10,13,18
  134:25 138:9
  138:24 139:5
  139:13,16

141:17 142:7
147:11,21
149:4,10
150:19 152:2
152:21 153:13
154:7,12
155:12,15,20
156:11,16
157:13,19
159:23 160:3,6
161:4,5,8,13
162:2,6,10
163:20 167:15
168:24 169:4
169:16 170:22
172:6,6
**exhibited** 157:18
**EXHIBITS**
172:4
**expense** 30:16
**experience** 85:4
110:16
**explain** 28:22
111:8 144:8
166:5 168:12
**extent** 8:15 62:10
72:11 134:8

**F**

**F** 174:2
**face** 98:23
**fact** 28:21 131:7
131:12 145:23
**failed** 159:5
**fair** 8:13 17:18
17:25 48:23
103:25 106:25
165:20
**Fajardo** 1:4
90:16,18 91:8
91:11,19 92:20
128:2
**familiar** 115:3
**family** 13:10,14
**far** 23:18 30:10
44:24,25 107:7
157:2
**Fasco** 161:5,22
172:7
**father** 10:3 13:9
17:12 18:16,22
21:19 23:10
26:16 30:12
32:25 33:8,10
33:15,18 50:22

51:18,20 58:15
60:2 62:2 63:3
73:25 76:20
84:25 107:10
111:4 115:7,15
115:22 116:6
117:19 121:19
125:8 131:24
133:12 138:5
143:12 147:3
155:13 157:6
159:17 164:5
**father's** 13:16
107:13 110:23
153:23
**federal** 7:15,20
43:14 94:3
**federally** 43:12
**feed** 111:9
**feel** 12:13
**field** 22:20,21,24
22:24 48:7,14
48:15 62:6
116:22 119:13
**fifth** 2:5,9 143:18
**figure** 79:9
**file** 17:22 88:15
88:17,22 89:22
90:2 92:17,23
98:7,13 118:7
118:18
**files** 71:12 89:18
90:5 108:11
119:14 131:16
131:18,19,19
131:21 164:18
**filing** 119:2,6,11
**fill** 68:17 69:4
83:12 122:25
122:25 123:3
123:11,14,17
132:8,20,21
133:7,9,10,14
134:20 149:16
149:19 152:10
**filled** 82:13,23
83:10,10
104:19 111:17
122:12,15,16
122:19,23
123:6,18 128:8
129:3,6 131:22
131:23,24
132:2,9 133:19
147:2,3,3,5,23

149:21
**filling** 159:9
**fills** 134:11
**final** 138:14
**find** 86:14,17
98:4,11 100:17
108:12
**fine** 7:4
**finish** 58:6 62:22
**finished** 122:3
144:13,16
161:12
**Finn** 102:5
**fire** 34:3,5
**fired** 87:21
**firing** 34:2 87:20
**FIRM** 2:17
**first** 3:3 5:10
7:25 26:9 60:16
68:8 80:8 102:6
105:3 126:22
126:25 127:2,7
127:15,23
128:8 137:20
138:9,14,14,16
139:7,15
141:17 142:6
143:19 144:4
154:12 156:15
159:4 163:19
163:20 164:2,6
165:9 169:4,16
**five** 110:10 164:9
164:11 165:9
167:19,23,24
168:6,12
**fix** 15:11
**flexibility** 62:8
**Floral** 1:15
**follow** 20:11
**follows** 3:4 121:4
**food** 110:4
**foreman** 101:20
101:21,23
162:24
**foremen** 101:25
**forgive** 32:15,17
**forklift** 46:4 47:4
**form** 7:16 11:13
16:5,22 18:20
24:24 25:4,20
27:10 33:12
35:7 36:5,17,23
37:18 38:3,15
45:18 56:8 57:8

62:9 66:3 68:11
68:19,20 71:3
72:21 73:10
74:14,24 76:25
77:15 80:11
81:13 89:8 92:7
100:10,20
101:10 103:5
103:22 104:10
104:16,25
107:23 114:13
115:24 117:25
118:20 120:25
122:19,22,22
123:7 124:3,23
125:14 129:4
131:10,14
132:5 133:25
134:6,23
135:19 141:13
142:9 143:7
147:6 148:21
149:23 150:2
159:19 167:10
167:13 169:19
170:2,13
**formal** 77:14
**formation** 11:11
**formed** 6:13
**former** 127:10
**formerly** 40:5
91:13 95:15
96:18 97:8,11
98:19 100:25
**forms** 124:4
159:9
**forth** 174:12
**forward** 93:6
**found** 65:6
**four** 11:24 12:15
110:10 126:25
127:2,15 156:5
**fourth** 127:22
129:8
**frame** 11:5
**FRANCIS** 2:8
**free** 12:13
**Friday** 78:10
**function** 26:14
30:8
**functions** 21:18
43:18
**funding** 107:5,7
107:8

**funds** 107:2
**further** 174:15

**G**

**Galeano** 1:6
98:16
**Garcia** 1:4 91:22
92:4
**Garcia's** 92:12
**general** 114:7,8
**generated** 141:11
**gesture** 3:16
**getting** 168:21
**give** 4:8 14:24
18:17 25:10
42:16,20 47:22
56:13 100:8
105:6 108:16
108:19,23
109:4 110:5,21
110:23 112:3
123:10
**given** 56:4,16
57:22 61:10
68:8 75:12 93:4
123:25 124:4,6
168:11 174:14
**giving** 111:4
**go** 3:13 12:13,17
12:20 26:11
28:11,11 29:10
32:17,19 37:14
37:22 60:15
108:7 121:8,14
127:2 140:23
146:5 157:23
162:21 165:17
**going** 7:10 12:14
27:16 41:8 74:5
79:7 89:7,12
94:19 126:21
140:21 145:3,6
146:3 154:6
162:21 166:6
169:18
**GOLDBERG**
2:4,6
**good** 28:12 48:6
62:4 73:3 74:21
**Gordon** 102:6
**government**
43:14
**governmented**
43:13
**GPS** 78:13,14,15

78:17,19 79:5
79:11,15,24
80:4,6 81:12,15
**graduate** 9:19
**grease** 105:14,15
105:17,20
130:25 156:6
**grinds** 59:6 61:20
61:21
**ground** 3:14 4:17
**growth** 109:12
**guess** 18:12
27:12 31:12
57:5 125:2,3
142:2,3 148:23
149:25
**guy** 45:23 102:5
158:21
**guys** 39:22 56:14
57:17 166:13
**guy's** 110:2

**H**

**H** 3:2,2,2 172:2
**half** 105:15 122:8
156:6
**hall** 86:8
**hand** 84:2,5,7
103:24 111:24
169:24 171:3,4
174:20
**handed** 162:9
**handful** 110:10
110:12 111:10
**handing** 121:21
121:25 124:9
124:11 126:14
126:17 129:20
132:14 135:3
139:2 147:14
149:6 150:21
152:4,20,23
153:14 154:9
156:12 157:15
159:24 161:9
162:8 168:25
**handle** 22:12
30:11 64:25
121:18,19
159:12
**handled** 19:18
38:6
**handles** 22:13,15
**handwriting**
125:17,20,22

125:24 129:15
132:23,24
138:8 149:20
155:2,9 170:9
170:19,20
**handwritten**
128:11 170:6
**happens** 83:23
**harassing** 12:8
**HARMOND**
2:21
**head** 79:13 86:4
151:6
**hear** 5:2,6
**heard** 5:7 18:8
115:4 126:9
**hearing** 38:8
**held** 1:21
**Helene** 1:11 2:13
10:6 17:11
18:16 19:20
20:21 21:4,11
21:15 22:17
23:3,6,9 24:7
31:2,6,9,17
38:6 51:18
52:20 53:10
64:15,20 73:24
83:16,17 90:10
117:19 119:4,5
119:10,14
125:10 126:5
126:11 130:7,8
139:18 156:22
156:23 157:3
158:7 159:8,13
**help** 8:16 13:11
15:11 26:15,16
26:17,23 32:19
86:14,17
101:24 143:13
159:10
**helped** 107:10
**helping** 142:17
**helps** 29:25 50:22
51:22 79:8
119:13
**hereinbefore**
174:12
**hereunto** 174:19
**He'll** 28:11
gh 8:25 9:5,9
9:17,24 15:5,8
**highest** 9:23
**Highway** 2:14

**hire** 3:22 4:11,14
33:3 46:12,13
46:15,19 47:13
47:14
**hired** 47:17 68:5
137:25
**hiring** 33:5,10,14
33:18,23
**hold** 20:4,7 27:4
118:15
**home** 71:13,15
71:16 97:21
**hope** 133:6
**horrible** 108:3
**hour** 73:15
105:15 116:14
**hourly** 48:24
49:8,13,17
50:10,14 69:21
126:3
**hours** 8:4,7,8
50:20,25 51:15
52:5,12,21,23
53:13 54:20,24
55:5,10,16,19
58:19 60:10
62:19,21 63:2,5
63:10,12,19,22
64:6,12,17,20
65:2,10,12,16
65:18,21 67:21
67:24 68:25
69:22 70:11,13
70:20 71:2,7,18
72:19,24 73:5
73:21 75:16
79:16,22 80:2,3
80:9 81:7,12,16
81:19 82:7,9,14
82:22 83:13
104:15 105:11
109:23 110:9
110:24 111:5
111:14,21,24
112:7 123:20
123:24 130:22
130:24,24
131:3,7,13
133:24 143:25
144:5,11,17,19
144:22 145:11
146:20 156:5,5
156:6
**house** 53:19
70:24

**HR** 17:19
**HRS** 143:19

---
**I**
---
**Ian** 2:8 3:11 7:22
17:24 71:25
94:11 114:15
148:25
**idea** 41:6,13
43:24 84:11,21
91:6 106:24
118:23 119:16
119:23 128:16
144:9
**identification**
161:8 162:6
**identify** 16:8
124:25 129:24
137:23 139:19
155:21 160:6
161:15
**ignorance** 28:14
28:21
**ignorant** 27:8
**imagine** 73:6
98:15 118:10
130:10 134:10
142:24 164:22
**immaterial** 3:25
7:21 9:2 41:21
**impair** 5:14
**important** 50:16
50:18 86:19,21
86:25
**impossible** 94:20
**improper** 7:18
12:3,19 93:15
**incident** 121:13
131:25
**incidents** 109:25
**include** 49:3,5
**included** 142:20
142:22
**income** 14:20
**incorporated** 6:3
7:8
**incorporation**
6:5
**incorrect** 34:21
**incur** 22:10
**incurred** 21:21
**incurs** 22:10
**indefinitely**
88:19
**independently**

134:16
**indicate** 131:5
148:19 155:25
156:3 165:10
168:7
**indicated** 127:7
144:5
**indicates** 145:12
156:2
**indicating** 28:20
145:11 168:10
**indication** 156:9
**individuals** 19:18
20:23 26:22
125:13 141:9
**Industries** 13:20
14:5,10,16
15:14 20:8 23:7
27:25 32:7
43:22,25 44:3
45:7 46:16,19
47:15,18
113:20 114:12
114:20,24
119:15 138:3
**influence** 113:5
**information** 26:9
28:6 29:18
52:25 53:4,6,14
69:21,21 70:2
70:13 71:23
72:9 73:3 86:6
86:12,17 92:15
98:4,11 99:21
100:17 101:6
108:12 121:13
134:21 146:21
173:9,9
**initial** 106:20
107:5,9
**initially** 109:14
**injection** 106:20
**inputs** 51:24
**inputting** 52:20
64:16
**installed** 79:5
**instance** 142:16
**instigated** 117:3
**instructed** 31:17
**insurance** 79:8
**interest** 8:14 10:9
**interested** 174:17
**interests** 10:9
**internal** 148:14
**interrupted**

140:10
**interviewed**
117:9
**invest** 107:2
**investigated**
116:13
**investigating**
121:17
**investigation**
116:21,23,25
117:4,7
**investment** 107:9
**invoices** 18:18,23
22:9 30:25
**involved** 18:23
19:2 26:2 29:12
29:20,23 33:23
128:23 130:11
130:18 135:16
135:21 150:16
162:17
**involvement**
116:20 125:10
**involving** 141:11
**Island** 13:20 14:4
14:10,16 15:13
20:8 23:7 27:25
32:7 43:22,24
44:3 45:7 46:15
46:19 47:15,18
113:20 114:2
114:12,19,24
119:15 138:3
**issue** 28:20 81:19
87:3,6 147:10
152:15,18
153:7,19
**issued** 150:6
**issuing** 150:16
151:12 152:13
153:21
**items** 72:12

---
**J**
---
**Javier** 1:5 96:10
**Jericho** 2:19
**JoAnn** 1:22 17:3
18:3 39:8 41:10
51:5 114:17
161:3 174:8,22
**job** 26:11 27:13
27:15,17 29:7
29:10 43:13
46:9,11,24 56:2
56:11,15,21

57:9,25 60:4,6
60:8,8,11,12,13
60:15,17,19,20
60:23,24 61:4
61:13,15,16,16
61:25 66:9,23
69:2 76:15
84:16 101:24
115:16 121:12
133:20 137:7
142:25 143:2
143:15 145:15
145:18,25
148:13 149:14
149:15 162:21
166:5,14 168:5
**jobs** 22:24 43:8
43:10,14,16,18
43:20 56:9,17
62:5 109:11
141:11 148:24
**JOHN** 1:12
**Jose** 1:5,6 95:2
99:23,25 154:3
158:14,17,19
158:24
**Joseph** 26:20
27:2,19,22 28:9
30:2 32:10,21
32:24 33:3 49:5
**Juan** 1:6 100:19
161:17,19
**judge** 12:13,17
**June** 1:16 136:9
136:20 137:10
174:20
**Junior** 137:20

---
**K**
---
**keep** 51:22 53:18
70:6,23 121:19
148:13
**keeping** 30:7,10
30:14 50:17,20
51:8,21 64:5
148:24
**keeps** 52:6,9
**Kenny** 137:20
**kept** 53:25 88:19
167:11
**Kevin** 1:6 98:16
136:15,16,19
**kind** 20:13 45:22
55:21 103:24
115:16 122:8

166:15
new 162:20
now 4:9,10 6:5
7:10,11 8:2
12:4,8 15:4
18:8 19:14,17
20:9 21:7 22:24
23:3,5,6,8,9,12
25:24 27:15,24
28:2 31:8,9,10
31:13,13 32:4
32:24 33:2
36:25 41:22
42:22 44:3 45:7
45:9 52:10
56:15 65:19,22
65:22 69:2 72:3
73:12,18,22,23
75:19,24 76:17
79:22 80:12
81:18 82:4,12
83:15,17,23
84:12,18 85:14
85:14,22 86:3
86:13 87:24,25
90:10,12,14,16
90:23 91:5,10
91:12 92:12
93:5 95:5,18
96:9 97:23 98:8
98:22 99:3,7
100:2,15
101:16 107:7
109:7,10 110:3
110:16,25
111:3,6,7,9
113:19,22
114:10,11,22
114:23 115:2,9
115:10,21
116:3,4,12,18
117:3,6 118:8
118:24,25
119:5,10,14,21
121:24 123:3,9
123:23 124:12
125:6,11 126:4
126:5,7,16
128:8,10,14,19
129:2,2,19
132:13,21
133:4 134:11
134:12,16,21
134:24,25
137:12 138:12

138:13,21,25
139:5,16
140:13 141:20
141:25 142:3
142:10,19
144:17,20
145:17 147:12
147:23,25
148:11 149:4
149:19 151:4,5
151:15,23
152:3,21 153:5
153:9,13 154:8
155:9,11,14
156:8 157:12
157:13,21,22
158:11,13,14
159:17,21,23
160:13 162:12
164:9,13,13
167:21
knowledge 44:14
122:25 161:24
knowledgeable
159:11
known 8:9 90:18
159:6
knows 41:21
72:15
Kreitzman
119:20,20
_____
L
L 1:5 95:2
Labor 38:9
116:12 117:10
laborers 120:14
120:20
landscaping 13:3
laptop 53:20
70:16 72:7
large 11:6 59:5
late 87:3,5,19,22
88:3,6
LAUREN 2:4,6
law 2:4,17 4:22
93:23
lawsuit 82:4
lawyers 8:9
lay 36:21 37:16
leave 19:6,8
20:12,13,13,24
37:12,21
leaving 20:21
left 81:9 90:23

99:3 103:24
141:18,23
legal 73:12 159:7
legally 73:4,8
Lerly 1:6 99:5
125:5 155:23
letters 143:24
level 9:23
lie 15:2
life 114:5
light 15:12
likes 153:10
limit 7:19
line 138:15 150:7
156:18 160:24
linear 104:3
lined 55:3
list 6:21 13:17
24:5 47:20,23
102:3
listed 18:21
78:21,25 122:6
135:25 136:19
137:19 142:6
142:20 143:15
163:20 164:6
lists 117:12,17
118:9
litigation 70:16
72:20 94:2
little 25:19 109:7
live 8:23,24
loan 159:18
loans 102:7,11
located 10:14,16
10:19,23 11:16
44:4,17 45:8
114:21
location 11:3
24:21 69:3
166:12 168:11
long 32:21 53:22
60:6 89:18
99:14 158:16
158:24
longer 37:7 88:25
90:3 95:19
96:21 97:13
100:6
look 71:10,11,17
72:18 86:5
92:15,21,25
98:6 99:19
101:4 105:17
108:9,14

117:24 118:4,5
121:9,10
138:24 145:24
146:16,20
147:9 159:2
looked 72:22
86:16
looking 72:14
looks 52:7 122:9
148:3 150:25
151:16,19,23
151:24 152:14
153:10 154:14
156:20 157:23
158:4,7 160:7
160:21,23
161:17
lot 25:7 30:11
45:5 62:7 78:14
107:8
lots 40:21 41:23
Louis 1:11 2:13
10:2,5 17:12
19:21 20:18
23:10 29:23
30:12,13 39:25
51:20,23 52:3,9
63:18 73:25
77:14,16,19
87:24 88:10
111:13 125:9
138:5 153:25
157:5
lucky 156:23
lunch 59:15,17
59:18 69:12
74:2
lunchtime 59:19
lying 14:25
L&V 115:2
_____
M
machine 57:18
58:23 59:2,5,8
59:25 61:7,18
66:23 76:3
105:17,17
machinery 47:9
machines 27:14
27:15
mail 23:17
maintain 73:5
117:12,17
118:9
major 30:16

majority 22:5,6
22:20 27:18
46:20 47:17
57:23 62:17
65:8 74:15
110:6
making 4:18
33:14,18
man 48:23 87:17
managed 23:10
manager 16:7,8
115:14
managerial
15:22 16:4,14
16:16,21
manager/super...
19:24 20:2
47:25
March 35:17
38:13,21 153:2
Marcos 1:7 101:8
101:16 136:14
136:18
mark 81:6 161:3
161:25
marked 127:4
147:11,21
152:20 153:12
154:7 159:22
161:7,13 162:6
marketing 21:17
25:14,16
marriage 174:17
Martinez 1:5
95:2
material 3:24
7:11 140:3
materials 22:10
46:7,10
mathematical
8:10
matter 174:18
matters 9:10
Maynor 1:4
90:16,18 91:7
91:10,19 92:20
128:2 160:22
McEvilly 16:9,10
16:16,19 17:11
18:16,22 19:21
20:4,7,16,17
21:20 24:7
26:21 30:11
34:14,18,25
39:21 47:21,23

48:2,5,18 49:3
49:8 50:9,13,21
51:18 52:19
53:2,5 58:12
60:2 62:2 63:3
63:13,20 64:13
64:15,25 65:3,6
68:3,5 75:17,25
76:19 83:16
84:8,9,25 88:5
90:11 91:4 92:5
96:4 97:2,21
103:15 112:4
115:16 117:20
121:18 124:4,6
125:8 131:22
133:12 134:20
135:13,14
143:12 147:3
151:16,20,23
152:14 153:10
153:10 155:13
155:16 157:8
159:16 163:18
164:4
McEvilly's 19:23
151:17
mean 9:4 13:3,10
22:22,22 35:20
42:23 45:14,16
45:17,21,22,23
59:18 65:16
66:21 104:21
131:21 138:21
141:5 142:17
143:24 146:17
156:8
means 17:17
18:11 43:5
106:24 138:12
138:13 144:2
mechanically
15:16
mechanism
104:15 133:23
Medford 10:15
23:21
medications 5:13
meet 166:6 167:2
meetings 118:16
members 166:21
166:24
memo 55:20,23
memos 55:25
men 43:6,10 56:2

113:5 162:20
Mendez 1:5 95:8
95:18,22 96:2,6
113:4 142:16
mention 58:23
mentioned 69:13
method 53:12
54:11 55:7,12
55:16 103:25
113:16 131:8
methods 112:6,7
112:9
middle 125:17
137:6 138:9
155:3 167:18
mill 59:3
milling 57:18
58:23 59:2,8,24
60:19 61:7,17
mind 39:4 47:22
50:16
minute 146:5
minutes 87:2,5
87:12
missed 109:25
111:10
moment 17:24
Monday 78:10
money 111:9
Montauk 168:9
168:11
month 4:12
36:24
months 35:10
morning 27:14
78:3 163:7
mortgage 110:3
111:8
mother 18:16,22
21:4,15,19 22:5
22:14 38:6 52:2
73:24 86:13
92:22 118:7
mother's 86:16
156:20
mouth 25:24
move 8:6 60:21
moved 40:10
moving 8:14
103:24
multiple 11:14
12:6 38:16
municipalities
42:14 141:12
municipality

42:18 43:16
mutual 8:14

_____
**N**
N 2:2 173:2
name 3:6,11
23:20 31:24
77:17 78:22
90:18 95:2,8
96:8,10 98:23
100:19 102:6,6
106:4 115:2,3
127:24 132:25
136:22 145:7
151:2,3,4,24
names 69:2 127:8
narrative 7:17
12:18
nature 79:10
134:7 146:11
nautical 80:14
necessarily 39:13
143:8
necessary 3:24
need 4:6 11:5
45:20,21 47:3
61:25 94:13
needed 110:3
162:21,22
Nelson 1:4 85:22
149:14 150:17
151:7 166:18
166:19,20
never 82:13
116:5 117:9
127:5 128:4
129:12 167:3
169:8,12
new 1:2,15,23
2:5,5,10,10,14
2:20 3:9 8:19
55:23 174:4,9
night 163:14,15
nodded 93:9
Noe 1:6 99:5
125:5,5 127:19
136:8
nonunionized
85:18
normally 28:16
133:10
North 10:15,17
10:20,24 11:3
11:16,21 23:16
23:21 24:11

44:7,11,17,19
44:20 45:8
Notary 1:23 3:3
171:18 174:8
note 7:22 55:2,3
132:7,9
noted 171:12
notes 169:24
171:3
notice 1:22
149:13,17,23
150:17 152:16
152:18
November 35:17
36:20 37:2
number 91:5
97:21 141:18
141:19,19,20
141:23,23,25
156:23 172:6
numbers 26:12
26:12 28:12,13
29:11 109:2
142:2
numerous 4:18

_____
**O**
O 3:2
oath 5:16 93:12
object 7:15 9:15
11:13 24:13,24
41:8 80:11 89:7
92:7 140:21
169:18 170:13
objection 3:23
7:9,16,18,21
9:2 11:15 16:5
16:22,23 18:20
25:4,20 27:10
30:18,23 31:7
33:12,20,21
34:10 35:7 36:5
36:17,23 37:6,9
37:13,17,18
38:3,15 41:5,15
41:16,20 44:9
44:13 45:3,18
54:9 56:8 57:8
62:9 66:3 68:11
71:3 72:21
73:10 74:14,24
76:25 77:15
82:15 100:10
100:20 101:10
102:9,13,17

103:5,22 104:4
104:10,12,16
104:25 106:22
106:23 107:16
107:23 114:13
115:24 116:7
117:25 118:20
120:3,25 123:7
124:23 129:4
130:13 131:10
131:14 132:5
133:25 134:6,7
134:23 135:19
140:17 141:2
141:13 142:9
142:11 143:7
146:4 147:6,7
148:21 150:2
159:19 167:10
167:13 168:19
170:2,8,11,24
objections 4:18
7:19 12:19
obligated 73:4,8
obligation 93:23
obligations 94:3
obtain 160:9
obviously 123:19
occasion 160:11
Occasionally
79:17
occasions 105:13
160:12
occupant 11:20
occupied 11:3
occupies 10:23
occupy 10:11
October 36:16
122:17
office 23:24 24:2
24:4 48:6,8,13
48:16,19 65:5,7
71:12,14 86:16
118:6 145:24
146:8 163:6
164:18 165:15
165:17 167:11
officers 6:22
offices 2:4 24:3,6
108:10
offspring 107:13
Oh 80:4 89:17
99:22 112:14
149:3 158:19
163:6 164:22

oil 108:4
oiler 27:6,9,13,17
28:3
oil's 105:18
okay 4:19,25 5:4
5:9 8:17 12:10
13:19,21 17:10
17:18 46:3
54:12 66:13
71:19,22 72:8
72:17 74:4 81:4
89:9 94:12
106:25 114:16
122:10 124:15
125:19 127:2
129:11,22
132:16 135:5
137:8,16
138:18 139:7
139:11,14
141:24 142:4
143:9,21
147:19 149:8
150:23 151:14
152:6,25
153:16 154:11
154:21,23
156:14,17
157:17 160:2
161:11 162:14
167:17,20
169:3,6
old 7:5,7 9:4
61:21 115:14
once 60:13,20
62:3 64:3
113:12 116:19
160:13 166:2
ones 127:18
147:2
operate 66:19,21
67:16 74:3
operated 13:11
13:15
operating 66:18
66:23,24 67:14
76:23
operation 56:5
77:6 120:9
134:5
operator 6:9
49:21 67:6,7
76:4 99:10
105:16
operators 67:12

120:13
opposed 25:12
42:2
order 85:2
145:22
ordinary 148:4
155:5 170:21
170:25
Osmar 1:5 96:8
outcome 174:18
outside 39:4
overlap 61:10
overlook 66:6,7
overlooked 66:20
overlooking 69:9
oversee 22:17
77:10
overseeing 22:23
overtime 81:20
81:22,24 82:2,3
112:12 121:4,6
121:11 143:25
144:18 156:10
owed 112:12
owned 13:11,14
115:7
owner 6:17,19
ownership 10:9
o'clock 102:25
O'Loughlin 1:23
174:8,22

_____
**P**
P 2:2,2 3:2 129:9
161:7 162:3,4,4
162:4,4,4,5,5,5
162:5 168:8
172:8,10,10,10
172:10,10,10
172:11,11,11
172:11
packet 126:18
140:3 147:15
pad 55:2,3 132:7
132:9
page 127:7,20,23
128:8 129:8
135:25 136:13
136:19 137:21
138:9,14,16
139:15,21
140:2 141:17
141:22 142:3,6
142:20 143:15
143:19 144:4

145:7 148:9
154:12,19
155:11,15,20
156:16 160:17
163:19 167:15
169:4,16 172:6
173:4
pages 126:22,25
127:2,15 139:7
Pagoada 1:5 96:8
paid 14:13,17
31:2 43:7,10
48:24 49:8,11
49:13,17 50:10
50:14 105:19
109:24 110:9
111:13 130:22
131:2 141:9
160:8
paper 51:4 52:24
53:3,9 54:22,23
54:25 55:6
64:11 67:25
68:2 70:19,23
70:25 72:18
123:2 135:24
apers 29:6
71:15
paperwork 82:13
Park 1:15
parking 40:21
41:23 45:5
part 58:9 60:18
67:9 79:4 95:12
142:8,16
166:14,23
particular 22:2
23:20 26:11
35:11 36:24
58:10 60:17
61:18 62:3,4,8
62:19 63:5,9,13
63:19 65:3,25
66:5 74:25
75:24 76:20
82:23 85:2,3
88:16 107:25
110:15 121:13
128:6 130:23
131:8,23,25
132:3,21
134:14 135:23
137:12 142:18
142:25 143:2
144:6 145:15

145:18,20
156:3 162:22
171:5
particularly 8:9
24:4 170:3
particulars
116:24
parties 174:16
patch 168:9
Pause 13:6 40:24
48:21 57:19
67:3 77:5 79:21
98:24 102:4
151:10
pave 40:20 41:19
42:7,10,13
58:18 66:18
74:11 133:2
paved 42:8
paver 78:17
106:3
paving 1:11 2:13
13:18,25 14:7
14:13,23 15:10
20:5 23:4 25:15
27:8,23 32:5
40:5,7,15 41:2
41:17,18 42:4,4
42:17 44:15
57:17 58:17,19
59:21 60:23
61:2,6,14,16,19
61:24 66:19,20
66:21,24 67:14
67:16 74:7,10
74:12,13,22,23
75:2,6,7 76:24
77:11,18 91:17
91:20 97:11
99:2,3 100:25
106:6 109:14
109:19 115:17
115:20,23
116:6,15
118:19 119:7
119:12,21
122:10 134:13
136:23 137:2
137:14 161:6
161:23 162:3
172:7,9
Paving's 41:14
44:16
pay 14:7,10
21:11,24 22:4

81:22,24 84:12
84:17,23 85:3,6
85:12 86:3
91:10 92:12,18
92:21,25 97:23
98:8 99:17
100:15 101:3
108:11 109:22
110:2,3,6 111:8
113:13 129:25
130:2,5,12
155:22,25
156:2,4 161:6
161:17 172:7
payables 18:7
paying 22:3,6,18
31:5,18 160:17
payments 110:14
110:19,21,24
111:5 159:18
payroll 17:7
125:15 139:20
140:15,16,19
140:24,25
141:3,4,4,5,11
141:18,18,22
141:23 142:21
142:22 145:7
146:19,21
155:19
pays 21:21 23:3,6
23:9
pending 17:5
114:18 144:24
people 18:15,21
24:5 102:15,20
127:10 149:24
160:10
percent 25:13
42:22 48:16,19
percentage 25:10
25:11 42:16,19
42:21
Perez 1:7 101:8
101:16
perfectly 31:15
perform 21:8
24:22 51:20
performed 61:3
performing
26:14
performs 17:7
21:5,18 28:4
30:8,14
period 35:11

65:11,13 73:9
89:21,25 100:8
110:11 112:16
130:23 131:3,8
131:17 132:3
142:7 143:3,6
144:6,11
145:19,23
146:2
perjury 5:18
permissible 7:19
person 16:20
22:15 27:9 33:7
63:4,17 90:3
101:17 131:24
139:16 150:6
151:12 152:13
153:21 166:11
personal 53:15
53:16,18 54:7
54:14,17 55:13
63:23 69:14
107:2 114:5
personally 19:17
36:3,6 38:4
47:12 51:16
54:2 69:4 87:21
96:25 107:19
107:20 109:24
111:15 117:9
117:14 132:20
148:7 158:5
personnel 17:15
17:21 88:17,22
89:18,22 90:2,5
98:13
pertain 84:16
167:22,24
pertaining 29:7
35:22 36:18
73:20
pertains 18:9
petty 113:17
phone 39:17 51:2
53:12,14 54:20
55:6,9,16,18,21
63:17,23 64:10
67:23 69:25
96:3 111:21
pick 27:12 38:17
134:8 165:13
165:17 166:2
picked 165:23
picks 39:11
pickup 78:18

106:3,5
piece 51:4 52:24
54:21,23,25
55:6 64:11
67:25 68:2
123:2,2 135:23
pieces 53:3,9
place 1:22 50:19
77:23 105:4
121:2
plaintiffs 1:8 2:4
2:9 3:12 82:4
95:21
Plaintiff's 126:15
127:4 128:20
129:3,18,24
132:10,13,18
134:25 139:13
161:5 162:2
172:4
plant 23:22
138:15,19,23
164:12 167:2
167:23 168:5
please 4:23 5:2
8:16 18:4 28:23
30:19 39:8 51:6
138:24 147:13
150:20 157:14
159:23 161:25
169:10
PLLC 2:4
pocket 110:5
point 30:24 37:3
37:3,7 38:12
39:10 80:23
91:16 93:6
128:24
policies 73:16,20
port 80:8,13,16
posed 27:11
position 94:16
positions 10:11
20:4,7
possession 71:18
89:22 167:5,8
possibly 151:11
158:22
power 34:5,18,25
88:5,8,11
Pracelis 1:5 95:8
95:18,22
practice 33:9
36:21 37:25
54:20 64:19

72:23 87:8
88:21 110:18
110:23 118:9
121:10 123:9
133:7 146:12
147:4 156:24
160:9 166:8
169:7,16,23
170:5
preceding 51:7
predominantly
40:20
prefer 94:13
preliminary 3:13
premarked
121:22 124:10
124:16 126:15
132:12 139:5
139:12
premises 10:23
11:16,20 23:15
23:18,19 44:6
44:11,17,19
prepared 36:14
163:14
prepares 163:17
present 106:19
129:6 136:3,5
166:9
preserve 4:20
president 5:21,23
6:12 10:12
36:11 67:6
77:18 140:8,11
pretty 79:13
112:10 131:4
134:19
prevailing 42:23
42:25 43:11,17
43:19 141:4,5,8
previous 68:23
82:20 170:17
Previously 82:6
price 108:4
prices 108:3
printed 135:12
prior 12:25 13:8
13:12,24 14:3,7
14:11 15:14
32:24 53:24
54:13,19 64:10
65:20 66:10
67:18,22 68:9
68:13 85:5
91:16 124:22

128:5 129:13
140:22 146:15
146:19 154:24
157:19 160:3,5
163:13,14,15
**private** 8:21 13:3
41:25 42:7,8,10
**privileged** 4:4
**probably** 13:7
20:25 25:13
40:25 43:17,19
48:12 73:24
86:8 108:18,21
109:2,11 118:6
125:15 128:18
134:19 138:22
144:2,13,17
156:9
**problem** 12:12
**procedure** 19:6
19:10,11,15,17
20:10 94:4
121:2,5,16
**procedures** 50:19
**process** 22:17
26:3,6,7,24
28:10 29:5,17
32:11 38:20
51:21 52:11
59:5 64:4,6,8
65:9 70:3,12
85:3 103:21
125:13
**produced** 29:8
83:7
**production** 29:13
29:20,23
**profits** 50:3,5
**program** 51:11
52:14
**prompted** 54:16
**pronunciation**
10:4
**proper** 4:3
**properly** 160:8
160:18
**provide** 38:17
134:9
**provided** 162:23
162:24
**Public** 1:23 3:4
171:18 174:8
**punch** 104:7,11
**Punctuality**
86:24

**purchase** 54:3
106:16
**purchased** 54:5
69:14 106:17
**purpose** 83:20
105:7 128:16
133:18 140:9
140:13 147:25
148:15,15
155:17 160:15
162:19
**purposes** 54:14
54:17
**pursuant** 1:22
**purview** 72:13
**put** 37:11 52:12
55:18 63:10
69:23 88:15,16
98:23
**P.C** 2:12
**p.m** 59:13 77:23
78:6 171:12
**P.O** 23:17

**Q**
**question** 4:3,21
4:22,23 5:2,6,6
11:7,23 12:2,15
17:4,5 18:4
28:23 30:2,19
38:17 39:4,8
41:11 45:15,19
45:24,25 68:23
74:6,21 77:3
79:25 80:12
81:6 82:18 89:8
89:11,13,16
92:20 100:11
101:13 102:18
103:6 114:9,14
114:17,18
115:25 118:21
126:22 129:5
131:11,15
132:6 134:7,9
135:20 140:22
141:14 142:7
142:11 144:24
169:10,14,19
170:15,17
**questioning** 8:8
**questions** 3:13
9:13 11:14 12:6
12:7 27:11
38:16 126:24

**quick** 168:22
**QuickBooks**
51:12,14 52:15
107:19
**quickly** 28:25
139:4
**Quintanilla** 1:4,5
85:22 96:10
149:14 150:17
151:7 166:18
166:19,20
**Quinteros** 1:7
100:19 161:18
161:19
**quite** 99:20 101:5
158:22

**R**
**R** 2:2 3:2,2 174:2
**radio** 92:10
97:20
**rarely** 78:4,7,12
81:17 111:6,13
**rate** 82:2,3 92:12
92:18 101:3
105:19,22
**rates** 105:23
**rationale** 55:15
**read** 17:3,5 18:3
18:5 39:7,9
41:12 51:5,7
101:15 114:18
150:25 157:23
**ready** 61:18
168:21
**really** 8:4,8 13:10
47:21 102:2
113:15
**reason** 159:8
168:5
**reasons** 79:8,8
**receivables** 18:10
**receive** 26:10
49:22,24 50:5
125:12 148:6,7
155:6,14,17
163:2,3,4,10,12
165:14,15
168:17 169:8
169:16,21,23
170:5,22 171:2
**received** 128:19
169:13 170:12
**receiving** 163:16
**recess** 18:2 39:6

69:12 101:12
145:5 168:23
**recession** 107:22
107:24
**recognize** 125:20
127:3,5,8,9,23
129:15 132:23
135:8 136:14
138:8,11
145:14 147:20
147:22 148:8
150:3,5,12,24
151:2,3,17,22
152:12 153:22
154:12,22
155:2 156:18
160:19 161:22
162:15
**recollect** 143:14
**recollection**
123:15
**record** 4:20
12:21,21 17:25
18:5 21:14
24:15,16 25:24
28:25 29:2 39:9
41:12 51:4,14
52:23 53:13
54:20 55:9
62:18,21 63:5
63:22 65:16,17
65:20 69:11
80:18,19 82:9
82:10 93:12
94:9,24,25
101:11,15
103:23 105:9
110:14,17,18
128:18 133:20
133:23 140:20
145:7 146:5,6
146:20 174:13
**recorded** 64:11
65:10 82:7
111:21 131:17
**recording** 52:4
55:5,16 65:12
112:7,9 113:17
**recordings** 72:19
**records** 51:25
53:7 62:25
83:22 86:7,11
90:7 93:13
105:9 108:7
121:19 140:15

140:16 146:19
155:19
**refer** 7:2 140:2
146:8 163:19
167:15
**reference** 79:24
81:13 128:18
**referenced**
106:11 122:12
132:17 133:5
**referred** 68:16
**referring** 13:12
13:15 21:15
48:8 52:8 54:23
74:17 125:18
127:20 138:22
139:15 146:25
164:7 166:16
166:17
**refers** 52:6
141:20,25
167:21
**reflect** 103:23
**refrain** 12:18
**regard** 93:25
94:3
**regarding** 70:13
71:2,7,18 72:24
73:5,7,15,20
82:14
**rehire** 36:19
38:13 39:11,13
**related** 174:15
**relates** 44:20
116:3
**relationships**
25:25
**relevance** 102:13
107:16
**remain** 27:17
**remaining** 57:14
**remains** 11:14
24:25
**remedies** 93:16
**remember** 5:14
32:16 68:6
113:8,10
136:15,15
137:9 158:20
**Renato** 90:19,20
113:4 127:24
160:21,22
**repeat** 5:3 28:23
30:19 41:10
77:2 114:17

119:9
**repeated** 12:7
**repetitive** 23:14
**rephrase** 4:24
49:15 82:18
89:12 100:12
106:10
**report** 63:12,16
63:18 64:19
65:2,4 67:21,24
75:15,25 76:6
87:16 103:7,10
103:13,15
114:11,19
159:5
**reported** 64:13
**reporter** 3:17
**reporting** 166:14
**reports** 51:19
**represent** 3:12
7:23,23 94:10
94:11
**representation**
103:25
**represented** 3:20
**representing**
120:16,19
**represents**
123:23
**request** 19:7
20:11 72:2,14
117:23 118:2,3
**REQUESTED**
71:23 72:9
173:9,9
**requesting** 71:21
93:2
**requests** 72:16
**require** 84:2,5
**required** 3:16
4:22 7:16 17:2
24:14 41:9
82:17 103:3,18
104:22 105:2
116:9 130:15
140:18 166:25
**requirement**
73:12
**requires** 8:8
**requiring** 20:20
**resemble** 132:4
132:10
**resembles** 124:21
**reside** 3:8
**resolution** 117:6

**respect** 6:7 9:12
~esponded 45:15
~esponse 5:8
  16:25 24:14
  41:9 51:6 82:16
  89:23 93:20
  116:8 130:14
  140:18
**responses** 3:16
**responsibilities**
  16:21 28:3
**responsibility**
  16:11,14 17:7
  68:9,14 76:6
  101:24 148:5
**responsible**
  52:20 61:23
  64:16 65:24
  75:11 119:2,5
  119:10 125:6
  139:16 154:16
  158:8 166:21
**rest** 136:16
**retain** 70:6,20
  71:15 72:6,23
  73:2,3,8 89:18
  89:21 146:12
  165:6 167:4,7
**retained** 70:25
  71:6,8 161:8
  162:6
**retention** 73:15
**retrieval** 128:23
**retrieve** 71:20
  86:11
**return** 95:20,23
  159:14
**returns** 118:19
  119:3,6,11,15
**review** 121:23
  124:12 129:18
  132:12,18
  139:4 147:4,12
  149:4 150:19
  152:2 153:12
  156:11 159:22
  162:11 168:24
**reviewed** 82:22
  82:25 83:5
  124:16 135:2,6
  139:12 149:9
viewing 122:2
  122:3 124:14
  126:20 129:21
  132:15 135:4

139:3,10
142:13 147:18
149:7 150:22
152:5,22,24
153:15 154:8
154:10 156:13
157:14,16
158:18,23
159:25 161:10
161:12 162:13
169:2
**revisit** 94:7
**right** 7:13 80:6
  80:12 121:7
  144:25,25
  145:2,16 171:7
  171:11
**ring** 91:22 95:2,4
  95:8 96:8,10
  97:3 100:19
  101:8
**Rivera** 1:5 96:13
  97:23 98:2
  152:7,15 153:2
**road** 42:3 59:6
  61:18 142:25
**roads** 40:21
  41:24,25 42:7,9
  42:11,13
**Rodriguez** 1:6
  99:5 125:5
  130:22 131:7
  155:23
**role** 148:19
**roller** 99:10
**rollers** 78:18
  106:3
**rules** 3:14 4:17
  7:15,20 73:14
  94:3
**run** 101:24
**runways** 40:23
  42:5

——————
      **S**
**s** 2:2 3:2 41:3
  172:2
**Saul** 2:15 94:19
  94:20
**saw** 82:13 128:4
**saying** 168:3
**says** 123:19,24
  126:2 132:25
  137:6 144:22
  159:15

**scale** 84:12,15,23
  85:3,6,12 86:3
  91:10 92:21,25
  97:24 98:9
  99:17 100:15
**scales** 84:17
**schedule** 59:9,10
  59:12 77:22,23
  135:12,18
  136:22,24
  137:3 146:10
  163:10,12
  165:18,23
  166:2 168:18
**schedules** 123:4
  135:22 146:13
  146:23 162:3
  162:23 163:2,5
  163:17 164:15
  164:16,23
  165:5,13 167:5
  167:7 172:9
**Scheduling** 48:20
**school** 8:25 9:5,9
  9:17,24 15:5,8
  35:21,25 36:4,6
  36:8,10,13,14
  36:16,21 37:4,8
  37:11,16,23
  38:21 39:11
  67:15 102:16
  102:21
**seasonal** 35:5,9
**second** 127:20,22
  137:19 141:22
  150:6 154:19
  155:11,14
  167:15
**section** 123:21
  132:25 137:6
  141:22 144:20
**see** 79:7 81:14
  111:4 122:16
  125:18 126:11
  136:24 137:7
  137:14,21
  138:15,19
  143:20,22
  151:13 167:18
**seen** 111:10,15
  117:21 124:19
  124:21 127:6
  128:7 129:12
  129:23 153:17

154:24 157:18
  160:3
**sees** 27:16
**Selden** 3:9 8:19
**self-reporting**
  104:15,17,21
**separate** 56:5
  105:19 118:18
**separation** 48:6
**series** 29:6 154:6
**set** 22:3 43:6
  57:25 59:8,10
  59:12,17,18,19
  60:3,13 61:24
  77:23 84:17
  107:3 174:12
  174:19
**sets** 60:20
**setting** 60:6
  61:13,16
**setup** 57:16,24
  58:2,6,11,13,16
  60:3,13,14,17
  60:20,24 61:3,6
  61:13,24 66:4
  95:12 142:17
**seven** 8:4,7 56:14
  56:21 109:12
  156:23
**share** 11:15 45:5
**shareholders**
  118:15
**sheet** 64:11 67:25
  68:3,16,19,21
  68:25 69:5,7,8
  87:16 122:14
  123:6 125:4
  131:23,25
  132:2,3,19
  134:11,13,21
  142:22 146:10
  146:21 148:3
  154:14,14
  169:4 171:2
**sheets** 83:6,7,9
  83:13,15,18,21
  83:24 84:3,6,10
  104:18 105:3,8
  111:17 121:8
  121:11 122:11
  122:25 123:11
  123:14,17
  125:16 131:16
  131:20,22
  132:17,21

133:8,10,15,18
133:23 134:4
134:11 146:13
146:22,24,25
147:5 148:6
154:17 155:7
164:21 169:8
169:13,23
170:4,6,22
171:4,5
**shoots** 59:7
**shop** 119:24
  120:2,16,19
**Short** 18:2 39:6
  101:12 145:5
  168:23
**shorten** 7:2
**show** 90:24 91:3
  92:3 96:23
  97:14 100:7,9
  147:11 154:6
  157:13
**showing** 159:6
**shown** 144:10
**shows** 27:13
  130:24,24
  144:7 145:13
  145:21 149:22
  153:4 154:5
  156:5,5,6 168:9
**sic** 43:13
**signature** 139:21
  140:5,12 150:3
  150:5,9,11,12
  151:12,13,15
  151:18,22
  152:12 153:22
  153:24 160:19
  160:24,25
**signatures** 148:8
**signed** 160:9
**signifies** 125:25
**signify** 144:21
**signing** 140:7
  146:15,19
  152:13 153:21
**signs** 151:24
**silly** 9:16
**similarly** 65:24
**simple** 68:25
  87:16,18
  109:12
**sister** 107:18
**sit** 12:14 26:11
  32:19 142:19

145:17
**site** 27:17 29:10
  40:17 56:11,21
  57:6,15 60:17
  60:21,23,24
  61:11,25 66:9
  103:4,7 115:2,6
  120:17 121:15
  143:5,16
  166:12,20
  168:7
**sites** 22:25 24:20
  25:3,8,12 46:25
  48:3 56:4,5
  57:7
**six** 56:14,21,25
  57:3 137:14
**Sixty** 48:13
**SJF** 1:9
**skills** 8:10
**slow** 119:8
**small** 60:12
**software** 51:8
**sole** 6:17,19
  11:20 14:19
  27:19 33:7
**solely** 52:20
  74:22 106:4
  158:8
**somebody** 27:7
  80:22 81:5 84:6
**sorry** 140:9
**sort** 15:9 20:12
  41:18 78:19
  79:19 87:16
**source** 14:19
  31:8
**span** 11:6
**speak** 93:13
  94:14,19,20
**speaking** 12:18
**speaks** 93:12
**specific** 4:6,8
  18:17 29:7 46:2
  84:16 89:24
  107:8 113:24
  114:2 121:12
  141:8 142:2,3
  144:15,16
  146:18 171:6
**specifically** 22:22
**specifications**
  133:20 149:15
**specifics** 56:12
  69:2 159:2

**specify** 120:4
142:3
pelled 122:9
**spend** 24:17 25:2
25:7,11 48:2
**SS** 174:4
**staffed** 77:7
**stamped** 129:9
139:24 161:6
162:3 168:8
172:7,9
**standard** 156:24
**start** 14:22 36:19
38:21 58:2,5
62:22 66:24
76:8,9 78:2
89:5 102:23
103:2 114:10
114:15 137:17
137:18 140:23
164:11 165:9
165:11 166:6
167:19,24
168:12
**started** 66:18
67:13 68:12
75:9 77:24
89:20 91:21
106:18 164:9
164:14
**starting** 109:10
137:20
**starts** 167:25
**state** 1:23 7:16
21:15 42:3
43:16 169:10
174:4,9
**stated** 54:7
**statement** 12:5,9
16:24 24:13
41:9 82:16,20
116:8 130:14
140:17
**statements** 28:18
160:10
**states** 1:2 134:15
148:22 152:9
**stating** 160:8
**stay** 75:23 76:13
**step** 39:4
**stepmother** 10:7
17:11
**steward** 119:24
120:16,19
**stewards** 120:2

**stop** 78:5
**stopped** 123:9
**storage** 73:20
**store** 70:13
**Street** 3:9 8:19
**strike** 15:23
25:15 36:19
38:20 71:5
77:25 80:7
88:25 89:13,16
104:4 105:25
126:4 129:23
150:4 168:16
169:13
**stub** 129:25
130:2 155:22
155:25
**stubs** 108:11
130:5,12 161:6
161:17 172:7
**stuff** 126:23
**Subscribed**
171:16
**subtract** 7:12
**subtraction** 8:12
**Suffolk** 1:11,11
2:13,18 6:2,8
6:12,15,22,24
7:2,3,7 10:9,12
10:14,16,22
11:2,10,15,20
13:18,25 14:7
14:13,20,22
15:9,17,19
16:20 17:8,15
18:13,18,24
19:2 20:2,5
21:2,6,9,11,18
21:21,24 23:4
23:14 25:15,16
25:17 26:3 27:3
27:4,20,22
29:12 30:5,8,14
30:17,21 31:3,5
31:6,19,23,25
32:4,22 33:5,23
34:3,6,13,19
35:4,13 36:9,12
36:20 37:7 38:5
39:12 40:5,7,8
40:11,13 41:2
41:14,18 42:4,7
42:10,13,17
44:7,10,15,16
45:10 46:4,8,21

47:3,5,9,11,23
49:11,18,24
50:13 51:9,21
51:24 52:21
56:25 57:10
61:8 65:23
73:14,19 74:3,7
74:9,10,12,23
75:3,5,7,8
76:23,24 77:7,9
77:10,11,18,20
78:13,22 83:7
83:13,20 84:22
88:21 89:19
91:13,17,20,20
95:15,19 96:15
96:18,21 97:5,8
97:11 98:19,25
99:3,11,14
100:3,22,25
102:8,12,15,20
103:20 104:14
105:3,7,25
106:4,6,7,8,12
106:21 107:3
107:21 108:5
108:20,25
109:5,14,19
113:13,16
115:17,19,23
116:6,13,15,16
117:12,18
118:8,13,15,18
118:19 119:3,6
119:11,21,24
120:9,23 121:3
122:10 125:4
127:11,14
128:12 130:2,5
136:2,10,11,20
136:23 137:2
149:24 151:7
156:25 157:11
157:25 158:16
158:24 161:19
162:2 163:21
163:23 167:4,6
172:9 174:5
**suggest** 9:10
**summer** 100:13
**Sunrise** 2:14
**supermarket**
13:4
**supervise** 58:10
58:15 62:11,15

66:15 77:12
**supervised** 67:19
75:16,20 76:3
81:2
**supervises** 59:21
59:24
**supervising**
58:13 65:24
68:9 75:12
80:21,22
**supervision**
16:17
**supervisor** 80:2,9
80:21,24 81:8
115:15 143:5
143:11 150:11
162:25 164:3
**supervisors**
105:11
**supervisory**
16:11
**supplied** 46:21
71:24 72:10
**supplier** 46:10
**supposed** 8:2
43:6,10 141:9
**sure** 19:11 20:19
20:22 26:16
27:14 30:20
33:11 34:4 43:3
46:20 47:19,21
52:13,18 55:4
58:25 59:20
77:4,4 81:10,21
84:13 87:7,13
92:23 93:22
98:5 100:14
102:19 103:19
105:17 108:11
112:14 122:5
131:4 134:10
137:4 146:7
148:16 151:11
159:16 160:16
162:16 164:20
165:7 169:11
**Suzanne** 2:21
3:21,22
**swipe** 103:20
**switch** 40:7
**sworn** 3:3 28:19
171:16 174:12
**system** 78:13,17
79:11,15 80:7
81:12,15 104:7

104:11
**systems** 78:14,15
78:19 79:5,24
80:5

---

**T**

**T** 3:2 172:2 174:2
174:2
**table** 123:21
**take** 17:24 29:18
60:6,10 93:23
105:16 108:23
109:4 110:5
145:3 163:15
168:22
**taken** 1:22 3:17
5:11 18:2 39:6
69:12 101:12
104:4,5,6 110:4
145:5 168:23
**takeoff** 29:16,18
**takeoffs** 26:10
28:12 29:15,21
29:24 32:20
**talked** 8:3
**talking** 22:9
114:3
**tardy** 87:9,12,22
**tarmac** 61:21
**tax** 118:18 119:3
119:6,11,15
**Taxiways** 40:23
**technology** 123:2
125:14
**teeth** 59:6
**tell** 4:23 5:2,5 9:5
15:3 19:15
20:10 36:24
38:25 41:2,4
43:21 45:21
61:24 65:13
71:25 130:22
166:12,19
**telling** 27:7 81:19
**template** 128:12
**ten** 87:2,11
**term** 17:19,21
18:6,11 24:10
35:8 42:23 43:4
80:14,14,16
101:19,23
135:17
**terms** 18:12 30:7
34:8 54:24 64:5
84:23 156:4

**Testa** 115:13,14
115:17,19
**testified** 3:4 11:9
54:10 57:10
60:3 70:19
75:11 76:2 82:6
102:23 104:18
105:10,24
106:2 111:17
111:24 112:8
**testimony** 44:16
75:22 76:12
86:15 111:12
128:4 141:7
150:14 174:13
**thank** 8:15 94:22
120:15 171:7,8
**theft** 79:8
**They'd** 118:6
**thing** 139:8,9
**things** 5:14 8:14
12:16 15:9,11
15:16 36:8,14
41:18 62:5
79:10 105:18
110:16 113:13
159:11
**think** 4:3 7:11
8:5,10 54:9,10
89:10 99:18
120:12
**third** 127:22
**Thirty** 108:22
109:3
**Thomas** 16:9,10
16:16,19 17:11
18:16,22 20:15
21:20 24:7
26:20 30:11
34:14 39:21
50:21 51:18,25
53:2,5 58:12
60:2 62:2 63:3
63:11 64:25
75:25 76:19
83:16 84:7,9,24
90:11 91:4 92:5
96:4,25 97:21
115:16 117:20
121:18 125:8
131:22 133:12
135:13,14
143:12 147:2
152:14 153:10
155:13,16

159:16 163:18
164:4
**iree** 8:8 18:21
19:18 26:22
30:11 60:10
109:21 126:22
139:21
**till** 106:18
**time** 1:21 7:25
11:5,6 12:24
22:20 25:3,7,11
25:11 30:7,10
30:14 35:11,22
48:2,19 50:16
51:8,21 55:12
56:4,16 62:17
64:8,11 65:8,11
65:13 66:5
67:25 68:3,16
68:19,21,25
69:4,7,8 73:9
74:19 76:7,8,9
76:17 79:9
80:24 83:6,7,9
83:15,18,21,23
84:3,5,9 89:21
89:25 90:7
100:8 102:23
103:2,9 104:7
104:11,18
105:3,8,9,14,15
105:16,20
111:17 112:9
112:11,16
121:8,10
122:11,14,25
123:4,6,11,14
123:17 125:4
128:18 130:25
131:3,8,16,17
131:20,21,23
131:25 132:2,3
132:3,17,19,21
133:20 134:11
134:11,14
137:17,18
142:7 143:3
144:6,11,14
145:19 146:10
146:13,22,24
146:24 147:5
154:14,14,17
155:6 156:6,7,8
156:9 159:4
163:4 164:15

164:16,20,23
165:5 166:6
168:4 169:4,8
169:13,23
170:3,5,22
171:2,4,5,12
**timeliness** 86:19
86:22,23
**times** 11:24 12:5
12:15 58:3,4
95:25 96:5
97:17 110:8,15
111:10 116:18
**title** 19:23 27:4
27:19 67:5,7,7
77:14 84:16
115:16 148:17
149:15
**titles** 6:7,10
77:19
**today** 3:20 4:16
5:13 19:12,16
26:17 69:19
71:11 75:2,22
77:12 86:15
92:16 112:8
124:19,22
128:5 129:3,13
134:5,5 142:19
145:17 153:17
154:24 157:19
160:4,5 164:17
**told** 14:25 19:19
31:21
**Tom** 19:21,23
20:4,7,17 34:18
34:25 47:21,23
48:2,5,18 49:3
49:7 50:9,12
52:19 63:13,20
64:13,15 65:3,6
68:3,5 75:17
88:5 103:15
112:3 124:4,6
134:20 151:17
**Tons** 36:8
**top** 79:13 86:4
122:6 129:15
136:22 141:18
141:23 143:20
148:18 151:6
**TOT** 143:19,24
**total** 123:20,24
131:3 143:25

**touch** 166:24
**tough** 108:3
**town** 42:3 148:18
148:22,23,25
**township** 42:18
43:18
**townships** 42:14
**track** 51:22 79:7
79:15 81:16
148:13,24
**tracking** 78:19
**transcribed** 3:15
**transfer** 53:2,3,9
63:23 68:2
91:19
**transport** 47:8
**travel** 168:4
**traveled** 79:9
**treasurer** 6:24
118:13
**TRIAL** 1:19
**tried** 92:10 96:4
97:22
**troubles** 159:7
**truck** 59:7
**trucks** 15:15
46:12,13,15,18
47:15 78:18
106:3,5 113:25
168:13
**true** 94:21
174:13
**try** 92:4,9 95:22
95:25 96:5,24
97:15,19
**trying** 8:6,6
98:23
**Tulio** 1:7 101:8
101:16
**turn** 129:8
154:19
**turned** 92:11
97:20
**Turning** 155:20
**Turnpike** 2:19
**Twenty-seven**
7:6
**twice** 96:7 160:13
**two** 44:21 53:23
54:3,8,11,13,19
55:10 56:9,16
57:7 102:2
109:21 120:11
125:13 126:22
130:24 135:8

136:6,7 141:23
141:25 142:5
156:6
**two-minute**
145:4 168:22
**type** 7:17 25:14
25:16 140:16
140:19 159:11
171:2
**types** 83:4 128:5
140:25
**typo** 137:5

**U**
**unable** 111:2
**unaware** 31:16
**understand** 3:18
4:23 5:6,16,18
17:17,19,21
18:6,11 35:8
45:16 80:16
101:19 125:24
126:3 148:17
149:2 160:17
**understood** 5:7
**unemployment**
37:14,22 38:2
157:24 158:3,9
158:12
**union** 67:9,11,12
84:12,17,23
85:6 86:3,8,9
91:10 92:18,21
92:25 97:23
98:8 99:17
100:15 101:3
119:24 120:2,4
120:8,13,14,16
120:17,19,20
120:22,23
141:3
**unionized** 67:7
85:16
**unions** 84:18
105:23 120:9
**UNITED** 1:2
**unreal** 9:3
**upcoming** 26:9
28:6
**upload** 70:2
**use** 24:10 31:6
51:9,10,12,14
53:12 54:7,11
54:13 55:7 70:4
70:17 78:13,15

79:12,15 80:6
81:11,15 85:3
86:11 107:19
107:20 123:3
133:17 157:4,7
157:10
**uses** 79:11
125:15 134:11
134:12
**usually** 33:9
57:22 65:3

**V**
**V** 3:2
**variables** 28:8
**varies** 56:15
**various** 71:12
74:2
**Vecchia** 1:11,11
1:12,20 2:13,13
2:19 3:7,11 4:1
5:1 6:1 7:1 8:1
9:1 10:1,2,6
11:1 12:1 13:1
14:1 15:1 16:1
17:1,12,12 18:1
18:6 19:1,21,21
20:1,18,21 21:1
21:4,11,15 22:1
22:18 23:1,3,6
23:9,11 24:1,7
25:1 26:1 27:1
28:1 29:1,3,23
30:1,12,13 31:1
31:2,6,17 32:1
33:1 34:1 35:1
36:1 37:1 38:1
38:7 39:1,25
40:1 41:1 42:1
43:1 44:1 45:1
45:24 46:1 47:1
48:1 49:1 50:1
51:1,19,20,23
52:1,3,9,20
53:1,10 54:1
55:1 56:1 57:1
58:1 59:1 60:1
61:1 62:1 63:1
63:18 64:1,16
64:20 65:1 66:1
67:1 68:1 69:1
69:13 70:1 71:1
72:1,11 73:1,24
73:25 74:1 75:1
76:1 77:1,16,19

78:1 79:1 80:1
81:1 82:1 83:1
83:16,17 84:1
85:1 86:1 87:1
87:24 88:1,10
89:1 90:1,11
91:1 92:1 93:1
94:1 95:1 96:1
97:1 98:1 99:1
100:1 101:1
102:1 103:1
104:1 105:1
106:1 107:1
108:1 109:1
110:1 111:1,13
112:1 113:1
114:1 115:1
116:1 117:1,19
118:1 119:1,4
119:14 120:1
121:1,21 122:1
122:3 123:1
124:1,9 125:1,9
126:1,5,11,14
127:1,3 128:1
129:1 130:17,8
131:1 132:1
133:1 134:1
135:1 136:1
137:1 138:1,6
139:1,4,18
140:1 141:1
142:1 143:1
144:1 145:1,6
146:1 147:1
148:1 149:1,9
150:1,19 151:1
152:1,2 153:1
153:25 154:1
155:1 156:1,22
156:23 157:1,6
158:1,7 159:1,8
159:13 160:1
161:1,12 162:1
162:9 163:1
164:1 165:1
166:1 167:1
168:1 169:1
170:1 171:1,14
**Vecchia's** 51:6
77:14 119:5,10
125:10
**Vega** 1:6 99:23
99:25 154:3
158:11,14,19

159:4,13
'ega's 158:2,5
ehicles 105:24
  113:23
Verbena 1:15
verify 80:2 81:12
  99:20 131:6,9
  145:22,25
  146:20
verifying 80:8
vernacular 80:15
Victor 127:19
  136:8 166:5,15
  166:16,16
viewed 12:7
violations 116:14
virtually 94:19

_____

**W**

W 1:5
wage 21:12 42:23
  42:25 43:6,11
  43:17,19 49:11
  49:14 90:9
  116:13 141:8,8
wages 14:7,10,14
  14:17 73:8
  81:25 84:15
Wallace 2:8 3:5
  3:11 4:2 7:13
  8:13,17 9:6,12
  11:25 12:10,17
  12:23 17:3,25
  18:3 24:15
  28:24 39:7
  41:10 51:5
  54:12 68:24
  72:5 77:17
  82:18,21 89:13
  89:16 93:11,15
  93:22 94:9,12
  94:16,21,24
  101:11,13
  104:3,6 114:7
  114:16 130:18
  140:22 145:2
  149:2 161:3,25
  168:21 170:10
  170:14,18
  171:7,11 173:4
Walter 1:4 91:22
  92:4,12
want 3:13 12:23
  15:2 20:11 26:7
  31:12 45:25

56:14 77:2
89:14 90:24
114:15 125:2
159:3 168:2
wanted 131:6
wants 19:5
warning 150:6
  151:13 152:13
  153:7,21
wash 15:15
wasn't 121:15
  169:22
waste 12:23
way 11:25 111:2
  145:17 148:19
  174:17
ways 108:12
WDW 1:9
weather 35:16,22
  36:18,25 37:4
week 22:2 63:9
  64:3 78:8 87:19
  97:18 113:12
  123:25 131:23
  145:12,20
weekends 78:11
weekly 124:7,8
  154:14,17
went 9:5,9 32:13
  108:4 133:21
  141:6 151:3
weren't 104:22
we'll 28:11
we're 8:2 35:23
  40:15 81:19
  145:3 166:6
we've 106:17
  160:17
WHEREOF
  174:19
wide 114:9
winding 115:22
  116:6
Withdraw
  140:22
withdrawing
  68:22 82:19
  170:16
witness 3:2 28:17
  28:23 72:17
  93:17,19 120:7
  122:2 124:14
  126:20 129:10
  129:21 132:15
  135:4 139:3,10

142:13 147:18
149:7 150:22
152:5,24
153:15 154:10
154:20 156:13
157:16 158:18
158:23 159:25
161:10 162:13
169:2 174:11
174:14,19
word 25:23
words 136:23
  137:14 138:15
work 12:25 13:8
  15:7 22:25 24:5
  24:20,22 25:3,7
  25:12,24 27:2
  35:23 36:9
  37:21 39:14,16
  48:3,5 54:14,17
  56:4,5 57:6,7
  57:15 59:9,10
  59:12 60:21
  61:10,25 77:22
  77:23 78:2,5,9
  78:11 81:20
  90:24 91:3 92:3
  92:9 95:20,23
  96:23 97:14
  100:7 103:4,7
  115:17 120:17
  121:15 143:2
  144:14 145:11
  145:23 146:22
  158:16,24
  159:5,14
  166:12,20
  168:7
workday 24:18
  103:10,12,16
  114:12 144:16
  167:2
worked 13:3,24
  14:4 32:25 89:3
  92:13 110:24
  111:5 115:15
  131:7,12
  142:24 144:5
  144:11,19,22
  145:18,25
working 14:22
  56:3,11,25
  57:22 58:2
  76:24 95:19
  115:19 121:16

143:15 164:14
works 62:8
worksheet
  162:20
worksheets
  162:16
wouldn't 17:17
  33:2 65:22
  73:22 108:14
  110:6 114:9
  133:14 134:24
wrap 168:21
write 51:3 87:15
  88:3,5,13
  169:24 171:3,5
write-up 88:14
  149:13
write-ups 88:19
writing 137:7
  149:24
written 19:6,10
  19:12 121:2
wrong 11:10
  13:24 44:6 50:9
  64:4 69:18
  75:10 76:13
  111:16,20,23
  145:10 154:15
wrote 111:24

_____

**X**

x 1:3,14 172:2
  173:2

_____

**Y**

yard 15:11 23:25
  24:11,18,21
  25:3,8,12 45:2
  46:22 48:9 65:5
  65:6 103:10,13
  103:15 114:20
yeah 14:2 18:12
  21:25 22:16
  43:15,15,19
  48:10 57:5 58:9
  58:22 60:11
  61:20 70:10
  87:4 108:23
  109:4 110:16
  111:11 116:17
  121:8 122:14
  123:8,18,18
  131:4 142:12
  144:13 146:14
  150:25 153:23

160:7 166:14
year 35:10,12
  38:25 62:4 68:6
  112:20 160:13
years 9:4 53:23
  54:4,8,11,13,19
  55:10 106:18
  159:3
York 1:2,15,24
  2:5,5,10,10,14
  2:20 3:9 8:19
  174:4,9
younger 107:17
  107:17

_____

**Z**

ZABELL 2:12
  2:15 4:9 7:22
  8:15 11:13 12:4
  12:11 16:5,23
  16:25 17:24
  18:20 24:13,24
  25:4,20 27:10
  28:16 30:18,23
  31:12,15 32:17
  33:12,21 35:7
  36:5,17,23 37:6
  37:9,13,17 38:3
  38:15 39:3 41:8
  41:15 44:9 56:8
  57:8 62:9 66:3
  68:11,22 69:11
  71:3,25 72:11
  72:21 73:10
  74:14,24 76:25
  77:15 80:11
  82:15,19 89:7
  89:10,14,17
  92:7 93:3,13,18
  93:21,25 94:22
  100:10,20
  101:10 102:9
  102:17 103:5
  103:22 104:5
  104:10,12,16
  104:25 106:23
  107:23 114:5,8
  114:13 115:24
  116:7 117:25
  118:20 120:25
  123:7 124:23
  129:4 130:13
  130:17 131:10
  131:14 132:5
  133:25 134:6

134:23 135:19
140:17,21,23
141:2,13 142:9
142:11 143:7
144:24 145:3
146:3 147:6,16
148:21,25
149:3 150:2
151:19 159:19
167:10,13
168:19 169:18
170:2,11,13,16
170:24 171:9
Ziskin 2:17,21
  3:21,22,23 4:5
  4:11,14,17,21
  7:9,21 9:2,8,15
  11:5,22 12:12
  12:20 16:22,24
  31:7 33:20
  34:10 39:5 41:5
  41:16,20 44:13
  45:3,18 54:9
  80:18 94:11,13
  94:18 102:13
  106:22 107:16
  120:3,8 146:4
  170:8

_____

**$**

$51 85:11

_____

**0**

004836 162:4
  172:10
004843 162:4
  172:10
004848 162:5
  172:10
004859 162:5
  172:11
004865 162:5
  172:11
004879 162:5
  172:11
004883 162:5
  172:11
004937 162:4
  172:10
004938 162:4
  172:10
004941 162:4
  172:10
0303 161:7 172:8
07 32:23 65:15

65:20 71:9
8 32:23 67:4,15
68:7 71:9 90:25
09 67:4,15 69:16
69:17 71:9
90:25,25

**1**
1 121:22 122:4
122:11 123:6
132:10
1-5 1:12
10 150:19
10:35 1:17
10017 2:5,10
1009 129:9
11 152:2
11716 2:14
11725 2:20
11784 3:10 8:20
12 59:16 152:21
12/18 149:22
12:30 59:16
1298 120:14,20
13 56:25 57:3
138 67:12 120:13
120:17
4 153:13
15 1:15 154:7,13
155:12,15,20
161 172:8
162 172:11
18303 161:7
172:7
18341 161:7
172:8
18417 161:7
172:8

**2**
2 124:10,17
126:6
20 87:5 109:7
2005 89:4,5
2006 6:6,13
11:10,15,19
12:25 13:8,12
13:24 14:3,8,11
14:13,16,20
15:14 40:9
65:23 66:4,10
66:12,19 68:12
68:13 71:2,4
74:17 75:9
77:24 89:6,9,20

91:21 99:16
109:11 110:11
112:11 113:9
115:20 165:24
166:8
2007 109:5 113:7
2008 67:15,18,22
68:7,10 69:14
75:11 107:22
108:25 112:25
113:2 165:6
2009 67:2,14,15
75:11 100:13
107:22 108:6
108:17 112:23
122:17 123:5
123:17,19
136:9,20
137:10 149:22
151:8,9 152:7,7
154:3 163:24
164:23,25
165:16
2010 100:14
108:20 112:20
123:14 153:2
165:3
2011 1:16 123:12
171:17 174:20
27 9:4
29 136:9,20
137:10

**3**
3 126:15,18
127:4 128:20
129:3 173:4
30 23:16 44:11
44:17,19 45:8
108:18 109:8
30A 10:15,17,20
10:24 11:3,8,16
11:21 23:21
24:10 44:7,20
30th 174:20
32 126:2 130:24
131:7 168:24
169:5,16
170:22
34 131:3
35 15:21,25 16:3
16:14,17 57:11
108:13

**4**

4 129:18,24
130:9,19,21
144:20
4:30 58:7,20
59:10,13 77:23
78:6 163:7
4:45 171:12
40 15:21,25 16:3
16:14,17 48:16
48:19 57:11
108:18,22
109:3 156:5
4125 139:24
44 123:22,23
47 99:18
48 156:11,16
4875 2:14
49 157:13,19
4938 168:8

**5**
5 132:13,18
5:30 137:6
138:15,19,23
163:7
50 42:22
50/50 48:11
501 2:5,9
55 159:23 160:3
160:6
58 161:5,13
172:7
59 162:2,10
167:16 172:9

**6**
6 134:25 138:9
6:30 163:8
60 42:22 48:14
60/40 48:12
6268 2:19

**7**
7 138:24 139:5
139:13 141:17
142:7 163:24
71 173:9
72 173:9

**8**
8 147:11,21
8:00 78:3 103:2,4
103:8
8:30 102:23

**9**
9 1:16 149:4,10
95 25:13