**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
---------------------------------------------------------X
NELSON QUINTANILLA, ALEJANDRO
AMAYA, ALEX AMIR AREVALO, MAYNOR
FAJARDO, WALTER GARCIA, JOSE L.
MARTINEZ, PRACELIS MENDEZ, OSMAR W.
PAGOADA, JAVIER QUINTANILLA, EDVIN
RIVERA, CARLOS ESCALANTE, KEVIN
GALEANO, LERLY NOE RODRIGUEZ, JOSE
VEGA CASTILLO, JUAN QUINTEROS, and
MARCOS TUILIO PEREZ,

                    Plaintiffs,

                                                    **MEMORANDUM**
                                                    **DECISION AND ORDER**

         - against -
                                                    CV 09-5331 (AKT)

SUFFOLK PAVING CORP., SUFFOLK
ASPHALT CORP. LOUIS VECCHIA,
CHRISTOPHER VECCHIA, HELENE
VECCHIA and JOHN DOES 1-5,

                    Defendants.
---------------------------------------------------------X

**A. KATHLEEN TOMLINSON, Magistrate Judge:**

In a prior short-form Electronic Order, the Court notified counsel that Defendants'

Motion for Summary Judgment was granted, in part, and denied, in part, and that the Court

would be issuing a full written decision.  This Memorandum Decision and Order constitutes

the full written decision.

**I.      PRELIMINARY STATEMENT**

This wage and hour action is brought by a group of 16 laborers, operating engineers,

and/or mechanics currently or formerly employed by the Suffolk Paving Corporation and Suffolk

Asphalt Corporation, a paving company based on Long Island.  The 16 Plaintiffs, namely,

Nelson Quintanilla, Alejandro Amaya, Alex Amir Arevalo, Maynor Fajardo, Walter Garcia, Jose

L. Martinez, Pracelis Mendez, Osmar W. Pagoada, Javier Quintanilla, Edvin Rivera, Carlos

Escalante, Kevin Galeano, Lerly Noe Rodriguez, Jose Vega Castillo, Juan Quinteros, and

Marcos Tulio Perez (collectively, the "Plaintiffs") allege that Defendants Suffolk Paving

Corporation and Suffolk Asphalt Corporation, through owners and operators Louis Vecchia,

Christopher Vecchia, and Helene Vecchia and John Does 1-5 (collectively, the "Defendants"),

failed to pay them their full wages, including overtime compensation, and falsely reported the

hours they worked in violation of the Fair Labor Standards Act ("FLSA") and the New York

Labor Law ("NYLL"). Several of these Plaintiffs further claim that they complained about these

unlawful practices and were consequently retaliated against by being terminated from

employment, having their unemployment benefits denied, and being subjected to retaliatory

litigation in state court. In addition, Plaintiffs allege that they were not compensated with the

prevailing wage on various jobs as mandated by the NYLL. Alternatively, if the Court finds that

Defendants did not violate the FLSA/NYLL, Plaintiffs claim that Defendants should be held

liable for breach of contract, *quantum meruit* and unjust enrichment for their unpaid wages.

Defendants have moved for summary judgment pursuant to FED. R. CIV. P. 56(a). In

their motion, Defendants argue that: (1) individually-named Defendant Helene Vecchia must be

dismissed since she does not meet the definition of "employer" under the FLSA; (2) Plaintiff

Alex Amir Arevalo must be dismissed because he was not an "employee" of Defendants under

the FLSA; (3) Plaintiffs were paid in accordance with the FLSA and NYLL as reflected in

employer records; (4) Defendants' "good faith" opposition to certain Plaintiffs' unemployment

insurance applications and the filing of lawsuits to recover unpaid debts did not amount to

unlawful retaliation against the Plaintiffs; (5) Plaintiffs lack standing to assert claims for

violations of the New York State prevailing wage; (6) Plaintiffs' breach of contract claim fails to identify the contractual provisions at issue and, in any event, is preempted by the FLSA; and, finally, (7) Plaintiffs' *quantum meruit* and unjust enrichment claims necessarily fail since the Plaintiffs have an adequate remedy at law. Ultimately, Defendants maintain that no material issues of fact exist which would warrant the denial of their motion.

Plaintiffs oppose the motion and contend that there are indeed material issues of fact which remain to be resolved by a finder of fact. Specifically, Plaintiffs argue that: (1) Defendant Helene Vecchia is an "employer" within the meaning of the FLSA because she exercised the requisite control over the terms and conditions of Plaintiffs' employment; (2) Plaintiff Alex Arevalo meets the definition of "employee" under the FLSA because he rendered services to the Defendants; (3) Plaintiffs' claims of unlawful retaliation must survive since material issues of fact exist sufficient to deny summary judgment; (4) the Defendants intentionally underreported Plaintiffs' hours resulting in violations of the FLSA and NYLL; (5) Plaintiffs' have standing to sue for violations of the prevailing wage under New York law; and (6) Plaintiffs' common law claims of breach of contract, *quantum meruit*, and unjust enrichment should survive since they are asserted in the alternative to the Plaintiffs' claims under the FLSA and NYLL. In their Reply, Defendants maintain Plaintiffs' opposition demonstrates that "no significant issues of fact exist warranting a trial." As such, Defendants argue that the Court should grant their motion and dismiss this action in its entirety.

The Court has considered the Declaration of Saul D. Zabell, Esq. and Steven Pinks, Esq. in Support of Defendants' Motion for Summary Judgment ("Zabell/Pinks Decl.") [DE 141], Defendants' Local Rule 56.1 Statement of Material Facts Which are Not in Dispute ("Defs.'

Rule 56.1 Stat.") [DE 142], Defendants' Local Rule 56.1(d) Statement of Additional Material

Issues of Fact,[1] Defendants' Memorandum of Law in Support of Defendants' Motion for

Summary Judgment ("Defs.' Mem.") [DE 143], Defendants' Reply Memorandum of Law in

Further Support of Defendants' Motion for Summary Judgment ("Defs.' Reply"),[2] Plaintiffs'

Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ("Pls.'

Opp'n") [DE 148], Plaintiffs' Counterstatement of Facts Pursuant to Rule 56.1 ("Pls.' Rule 56.1

Stat.") [DE 149], the Affirmation in Opposition of Ian Wallace ("Wallace Aff.") [DE 150], as

well as the applicable law, and hereby GRANTS the Defendants' motion for summary judgment,

in part, and DENIES the motion, in part.

## II.    BACKGROUND FACTS

The following facts are drawn from the pleadings, Defendants' Rule 56.1 Statement and

Plaintiffs' Rule 56.1 Counterstatement, the Zabell/Pinks Declaration, the Wallace Affirmation,

the Vecchia Affidavit, and the memoranda of law in support of or in opposition to the instant

summary judgment motion.  The material facts cited below are undisputed unless otherwise

---

[1]    In an Order dated August 22, 2013, the Court directed the parties to file their summary judgment motion papers on ECF "promptly once they redact all information concerning plaintiffs' immigration status (including the applicable portion of plaintiffs' deposition transcripts) from the publicly filed documents."  DE 139 at 2.  Further, the Court directed that the "[u]nredacted copies of the motion papers are to be filed under seal."  *Id.*  Defendants then filed a redacted version of their Local Rule 56.1 Statement of Material Facts Which are Not in Dispute as well as *two* sealed versions.  *See* DE 142 (redacted), 144 (sealed), and 147 (sealed). Moreover, the Court notes that Defendants submitted to Chambers a courtesy copy of their Local Rule 56.1(d) Statement of Additional Material Issues of Fact; however, they did not file their Rule 56.1(d) Statement on ECF.  Defendants are directed to file their Rule 56.1(d) Statement on ECF within five days.

[2]    The Court notes that Defendants' counsel filed his Memorandum of Law in Support of the Motion for Summary Judgment twice - - first in DE 143 and again in DE 146 - - but that the Reply Memorandum of Law was never filed on ECF, although a courtesy copy was submitted to Chambers.  Given this filing error, the Court directs Defendants' counsel to file his Reply Memorandum of Law on ECF within five days of the entry of this Order.

noted. In considering a motion for summary judgment, the Court construes the facts in the light most favorable to the non-moving party. *See Beyer v. Cnty. of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008); *Capobianco v. New York*, 422 F.3d 47, 50 (2d Cir. 2001).

### A.     The Third Amended Complaint

Plaintiffs allege that Defendants Suffolk Paving Corporation ("SPC") and Suffolk Asphalt Corporation ("SAC") are Long Island-based paving contractors for private entities and also for the State of New York and the federal government. *See* Third Amended Complaint ("Compl.") [DE 115] ¶ 14. Defendants SPC and SAC are "related entities" which are "jointly managed by Louis Vecchia and other Defendants" and possess a "common place of business" as well as a "common managerial and ownership structure." Compl. ¶ 16. SAC is "nominally owned" by Christopher Vecchia, notwithstanding the fact that Louis Vecchia "retains ultimate managerial, administrative and financial oversight and control over this entity as well as other entities under his ownership." *Id.* ¶ 18. The Complaint asserts that "Defendant Louis Vecchia has retained direct and ultimate managerial oversight of Suffolk Paving, Suffolk Asphalt and all entities owned by him in the business of paving, including hiring and firing decisions, labor relations and financial control." *Id.* ¶ 19. Louis Vecchia is the Chairman and/or Chief Operating Officer of SPC. *Id.* ¶ 22. Defendant Christopher Vecchia became President of SPC in or around 2006. *Id.* ¶ 26. According to the Plaintiffs, "Defendant Helene Vecchia has been responsible for making decisions and implementing policies on behalf of Suffolk Paving, Suffolk Asphalt and its related entities that have affected Plaintiffs; had the power to hire and fire Plaintiffs and their co-workers; determined the rate and method by which Plaintiffs were paid; and/or controlled and maintained Plaintiffs' employment records, including time sheets and pay schedules." *Id.* ¶ 28.

5

Plaintiffs claim that Defendants have "intentionally vastly underpaid Plaintiffs' wages throughout their employment, which for some Plaintiffs spans an eleven year period." *Id.* ¶ 31. Plaintiffs' titles and employment dates with SPC, SAC or their related entities are described in Section II.B., *infra*. According to the Complaint, Plaintiffs did not receive a significant amount of their wages, including overtime compensation. Plaintiff Nelson Quintanilla was hired as a laborer by SPC and/or SAC and/or its related entities[3] in 1998 and worked for the Defendants until 2003. *Id.* ¶ 32. He returned to SPC in or around March 2004 and worked for the Defendants until June 2006. *Id.* Nelson Quintanilla again returned to SPC in March 2007 and worked there until August 2011 when Plaintiffs allege that he was discharged by Louis Vecchia. *Id.* Nelson Quintanilla claims that he was not paid "most of his wages, including overtime wages" during his employment with Defendants. *Id.*

Plaintiff Alex Amir Arevalo was employed as a mechanic for SPC and/or SAC and/or its related entities from February 15, 2006 to August 25, 2009. *Id.* ¶ 34. Plaintiff Maynor Fajardo worked as an operating engineer from August 21, 1998 until his termination on September 15, 2009. *Id.* ¶ 35. Plaintiff Walter Garcia was employed as a laborer from March 15, 2001 to August 2003, and from June 2005 until January 2007. *Id.* ¶ 36. He returned to work in April 2008 and remained until December 17, 2009. *Id.* Jose Martinez worked as a laborer for SPC from July 6, 2004 to July 15, 2008. *Id.* ¶ 37. Plaintiff Pracelis Mendez was employed as an operating engineer in 1998 and from 2001 until the Defendants allegedly terminated his employment unlawfully in November 2009. *Id.* ¶ 38. Plaintiff Osmar W. Pagoada has been

---

[3]  In their Complaint, all Plaintiffs have been generally deemed one-time employees of "Suffolk Paving and/or Suffolk Asphalt and/or its related entities." Thus, the Court treats the references to Plaintiffs' employment history as referring to these entities.

employed as a laborer for SPC from October 23, 2008 to the present.[4]  *Id*. ¶ 39.  Plaintiff Javier Quintanilla was employed as a laborer from August 7, 2003 through May 5, 2005.  *Id*. 40. Plaintiff Edvin Rivera has worked as a laborer from May 20, 2003 to the present.  *Id*. ¶ 41.

Plaintiff Lerly Noe Rodriguez was employed as an operating engineer from April 15, 2002 through January 12, 2005 and again from April 19, 2007 to the present.  *Id*. ¶ 42.  Plaintiff Kevin Galeano has worked as a laborer from November 15, 2007 to the present.  *Id*. ¶ 43. Plaintiff José Vega Castillo was employed as a laborer from May 15, 2003 until he was discharged in November 20, 2009, after the instant lawsuit was filed.  *Id*. 44.  Plaintiff Carlos A. Escalante was employed as a laborer from March 22, 2001 to December 23, 2002, then again from March 17, 2004 to December 15, 2004, and, finally, from March 26, 2006 to December 10, 2009.  *Id*. ¶ 45.  Plaintiff Juan Quinteros has worked as a laborer from July 2008 to the present. *Id*. ¶ 46.  Plaintiff Marcos Tulio Perez has been employed as a laborer from June 15, 2004 to the present.  *Id*. ¶ 47.

The Plaintiffs allege that Defendants "intentionally vastly underpaid" them.  Plaintiffs assert that they typically worked between 50 and 60 hours per week, and have, on occasion, exceeded 70 hours per week.  *Id*. ¶ 50.  They kept track of their time by completing contemporaneous time sheets which they signed on a weekly basis and delivered to Operations Supervisor Tommy McEvilly or his predecessors.  *Id*. ¶ 51.  Despite working "between 50-60 hours per week as accurately reflected in their timesheets," Plaintiffs assert that they were rarely

_____

[4]  The Court notes that there are references to certain Plaintiffs working "to the present" in both the Third Amended Complaint and the motion papers being reviewed here.  To be clear, the Court takes this language to mean that the respective Plaintiff was still working for the Defendants at the time these motion papers were filed.  The Court has no information as to whether any of the Plaintiffs are still working for the Defendants as of the date of this Memorandum Decision and Order.

compensated for more than 40 or 42 hours per week.  *Id*. ¶ 52.  Plaintiffs allege that they were

underpaid by at least 10 to 20 hours weekly.  *Id*. ¶ 53.  Further, Defendants "intentionally refused

to pay Plaintiff[s] their statutory overtime rate for the hours they worked in excess of 40 hours

per week."  *Id*. ¶ 54.  Plaintiffs maintain that some of them were entitled to double their standard

hourly rate for overtime hours worked pursuant to the collective bargaining agreement between

the Defendants and Local 138 International Union of Operating Engineers.  *Id*. ¶¶ 55-57.

According to the Complaint, Defendants retaliated against the Plaintiffs for exercising

their right to complain about wage and hour violations.  Plaintiffs aver that they complained on a

continuous basis to Louis Vecchia and Tommy McEvilly about the fact that the Defendants were

not paying them all of their wages, including overtime compensation.  *Id*. ¶ 67.  The Complaint

asserts that:

> 71.  For example, Mr. Fajardo and Mr. Mendez would tell Mr.
> McEvilly, "We are missing a lot of overtime."
>
> 72.  In response, Mr. McEvilly would state, "Reynaldo, I'm
> trying my best. I always put the right hours into the
> computer but you know how Louis is… I don't know why
> Louis and Helena change the hours all the time but they
> always change everything."
>
> 73.  Or, Mr. McEvilly would state: "It's not my fault."
>
> 74.  When Mr. Fajardo, Mr. Mendez and their co-workers
> would personally complain to Louis Vecchia that they were
> being underpaid, Louis Vecchia would respond, "You guys
> have to understand that I have no money"; "that you guys
> work too slow anyway"; and that "you worked stupidly and
> that's why you work late."

*Id*. ¶¶ 71-74.

In response to their complaints, Plaintiffs state that Defendants retaliated by intimidating the Plaintiffs and threatening them with termination. *Id.* ¶ 68. For example, in September 2009, Plaintiffs allege that Maynor Fajardo was terminated in retaliation for his complaints to management. *Id.* ¶ 76. Plaintiff Pracelis Mendez also complained to management about overtime, especially in October 2009, and was refused permission to return to work as of November 11, 2009. *Id.* ¶¶ 80-83. The Complaint asserts that after being served, Louis Vecchia "threatened Mr. Rivera, in reference to all the named Plaintiffs in this lawsuit, that 'none of you will work again. I will send a letter to all the union paving companies and make sure that none of you guys work again.'" *Id.* ¶ 86. A week after being served with this lawsuit, Louis Vecchia told Plaintiff Walter Garcia that "he would no longer need him." *Id.* ¶ 94. On December 19, 2009, Walter Garcia's employment at his second job with another employer, Power Paving Company, was terminated - - five days after the Summons and Complaint in this lawsuit were served on the Defendants. *Id.* ¶ 93.

Plaintiffs bring the first cause of action under the FLSA, 29 U.S.C. §§ 206 and 207, alleging that Defendants intentionally underreported Plaintiffs' hours to deprive them of their proper wages and overtime compensation. *Id.* ¶¶ 98-103. A second claim is asserted under the NYLL, alleging again that Plaintiffs were deprived of the statutory overtime rate for hours worked in excess of 40 per week. *Id.* ¶¶ 104-109. Further, Plaintiffs claim that Defendants failed to keep proper wage and hour records. *Id.* Under their third cause of action, Plaintiffs claim that Defendants failed to pay them the prevailing wage under the NYLL on projects Defendants contracted for with various municipal and state entities. *Id.* ¶¶ 110-114. Under their Fourth, Fifth, and Sixth Causes of Action, Plaintiffs assert, in the alternative, that Defendants

should be held liable for breach of contract, unjust enrichment, and *quantum meruit*, respectively. *Id*. ¶¶ 115-128.

In the seventh cause of action, Plaintiffs Maynor Fajardo and Pracelis Mendez have brought a claim for retaliatory discharge in violation of the FLSA and NYLL. *Id*. ¶¶ 129-134. In the eighth claim for relief, Plaintiffs Walter Garcia, Osmar Pagoada, Edvin Rivera, Carlos Escalante, and Jose Vega Castillo assert a claim for retaliatory discharge under the FLSA and NYLL. *Id*. ¶¶ 135-143. Plaintiffs Maynor Fajardo and Pracelis Mendez aver in the ninth cause of action that they were subjected to retaliatory lawsuits in violation of the FLSA and NYLL after they initiated this action against the Defendants. *Id*. ¶¶ 144-149. In the tenth cause of action, Plaintiffs assert that Defendants retaliated against Edvin Rivera, Nelson Quintanilla and Lerly Rodriguez by opposing their applications for unemployment benefits solely because they had filed this wage and hour lawsuit against the Defendants. *Id.* ¶¶ 150-161. Finally, in their eleventh claim, Plaintiffs aver that Defendants contacted Plaintiff Pracelis Mendez's subsequent employer  - -  Capitol Concrete - - in retaliation for Mendez's participation in this litigation, resulting in the termination of Mendez's employment with Capitol Concrete. *Id. ¶¶* 162-175.

**B.      Material Facts Not in Dispute in Defendants' Rule 56.1(a) Statement**

**1.      *Nelson Quintanilla***

Plaintiff Nelson Quintanilla was employed with SPC from 1998 to 1999 and rejoined SPC from 2001 to 2003. Defs.' Rule 56.1 Stat. [DE 144] ¶ 2. Quintanilla would regularly chauffer five to six co-workers from Defendants' facility to various job sites. *Id*. ¶ 7; Pls.' Rule 56.1 Counterstat. [DE 149] ¶ 7. Beginning in 2009, Plaintiff Quintanilla received a daily morning call from Operations Supervisor Christopher Vecchia who would tell Plaintiff where to

report for that day. Defs.' Rule 56.1 Stat. ¶ 8. Quintanilla testified that he took lunch on a daily

basis; however, his meal break was shorter than Edvin Rivera's, who would leave the work site

to pick up lunch for the other workers. *Id*. ¶ 14. When it rained, Quintanilla stated that Plaintiffs

were not required to work. Pls.' Rule 56.1 Stat. ¶ 17. On a few occasions, Quintanilla was

compensated at the rate of one and one-half his regular rate of pay for overtime hours worked.

Defs.' Rule 56.1 Stat. ¶ 24; Pls.' Rule 56.1 Counterstat. ¶ 24.

### 2. *Alejandro Amaya*

Plaintiff Alejandro Amaya was employed with SPC as a laborer. Defs.' Rule 56.1 Stat

¶ 34. In 2005, he was paid $16 per hour. *Id*. Amaya's hourly rate remained the same until 2007

when he received a raise to $18.75 per hour. *Id*. ¶ 35. Plaintiff Pracelis Mendez kept track of the

hours worked by Amaya. *Id*. ¶ 39. Amaya is seeking back wages of between $60,000 and

$75,000 in this action. *Id*. ¶ 40. This amount is based on Defendants' alleged failure to regularly

compensate Amaya for ten, fifteen and twenty hours per work week. *Id*.

### 3. *Javier Quintanilla*

Plaintiff Javier Quintanilla commenced employment with SPC in 2003 and most recently

worked for the paving company in 2005. Defs.' Rule 56.1 Stat. ¶ 44. Javier is the brother of co-

Plaintiff Nelson Quintanilla. *Id*. Initially, Javier was hired as a laborer. *Id*. ¶ 43. During the

entirety of his employment, he was paid via check. *Id*. Javier ultimately resigned from his

position at SPC because he requested and was declined a pay raise. *Id*. ¶ 49. When he sought

this raise, Javier did not mention wage and hour violations. *Id.* Javier would typically arrive at

the yard at SPC and assemble the necessary materials for the day's work and leave the facility

within five minutes. *Id*. ¶ 53. He worked prevailing wage jobs and received additional

compensation for those projects. *Id.* ¶ 60. In addition, Javier confirmed that SPC provided him with W-2 forms. *Id.* ¶ 61. When shown a particular W-2 form, Javier testified that the form was accurate. *Id.* ¶ 62.

### 4. Jose Vega Castillo

In 2002, Plaintiff Jose Vega Castillo was hired by SPC as a laborer and was paid $100 per day. *Id.* ¶¶ 69-70. He did not perform any prevailing wage work in 2002. *Id.* ¶ 71. In 2003, Castillo worked for SPC as a Raker and was paid $10 per hour. *Id.* ¶ 73. Also in 2003, Castillo performed some prevailing wage work in school parking lots on behalf of SPC. *Id.* ¶ 74. Castillo testified that he received additional compensation for the prevailing wage jobs he did in 2003. *Id.* ¶ 75. In 2004-2005, while working for SPC, Castillo received $16 per hour. *Id.* ¶¶ 77-78. Upon Castillo's return to work for SPC in 2009, he became a member of the union and his hourly rate increased to $36. *Id.* ¶¶ 82-83. However, Castillo maintains that he was still not appropriately compensated for the hours he actually worked. Pls.' Rule 56.1 Counterstat. ¶ 82. Castillo stopped working for SPC in November 2009 when the paving season ended. Defs.' Rule 56.1 Stat. ¶ 85. He testified that he filed suit against Defendant SPC because the company retaliated against him for complaining about his wages. *Id.* ¶ 92. Castillo stated that he possessed a large quantity of paystubs from his work with Defendants. *Id.* ¶ 98. At the start of each work day, Castillo was required to report to Defendant SPC's yard where he spent between five and ten minutes assembling materials for the work day. *Id.* ¶ 102. He acknowledged that Defendant was entitled to take time out of his pay for lunch periods and breakfast breaks. *Id.* ¶ 104. However, Castillo testified that he and his co-workers would not take a lunch break. Pls.' Rule 56.1 Counterstat. ¶ 104.

### 5. *Juan Quinteros*

Plaintiff Juan Quinteros began employment with Defendants in July 2008 and was earning $34 or $35 per hour. *Id*. ¶¶ 113-114. Quinteros received a paycheck for every week he worked and consistently reviewed the number of hours contained on his pay stub. *Id*. ¶ 116. He worked for both Defendant SPC and Defendant SAC earning $36 per hour from 2009 to 2011. *Id*. ¶¶ 117-119. At the time of his deposition, Quinteros remained employed with SAC at that same hourly rate. *Id*. ¶ 119. Quinteros was typically required to appear at SPC's pickup facility to obtain materials for the day's assigned work. *Id*. ¶ 120. A paystub dated August 27, 2009 which was shown to Quinteros at his deposition reflected that he was compensated for nine hours of overtime. *Id*. ¶ 126. Plaintiffs point out that the vast majority of Quinteros' paystubs reflect minor overtime payments of no more than two hours. Pls.' Rule 56.1 Counterstat. ¶ 126. Further, Quinteros testified that he would have to work many hours, often in excess of 55 per week, to receive overtime from Defendants. *Id.*

### 6. *Kevin Galeano*

Plaintiff Kevin Galeano started working for SPC in November 2007. *Id*. ¶ 131. He worked for SPC until this lawsuit was commenced. *Id*. ¶ 138. Galeano earned $23 per hour each year that he worked for SPC until his termination in November 2010. *Id*. ¶¶ 140, 143.

### 7. *Osmar Pagoada*

Plaintiff Osmar Pagoada testified that he earned approximately $20 per hour in 2008 and 2009 while working for SPC. *Id*. ¶¶ 152-153. Pagoada spent less than one-half hour at Defendants' facility each day where he assembled tools and materials for the day's work. *Id*.

¶ 161.  Pagoada testified that he worked until 9 p.m. every day, but subsequently stated that his days ended between 6 p.m. and 9 p.m.  *Id.* ¶ 170.  Plaintiffs maintain that Pagoada worked no less than 60 hours per week (at 12 hours per day) as he arrived at Defendants' facility no later than 6 a.m. and would finish work no earlier than 6 p.m. from Monday to Friday.  Pls.' Rule 56.1 Counterstat. ¶ 170.

### 8.  *Alex Amir Arevalo*

Plaintiff Alex Amir Arevalo was hired as a mechanic by Defendant SPC in February 2006.  Defs.' Rule 56.1 Stat. ¶¶ 174, 176.  Arevalo worked for Defendants through 2009.  *Id.* ¶ 178.  He earned $13 per hour in 2006, $15 per hour in 2007, and finally $17 per hour in 2008 and 2009.  *Id.* ¶ 179.  Plaintiff was not happy earning $17 per hour.  *Id.* ¶ 180.  Arevalo testified that he received a paycheck on a weekly basis, reviewed each paycheck, and was never compensated in cash.  *Id.* ¶ 181.  Arevalo was terminated by his supervisor in 2009 after purportedly having difficulties connecting a truck to a trailer.  *Id.* ¶ 191.

### 9.  *Lerly Noe Rodriguez*

Plaintiff Lerly Noe Rodriguez worked for SPC in 2002 as a laborer and earned $15 per hour.  *Id.* ¶ 195.  He was paid by check.  *Id.*  Six months later, Rodriguez became a roller.  In 2003, Rodriguez was paid $20 per hour and that rate was increased in 2004 to $22.50 per hour.  *Id.* ¶¶ 196, 197.  In 2005-2006, Rodriguez was outside of the jurisdiction and performed no work for Defendants.  *Id.*  ¶ 198.  Rodriguez returned to work for SAC in 2007 - - now as a union worker.  *Id.* ¶ 199.  At that time, he was earning $22.50 per hour.  His hourly rate increased to $42.28 in July 2007.  *Id.* ¶ 201.  Rodriguez continued to work for SAC in 2008 and was paid $44 per hour.  *Id.* ¶ 202.  In 2009, Rodriguez worked for SAC and earned $45 per hour with an

overtime rate at double that amount.  *Id.* ¶ 203.  In 2010, SAC paid Rodriguez $47 per hour and

an overtime rate of twice that amount, although, according to Plaintiffs, Rodriguez would rarely

be paid overtime.  *Id.* ¶ 204; Pls.' Rule 56.1 Counterstat. ¶ 204.  Rodriguez continued to work for

SAC and earned $48 per hour.  Defs.' Rule 56.1 Stat. ¶ 206**.**  In August 2011, he began working

for non-party Capitol Concrete while still employed by SAC.  *Id.*  According to Rodriguez, the

paving season lasts for nine months, from April to December each year.  *Id.* ¶ 220.  Rodriguez

estimated that he worked 16 overtime hours per week.  *Id.* ¶ 221.  On two to three occasions

during his employment with Defendants, Rodriguez admitted to playing soccer during work

hours.  *Id.* ¶ 225.  However, such activity would only occur on those rare occasions when

Defendants' machines broke down.  Pls.' Rule 56.1 Counterstat. ¶ 225.

### 10.   *Edvin Rivera*

Plaintiff Edvin Rivera was hired by Defendants in May of 2002.  Defs.' Rule 56.1 Stat.

Will ¶ 228.  He received a paycheck for each week he worked.  *Id.* ¶ 228.  Rivera worked for

Defendant SPC from 2002 through 2007.  *Id.* ¶ 229.  From 2007 through 2009, Rivera worked

for Defendant SAC.  *Id.* ¶ 230.  Upon commencing employment in 2002, Rivera earned $18 per

hour.  *Id.* ¶ 231.  During 2003 and 2004, he earned $18 per hour and, on occasion, received a

higher hourly rate.  *Id.* ¶ 232.  In 2004, Rivera received a pay increase.  *Id.* ¶ 233.  While

employed exclusively with SPC in 2005, Plaintiff earned $18 per hour and received a higher rate

of pay for some hours worked.  *Id.* ¶¶ 235-236.  Rivera earned $19-$20 per hour in 2006 and

received a higher rate of pay for some hours worked.  *Id.* ¶ 237.  Then, in 2007, Rivera worked

for Defendant *SAC* and received a paycheck and pay stub for each week he worked.  *Id.* ¶ 239.

Rivera's hourly rate was increased to approximately $27 in light of his membership in the union.

*Id. ¶* 240.  In 2008 and 2009, Rivera continued to work for Defendant SAC and received a

paycheck and pay stub every week.  *Id*. ¶¶ 241-242.  Rivera testified that in light of the seasonal

nature of the Defendants' paving work, he, like other Plaintiffs, was subject to seasonal lay-offs.

*Id*. ¶ 255.  Rivera's employment with Defendants ended in 2009.  *Id*. ¶ 261.  Sometime

thereafter, Rivera attended an unemployment insurance hearing where it was determined that he

was not eligible for benefits.  *Id.* ¶ 264.  He could not afford to retain counsel for that hearing.

Pls.' Rule 56.1 Counterstat. ¶ 264.  Rivera was ordered to return benefits that were previously

awarded to him prior to the hearing.  Defs.' Rule 56.1 Stat. ¶ 264.

### 11.     *Maynor Fajardo a/k/a Renato Guerra*

Plaintiff Maynor Fajardo also has been known as "Renato Guerra" for work authorization

purposes.  *Id*. ¶ 266.  Fajardo worked as Renato Guerra from 1998 through 2002 or 2003.  *Id*.

¶ 267.  In 2008, Fajardo had financial difficulties and borrowed $2,000 from Defendant Louis

Vecchia.  *Id*. ¶ 268.  Fajardo also secured two additional loans from Vecchia in 2008 - - one for

$8,500 and one for $8,000.  *Id*. ¶ 269.  In the instant action, Fajardo seeks 16-17 weekly overtime

hours (lowered to 14-15 hours per week at his deposition).  *Id*. ¶ 271.  Fajardo worked for SPC

from 2003 to September 2009.  *Id*. ¶¶ 272-273, 288.  He received a paycheck for each week he

worked for SPC and, in addition, received occasional cash payments.  *Id*. ¶ 276.  In 2003,

Fajardo earned $32 per hour for regular work and $49 per hour for prevailing wage work.  *Id*.

¶ 277.  He states that he did not receive overtime compensation for all overtime hours he actually

worked.  *Id*. ¶ 278.

Fajardo was issued a company vehicle by Defendants.  *Id.* ¶ 282.  He was also frequently

picked up by his co-workers in other company owned vehicles where he was either driven to

Defendants' yard or directly to the job site. *Id.* ¶ 283. Fajardo testified that his co-workers went to Defendants' yard to pick up a ride to the job site. *Id.* Fajardo testified that he is seeking compensation for time spent traveling to Defendants' job sites. *Id.* ¶ 285. He maintains that he started work at 5:30 or 6 a.m. every day and, occasionally, started his work day as late as 8 a.m. *Id.* ¶ 286. However, Fajardo testified that he has never started his work day as late as 8:30 am. *Id.* Fajardo believes he was terminated by Defendants because Louis Vecchia wanted his son, co-Defendant Christopher Vecchia, to run Fajardo's work group. *Id.* ¶ 289. Fajardo went to Seattle, Washington in September 2009. *Id.* ¶ 291-92. Prior to his departure, Plaintiff's work was criticized by Defendant Louis Vecchia on a daily basis, except that Fajardo maintains that the criticisms were pretextual. *Id.* ¶ 293; Pls.' Rule 56.1 Counters him tat. ¶ 293. According to Fajardo, there was not a single week while he was employed by defendants that he was paid appropriately. Defs.' Rule 56.1 Stat. ¶ 296.

### 12. *Marcus Tulio Perez*

Marcus Tulio Perez started working for Defendant SPC in June or July of 2004. *Id.* ¶ 298. Louis Vecchia hired him as a Raker and he was paid $21.90 per hour. *Id.* ¶ 299. Perez testified that his rate of pay stayed constant from his date of hire until his separation in 2009, with the exception of the rate for prevailing wage work. *Id.* He received a paycheck for each week he worked for Defendant SPC. *Id.* ¶ 302. Perez acknowledged that there were weeks when weather prevented him from working a full 40 hours. *Id.* ¶ 307.

### 13. *Walter Garcia*

Plaintiff Walter Garcia worked for Defendant SPC as a roller operator from 2000 through August 2003. *Id.* ¶ 325. Garcia resigned from SPC in August 2003 but ultimately returned in

June 2005. *Id*. ¶ 326. He resigned from SPC in 2007 to work for another paving company. *Id*. ¶ 332. He later returned to SAC in April 2008 and remained employed there through 2009. *Id*. ¶ 333. In 2008, Garcia initially earned $40.99 per hour, but in June his rate increased to $44 per hour. *Id*. ¶ 329. A year later, Garcia's rate with SPC increased again to $45 per hour. *Id*. ¶ 330. While working for SAC in 2009, Garcia was paid between $44 and $45 an hour. *Id*. ¶ 331. He was subject to seasonal lay-off and would work sporadic days between December and the traditional start of the new paving season in March. *Id*. ¶ 337. However, during Plaintiff's employment with SAC, the paving season began in April - - not March. *Id*. ¶ 338.

During the off-season (December to March), Garcia was compensated at $20 per hour to perform snow removal for Defendants on a number of occasions. *Id*. ¶ 341. Garcia also testified that he would receive cash payments for small jobs during the paving season. *Id*. Garcia cited one example where he was paid $200 cash for a day's work on a driveway for Suffolk Asphalt. *Id.*

Garcia testified that he was not "comfortable" working past 4:30 p.m. for Defendants since he was not paid overtime for any hours worked beyond that time. *Id*. ¶ 357; Pls.' Rule 56.1 Counterstat. ¶ 356. In one instance, Garcia worked for Defendants in Southampton, New York and returned to Defendants' yard/facility in Medford, New York at 9:30 p.m. Defs.' Rule 56.1 Stat. ¶ 358. Garcia claims that he did not receive overtime compensation for this work. *Id*. He states that he was terminated by SAC in December 2009 and was not called back for work during the start of the 2010 paving season. *Id*. ¶ 359. According to Garcia, he called Defendants to talk about returning to work but received no affirmative response or start date. *Id*. ¶ 360.

### 14. *Jose Martinez*

Plaintiff Jose Martinez was hired by SPC on June 6, 2004. *Id.* ¶ 363. He worked from June through December 2004 when the paving season ended. *Id.* ¶ 366. In 2004, Martinez performed some prevailing wage work for SPC at various schools. *Id.* ¶ 368. He worked for SPC from March through December 2005 and was paid $18.75 per hour. *Id.* ¶¶ 369, 371. He earned the same hourly rate of $18.75 in 2006 and 2007. *Id.* ¶¶ 373, 375. He did not file an application for unemployment insurance benefits and found another position one year following his termination in 2009. *Id.* ¶ 380.

### 15. *Pracelis Mendez*

Plaintiff Pracelis Mendez was employed by SPC beginning in 1998. *Id.* ¶ 396. After a brief break, he returned to work for the company in 2001 and continued to work for SPC through 2009. *Id.* ¶ 392-93. Mendez was able to purchase a home with the help of a $25,000 loan he secured from Defendant Louis Vecchia. *Id.* ¶ 387. Mendez entered into a repayment agreement with Vecchia. *Id.* ¶ 388.

Like his co-Plaintiffs, Mendez was subject to seasonal lay-off and received unemployment insurance benefits for approximately three months of that lay-off period for each year he worked for the Defendants. *Id.* ¶ 394. From 1998 on, Mendez was issued an SPC-owned pick-up truck for his use. *Id.* ¶ 396. Mendez regularly performed Saturday work on behalf of Defendants. *Id.* ¶ 399. He seeks to recover compensation for travel time spent going to and from the job sites. *Id.* ¶ 411. Mendez acknowledged that he sometimes spent in excess of one hour per day traveling to and from his assigned job site. *Id.* He admitted that he disabled the GPS tracking device placed in his work vehicle on several occasions when he felt "annoyed." *Id.*

¶ 412. Plaintiffs, however, maintain that he only did so in protest against Defendants' failure to proper wages. *See* Pls.' Rule 56.1 Counterstat ¶ 412.

### 16. *Carlos Escalante*

Plaintiff Carlos Escalante was hired by Defendant SPC in March 2001. Defs.' Rule 56.1 Stat. ¶ 418. He worked as a Raker from March 2001 to December 31, 2001. *Id.* ¶ 421. Escalante continued worked for SPC until the end of the 2002 paving season and then went to work for other paving companies and for a contractor in 2003. *Id.* ¶ 424. Escalante returned to Defendant SPC in March 2004 and worked there through December 15, 2004. *Id.* ¶ 426. After leaving SPC for another employer in 2005, Escalante returned to SPC on March 23, 2006. *Id.* the ¶ 428. In July 2007, Escalante became employed with *SAC* and remained in his position as a raker until December 9, 2009. *Id.* ¶ 429. He testified that he voluntarily resigned from SAC in December 2009 due to an undisclosed illness. *Id.* ¶ 431. Escalante applied for and received seasonal unemployment benefits nearly every year, save for two instances where he was ineligible and had to repay the funds, which, according to Plaintiffs' counsel, he did. *Id.* ¶ 436; Pls.' Rule 56.1 Counterstat. ¶ 436.

At the start of the paving season in March 2010, Escalante contacted Louis Vecchia. *Id.* ¶ 441. However, before hearing back from Vecchia, he had accepted a position with another employer. *Id.* He had performed prevailing wage work for Defendant SPC and Union work for Defendant SAC. *See* Deposition of Carlos Escalante, annexed as Ex. P to the Wallace Aff. ("Escalante Tr.") at 42. His rate of pay for Union work was approximately $37.00 per hour and $54.00 per hour for prevailing wage work. Defs.' Rule 56.1 Stat. ¶ 445. During his employment with SAC, Escalante's wages rose from $165 per day to $240 per day. *Id.* ¶ 445. Nonetheless,

Escalante says Defendants always underreported his hours, whether for prevailing wage jobs or other work. Pls.' Rule 56.1 Counterstat. ¶ 445.

On one occasion, Escalante was not paid the prevailing wage while working for Defendant SPC in 2004 and this caused him to resign his position. Defs.' Rule 56.1 Stat. ¶ 447. Escalante was unable to recall the specifics of the job but maintains that he is owed eight hours of compensation for that project. *Id.* ¶ 447. He is not seeking to recover wages for time spent travelling. *Id.* ¶ 449.

Escalante was issued a company-owned vehicle, although he could not recall when he took possession of it. *Id.* ¶ 453. He fueled the vehicle in Defendants' yard and drove it to transport co-Plaintiff Maynor Fajardo to work each morning. *Id.*

Escalante and his co-workers generally went to Defendants' yard at the start of the day, but sometimes he went directly to the job site. *Id.* ¶ 454. He was aware Defendants placed GPS tracking devices in company vehicles and that these devices would accurately determine the vehicle's whereabouts. *Id.* ¶ 455. Escalante does not seek recovery of meal time or break time. *Id.* ¶ 456.

## C. Material Facts Not in Dispute in Plaintiffs' Rule 56.1(d) Statement

In addition to their Rule 56.1 Counterstatement, Plaintiffs have filed a Rule 56.1(d) Statement of Additional Material Issues of Fact (Pls.' Rule 56.1(d) Stat."). Defendants have disputed the majority of the additional facts in that Statement. However, the following facts are not in dispute.

Defendants concede that Operations Supervisor Tommy McEvilly testified that the Plaintiffs' timesheets are no longer used to report Plaintiffs' hours and that he no longer receives

those timesheets. *See* Pls.' Rule 56.1(d) Stat. ¶ 501. Louis Vecchia testified generally that

McEvilly would provide him with a copy of Plaintiffs' computerized timesheets every Thursday,

without specifying the timeframe during which this policy existed. *Id.* ¶ 531. After reviewing

those timesheets, Louis Vecchia gave them to Helene Vecchia in order to process the payroll. *Id.*

The parties likewise do not dispute that Helene Vecchia never received from either

Christopher or Louis Vecchia any notes documenting cash payments made to the Plaintiffs. *Id.*

¶ 538. Helene Vecchia testified that she files Defendants' corporate tax returns, performs the

payroll function for SAC and SPC, and handles the wage deductions, payment of taxes, and

union contributions. *Id.* She has always performed bookkeeping functions for all of Defendants'

entities, including SPC, SAC, Cross Island Industries and L&V Site Development. *Id.* ¶ 561. In

addition, Helene Vecchia was the only person who inputted the Plaintiffs' work hours into

Defendants' computer database for those employed by both SPC and SAC. *Id.* ¶ 565. The

computer database and the computer generated records, including those for Plaintiffs' hours and

wages, were exclusively within Helene Vecchia's responsibilities. *Id.* She was primarily

responsible for filling out and generating certified payroll reports, including reports of work

performed by Plaintiffs on prevailing wage jobs. *Id.* ¶ 568.

Further, Louis Vecchia assisted his son Christopher with personnel and management

issues relating to SAC. *Id.* ¶ 548. Essentially, SAC and SPC have the same function and

perform the same business. *Id.* ¶ 549. In fact, all entities under Defendants' control, including

Cross Island Industries, are located at 30 North Dunton Avenue in Medford, New York. *Id.*

Louis Vecchia is the sole owner of Cross Island Industries and L&V Site Development, the latter

of which no longer exists. *Id.* ¶ 550. According to Louis Vecchia, none of the Plaintiffs have

ever been employed by Cross Island Industries. *Id*. ¶ 551. SAC is comprised exclusively of unionized employees who are mandated to perform union jobs, whereas SPC employs exclusively non-unionized employees who work on non-union contracting jobs. *Id*. ¶ 555.

At his deposition, Louis Vecchia admitted that both Plaintiffs Fajardo and Mendez had complained about their wages and the failure of Defendants to pay overtime. *Id*. ¶ 583. Christopher Vecchia also confirmed that Fajardo, Mendez and other Plaintiffs complained about the failure to pay their wages and overtime wages on a weekly basis. *Id*. ¶ 584.

Louis Vecchia also testified that he discharged Plaintiff Fajardo on September 15, 2009 for "just a really bad attitude." *Id*. ¶ 585. Mendez was discharged in November 2009 after ten years of employment for a "very bad attitude, very arrogant, very disrespectful" behavior. *Id*. ¶ 588. Louis Vecchia discharged Nelson Quintanilla in August 2011 after six years of service for being "just very, very, very obnoxious." *Id*. ¶ 590.

Typically, at the start of the paving season, Defendants would call each Plaintiff to report to work - - a practice which was consistent throughout Plaintiffs' employment with Defendants. *Id. ¶* 593. In fact, Defendants instructed Plaintiffs not to call at the beginning of the season; instead, Defendants would recall them for work on an "as needed" basis. *Id. ¶¶* 593-594.

The Court now turns to the procedural posture of the case.

## III.   PROCEDURAL HISTORY

The original complaint in this action was filed on December 7, 2009. *See* DE 1. Before Defendants responded, Plaintiffs filed an Amended Complaint on January 19, 2010. *See* DE 9. Defendants filed their Answer to the Amended Complaint on February 4, 2010. *See* DE 10.

By Notice of Motion dated June 30, 2010, Defendants moved to compel arbitration and to dismiss the action for lack of jurisdiction. *See* DE 22. In an August 30, 2010 Electronic Order, Judge Feuerstein referred the motion to then Magistrate Judge Wall, who was assigned to this action at the time. *See* Aug. 30, 2010 Electronic Order. However, Judge Wall recused himself, pursuant to 28 U.S.C. § 455(a), on February 3, 2011 and the case was reassigned to this Court. *See* DE 33. Thereafter, on February 10, 2011, the undersigned issued a Report and Recommendation to Judge Feuerstein recommending that Defendants' motion to compel arbitration and to dismiss the case be denied. *See* DE 34 at 14. This Court further recommended that Plaintiffs be granted leave to file a second amended pleading. *Id.* By Order dated March 28, 2011, Judge Feuerstein adopted the Report and Recommendation in its entirety and granted Plaintiff leave to re-plead within ten days of the Order. On April 5, 2011, Plaintiffs filed their Second Amended Complaint. *See* DE 43. Defendants filed their responsive pleading on April 25, 2011. *See* DE 46.

On July 11, 2011, counsel for the parties filed a "Notice, Consent, and Reference of a Civil Action to a Magistrate Judge" consenting to the assignment of this case to a United States Magistrate Judge for all purposes, pursuant to 28 U.S.C. § 636(c)(1). *See* DE 60, 69. The case was then reassigned to this Court for all purposes.

By Notice of Motion dated October 24, 2011, the Plaintiffs requested leave to file a Third Amended Complaint. *See* DE 94. On September 17, 2012, the Court granted Plaintiffs' motion and directed counsel for Plaintiffs to file the Third Amended Complaint within ten days of that

Order.  DE 114 at 16.  Plaintiffs filed the Third Amended Complaint on September 21, 2012.

*See* DE 115.  On November 6, 2012, Defendants filed their Answer.  *See* DE 118.

At the conclusion of discovery, Defendants filed this motion for summary judgment

seeking to dismiss the Third Amended Complaint.  *See* DE 140.  Plaintiffs oppose the motion on

a variety of grounds as discussed below.  *See* DE 150.

## IV.    STANDARD OF REVIEW

Rule 56(a) provides that a "court shall grant summary judgment if the movant shows that

there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law."  FED. R. CIV. P. 56(a).  The moving party bears the initial burden of establishing

the absence of any genuine issue of material fact.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 256 (1986); *Mihalik v. Credit Agricole Cheuvreux North America, Inc.*, 715 F.3d 102, 108

(2d Cir. 2013); *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008).  To determine whether

the moving party has satisfied this burden, the Court is required to view the evidence and all

factual inferences arising from that evidence in the light most favorable to the non-moving party.

*Doro v. Sheet Metal Workers' Int'l Ass'n*, 498 F.3d 152, 155 (2d Cir. 2007); *Woodman v.

WWOR-TV, Inc.*, 411 F.3d 69, 75 (2d Cir. 2005).

Where the movant shows a *prima facie* entitlement to summary judgment, "the burden

shifts to the nonmovant to point to record evidence creating a genuine issue of material fact."

*Salahuddin v. Goord*, 467 F.3d 263, 273 (2d Cir. 2006); *Miller v. Nassau Health Care Corp.*,

No. 09 Civ. 5128, 2012 WL 2847565, at *3 (E.D.N.Y. July 11, 2012).  "[T]he nonmovant cannot

rest on allegations in the pleadings and must point to specific evidence in the record to carry its

burden on summary judgment."  *Salahuddin*, 467 F.3d at 273; *see McPherson v. N.Y.C. Dep't of*

*Educ.*, 457 F.3d 211, 215 n.4 (2d Cir. 2006) ("[S]peculation alone is insufficient to defeat a motion for summary judgment."); *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 101 (2d Cir. 2001) ("Even where facts are disputed, in order to defeat summary judgment, the non-moving party must offer enough evidence to enable a reasonable jury to return a verdict in its favor."). Summary judgment is mandated if the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see Dobbs v. Dobbs*, No. 06 Civ. 6104, 2008 WL 3843528, at *5 (S.D.N.Y. Aug. 14, 2008) ("The Court's goal should be to isolate and dispose of factually unsupported claims.") (internal quotation marks omitted).

## V.    DISCUSSION

### A.    Whether Helene Vecchia was an "Employer" Under the FLSA/NYLL[5]

As an initial matter, Defendants argue that Helene Vecchia does not qualify as an "employer" within the meaning of both the FLSA and the NYLL. Specifically, Defendants

---

[5]    As the Second Circuit explained in *Irizarry v. Catsimatidis*, 722 F.3d 99 (2d Cir. 2013), the question of whether the tests for "employer" are the same under the FLSA and NYLL has not yet been resolved by the New York State Court of Appeals. *Irizarry*, 722 F.3d at 117. However, courts generally apply the same analysis to evaluate "employer" status under both statutes. *See Ramirez v. Riverbay Corp.*, 35 F.Supp.3d 513, 520 (S.D.N.Y. 2014); *Berrezueta v. Royal Crown Pastry Shop, Inc.*, No. 12 Civ. 4380, 2014 WL 3734489, at *8 n.2 (E.D.N.Y. Jul. 28, 2014) ("[C]ourts have interpreted the definition of 'employer' under the [NYLL] coextensively with the definition used by the FLSA.") (internal quotations omitted); *Berrios v. Nicholas Zito Racing Stable, Inc*., 849 F. Supp. 2d 372, 393 (E.D.N.Y. 2012) ("The definition of employer is equally expansive under New York Law and the economic reality test is used to determine whether an individual is an employer under both federal and state law.") (internal citations omitted).

maintain that Ms. Vecchia's status as an employer fails to meet the "economic realities test" when considering the "totality of the circumstances."  *See* Defs.' Mem. at 2 (citing *Herman v. RSR Sec. Svcs.*, 172 F.3d 132, 139 (2d Cir. 1999)).  Under the FLSA, an "employee" is defined as "any individual employed by an employer," *Arena v. Plandome Taxi Inc*., No. 12 Civ. 1078, 2014 WL 1427907, at *3 (E.D.N.Y. Apr. 14, 2014) (quoting 29 U.S.C. § 203(e)(1)).  To "employ" under the FLSA means to "to suffer or permit to work."  *Id.* (quoting 29 U.S.C. § 203(g).   Moreover, under governing law, "the question of whether an employee-employer relationship exists is one of 'economic reality.'"  *Id.* (quoting *Velu v. Velocity Express, Inc.,* 666 F.Supp.2d 300, 305 (E.D.N.Y.2009)); *see also Goldberg v. Whitaker House Coop., Inc.,* 366 U.S. 28, 33 (1961)).  Indeed, the Supreme Court has held that "the determination of whether an employer-employee relationship exists for purposes of the FLSA should be grounded in 'economic reality rather than technical concepts.'"  *See Irizarry v. Catsimatidis*, 722 F.3d 99, 104 (2d Cir. 2013) (quoting *Goldberg*, 366 U.S. at 33).

"The Second Circuit 'has treated employment for FLSA purposes as a flexible concept to be determined on a case-by-case basis by review of the totality of the circumstances'" and has "'identified different sets of relevant factors based on the factual challenges posed by particular cases.'"  *Id*. at 104 (quoting *Barfield v. N.Y. City Health and Hosps. Corp.*, 537 F.3d 132, 141-42 (2d Cir. 2008).  For example, in *Carter v. Dutchess Cmty. Coll.*, 735 F.2d 8 (2d Cir. 1984). where the Court was asked to resolve the question of whether a prisoner serving as a tutor in a community college class held in a prison was an employee under the FLSA, the Court analyzed "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate

and method of payment, and (4) maintained employment records." *Arena v. Plandome Taxi Inc.*, No. 12 CV 1078, 2014 WL 1427907, at *3 (quoting *Carter,* 735 F.2d at 12). In *Brock v. Superior Care, Inc.*, 840 F.2d 1054 (2d Cir. 1988) the Second Circuit analyzed whether a nurse should be considered an independent contractor or employee of a healthcare agency. *Brock*, 840 F.2d at 1058–59. In doing so, the Court assessed "(1) the degree of control exercised by the employer over the workers, (2) the workers' opportunity for profit or loss and their investment in the business, (3) the degree of skill and independent initiative required to perform the work, (4) the permanence or duration of the working relationship, and (5) the extent to which the work is an integral part of the employer's business." *Id.*; *see also Arena v. Delux Transp. Svcs., Inc.,* 3 F.Supp.3d 1 (E.D.N.Y. 2014) (finding the *Brock* factors most helpful to determine the "economic reality" of whether an employment relationship exists under the FLSA).

The Second Circuit applied still another set of factors in *Zheng v. Liberty Apparel Co.,* 355 F.3d 61 (2d Cir. 2003) - - a case in which the Court assessed "whether a garment manufacturer [the defendant] that contracted out the last phase of its production to workers including the plaintiffs was an 'employer' under the FLSA." *Zheng*, 355 F.3d at 64; *see also Irizarry*, 722 F.3d at 105 n.4 (discussing *Zheng*). In *Zheng*, the Court considered the following factors:

> (1) whether [the defendant's] premises and equipment were used for the plaintiffs' work; (2) whether the Contractor Corporations had a business that could or did shift as a unit from one putative joint employer to another; (3) the extent to which plaintiffs performed a discrete line-job that was integral to [the defendant's] process of production; (4) whether responsibility under the contracts could pass from one subcontractor to another without material changes; (5) the degree to which the [defendant] or [its] agents supervised plaintiffs' work; and (6) whether plaintiffs worked exclusively or predominantly for [the defendant].

28

*Zheng*, 355 F.3d at 72.  As the Second Circuit noted in *Irizarry*, the foregoing factors "highlight the flexible and comprehensive nature of the economic realities test in determining when an entity is an 'employer.'" *Irizarry*, 722 F.3d at 105 n.4.  In *Arena v. Plandome Taxi Inc.*, a case in which the court similarly surveyed the various tests the Second Circuit has applied to analyze the employment relationship under the FLSA, the Court there reviewed the (1) the degree and control exercised by defendants; (2) the opportunity for profit or loss; (3) the degree of skill and independent initiative required to perform the work; (4) the permanence or duration of the working relationship; (5) the extent to which the work is an integral part of the employer's business; (6) the employer's maintenance of employment records; (7) use of employer's equipment for work; and (8) whether the alleged employee worked exclusively for defendant. *Arena v. Plandome Taxi Inc and* 2014 WL 1427907, at *5-7.  However, as the Second Circuit explained in *Barfield*, none of the various tests provide a "rigid rule for the identification of an FLSA employer."  Barfield, 537 F.3d at 143.  Rather, "they provide 'a nonexclusive and overlapping set of factors' to ensure that the economic realities test mandated by the Supreme Court is sufficiently comprehensive and flexible to give proper effect to the broad language of the FLSA."  *Id.* (quoting *Zheng*, 355 F.3d at 75-76); *see also Gonzalez v. Jane Roe Inc.*, No. 10 Civ. 1000, 2014 WL 4175730, at *4 (E.D.N.Y. Aug. 20, 2014) (explaining that the economic realities test is "not confined to a narrow legalistic definition" and none of its factors are dispositive); *Lawrence v. Adderley Indus., Inc.*, No. CV-09-2309, 2011 WL 666304, at *6 (noting that the Second Circuit has treated employment for FLSA purposes as a "flexible concept to be determined on a case-by-case basis by review of the totality of the circumstances") (quoting *Barfield*, 537 F. 3d at 141-42).

Here, both parties agree that Helene Vecchia's status as an employer is governed by the economic realities test which encompasses the totality of circumstances involved in an alleged employer's relationship to an employee. However, the Defendants maintain that there are no material issues of fact in dispute under the economic realities test, while Plaintiffs argue that there are. Specifically, Defendants a contend that Helene Vecchia "maintains no ownership interest in either Defendant SPC or SAC, nor did she exert any measure of control over the day-to-day functions" or over the Plaintiffs' terms of employment. Defs.' Mem. at 3. Moreover, Defendants assert that Plaintiffs' "sole basis for imputing liability" is premised on Helene Vecchia's having worked at "[D]efendants' facility and the fact that she "is the wife of Defendant Louis Vecchia." *Id.* Those two facts, Defendant maintains, are insufficient to survive summary judgment since Plaintiffs have adduced "no facts" from Helene Vecchia's deposition which demonstrate that she "exerted any control over their day-to-day employment." *Id.*

For their part, Plaintiffs preliminarily contend that absolute control is unnecessary to be considered an "employer" under the FLSA or NYLL. Pls.' Opp'n. at 5. Moreover, Plaintiffs point out that Helene Vecchia had the power to fire employees, that she controlled and processed the employees' payroll (including the Plaintiffs') and that she processed Plaintiffs' paychecks, including calculating and taking the required deductions and paying union dues. *Id.* Further, during his deposition, Louis Vecchia testified that Helene Vecchia "does everything" for Suffolk Paving and that she was "all-around" like Mr. Vecchia himself. *See* Louis Vecchia Deposition Transcript ("L. Vecchia Tr."), annexed as Ex. Q to the Affirmation of Ian Wallace, Esq. ("Wallace Aff.") at 37-38, 45; *see also* Helene Vecchia Deposition Transcript ("H. Vecchia Tr."), annexed as Ex. S to the Wallace Aff. at 17, 19, 20, 24, 25, 26, 29, 31, 33, 43, 56-57.

Plaintiffs also assert that Helene Vecchia's payroll responsibilities included both Suffolk Paving and Suffolk Asphalt's employees (including all Plaintiffs) as well as the Defendants' other corporate entities. L. Vecchia Tr. at 37, 38, 44; H. Vecchia Tr. at 17, 19, 24, 56-57, 74, 84. Importantly, Plaintiffs maintain that Helene Vecchia was the "sole person" charged with inputting Plaintiffs' work hours into the Defendants' computer system for all Plaintiffs who were employed by Suffolk Paving and Suffolk Asphalt. H. Vecchia Tr. at 30 ; L. Vecchia Tr. at 38, 44-45; *see also* Thomas McEvilly Deposition Transcript ("McEvilly Tr."), annexed as Ex. T to the Wallace Aff., At 48-49, 110, 114 *Id*. at 6. Thus, Plaintiffs' counsel argues that Helene Vecchia was the individual responsible for "underreporting Plaintiffs' hours as she generated Defendants' computerized timesheets that vastly underreported the hours which Plaintiffs had worked and generated Plaintiffs' paychecks which further underreported Plaintiffs' hours." Pls.' Opp'n. at 6. Moreover, Plaintiffs claim that Helene Vecchia performed "bookkeeping functions for all of Defendants' entities," was "solely responsible for paying the bills," was "primarily responsible for filling out and generat[ing] certified payroll reports," and was "responsible for filing the corporate tax returns for Suffolk Asphalt and Suffolk Paving." *Id*. According to the Plaintiffs, the foregoing factors "at the very least" create a genuine issue of material fact regarding Helene Vecchia's status as an "employer" of the Plaintiffs.

In their Reply, Defendants maintain that Plaintiffs have set forth no facts demonstrating that Helene Vecchia was their employer. Defs.' Reply at 3. In particular, Defendants claim "Plaintiffs' assertion that Ms. Vecchia had the ability to hire and fire employees is 'devoid of any factual support or citation to the record.'" *Id*. Further, Defendants argue that Helene Vecchia's payroll and bookkeeping responsibilities are "plainly insufficient to impute liability." *Id*. And

according to the Defendants, Helene Vecchia maintains no ownership in the Defendants' entities. *Id*. Nor was Helene Vecchia involved with personnel matters and had no responsibility for maintaining employee time sheets or verifying the accuracy of such documents. *Id*.

Having reviewed all of the papers submitted in support of and in opposition to Defendants' motion with respect to this issue, the Court finds that there is a genuine issue of material fact with respect to Helene Vecchia's status as an employer. As a preliminary matter, the Court notes that "[t]he question of whether a defendant is an employer under the FLSA is a mixed question of law and fact, with the existence and degree of each relevant factor lending itself to factual determinations." *Berrios v. Nicholas Zito Racing Stable, Inc*., 849 F. Supp. 2d 372, 393 (E.D.N.Y. 2012) (citing *Franco v. Ideal Mortg. Bankers, Ltd*., No. 07 Civ. 3956, 2011 WL 317971, at *6 (E.D.N.Y. Jan. 28, 2011); *Ansoumana v. Gristede's Operating Corp*., 255 F. Supp. 2d 184, 190 (S.D.N.Y. 2003)). "Therefore, individual employer liability is rarely suitable for summary judgment." *Id.* (citing *Franco*, 2011 WL 317971, at *6). Contrary to Defendants' assertions, there is evidence in the record that Ms. Vecchia's job duties satisfied several of the criteria under the economic realities test, namely, (1) the power to hire and fire employees, (2) supervise and control employee work schedules or conditions of employment, (3) determine the rate and method of payment, and (4) maintain employment recor is ds. *See Berrios,* 849 F. Supp. 2d at 393.

For example, when asked whether Helene Vecchia had the power to hire employees at Suffolk Paving, Louis Vecchia testified that she did have that power at "various times." L. Vecchia Tr. at 40. Louis Vecchia also testified that his spouse had the power to fire employees at Suffolk Paving "if she asked nicely" (albeit Mr. Vecchia then added "No, I don't know"). *Id*.

32

at 40.  Meanwhile, during her own deposition, Helene Vecchia testified that her hiring authority was limited to secretarial candidates at Suffolk Paving.  H. Vecchia Tr. at 66.  She further testified that her personnel decision-making authority was limited to secretaries at Suffolk Paving.  *Id.* at 12-13.  In light of the totality of the testimony, the issue of Helene Vecchia's ability to hire and fire Plaintiffs should be resolved by the trier of fact.

There is also evidence in the record that Helene played a substantial role in the maintenance of employment records, insofar as she was responsible for the processing of Plaintiffs' payroll records and payment of union dues.  She was also the sole person charged with inputting Plaintiffs' hours into the Defendants' computer database.  *See* H. Vecchia Tr. at 18-19, 30, 50-51, 72-74, 98; *see also* L. Vecchia Tr. at 38, 44-45, 75-78; McEvilly Tr. at 48-49, 114.  Louis Vecchia testified that his spouse was "possibly occasionally" responsible for accounts receivable and payable for Suffolk Paving.  L. Vecchia Tr. at 40.  Perhaps most significantly, when asked what Helene Vecchia's "personnel responsibilities" were at Suffolk Paving, Louis Vecchia testified that "[s]he was all-around" and that "[s]he's like me, she does everything."  *Id.* at 38.

Several of the Plaintiffs perceived Helene Vecchia to be an owner of the Defendant-companies.  For example, Plaintiff Lerly Rodriguez testified that he believed the company was a "family company."  L. Rodriguez Tr. at 174.  Likewise, in response to questioning at his deposition, Plaintiff Walter Garcia had the following exchange with Defendants' counsel:

> Q.      How do you know Helene Vecchia owns Suffolk Paving?
>
> A.      Because when we claimed by hour, and we had to do that, they always said that it was Louie, and if it wasn't Louie, it was Helene.

Q.    Who said Helene was an owner of the company?

A.    Nobody said that, but since she was the woman that had to
      deal with the hours, she was the owner.

Q.    So you think she was the owner because she had to deal
      with the hours?

A.    And the wife of the owner.

Q.    Is that the only reason why you think she was the owner?

A.    Yeah, she was a boss.

W. Garcia Tr. at 94-95.   Another Plaintiff, Jose Martinez, testified that he believed Helene

Vecchia was an owner because she was Mr. Vecchia's spouse and spent "a lot of time at the

company."  Martinez Tr. at 134-35.

    Plaintiffs rely on *Ke v. Saigon Grill,* 595 F.Supp.2d 240, 262 (S.D.N.Y. 2008) in arguing

that Helene Vecchia was an "employer" under the FLSA and NYLL.  Pls.' Opp'n. at 5.  In *Ke*,

the court found that the defendant-restaurant owner's wife was an "employer" under the FLSA

and NYLL.  *Ke*, 595 F.Supp.2d at 265.  As an initial matter, this Court notes that *Ke* was an

FLSA bench trial in which Magistrate Judge Dolinger issued his findings of fact and conclusions

of law after having had the benefit of hearing all of the evidence in the case, including the

opportunity to weigh the credibility of the witnesses who testified. *Ke*, 595 F.Supp.2d 240.  As

such, the standard of review in *Ke* was markedly different from that which this Court must apply

on a motion for summary judgment.  Nonetheless, the Court finds Judge Dolinger's analysis of

"employer" status instructive here.  The wife of the restaurant owner in *Ke* was "directly

involved in the setting up of the network of corporations that controlled the four restaurants," had

hiring authority, assigned work hours, posted written schedules, advised workers of their pay,

supervised their performance, and exacted discipline, among other tasks. *Ke*, 595 F.Supp.2d at 265. Defendants contend that unlike the present matter, the wife in *Ke* was "integrally involved in the management of the corporation, including hiring and firing of [workers] and therefore, directly controlled the terms and conditions of [the workers'] employment." Defs.' Reply. at 4. Defendants, however, leave out the key factor here, namely, that this Court has not heard trial testimony from any witnesses and thus is faced with "facts" clearly disputed by the parties -- and consequently not ripe for summary judgment. In *Ke*, the court was resolving questions of credibility following a bench trial - - not resolving a summary judgment motion. In light of the record before this Court, the determination of whether Helene Vecchia was an "employer" of the Plaintiffs should be resolved by a jury.

Finally, the Court finds distinguishable *Bravo v. Eastpoint Int'l, Inc.,* No. 99 Civ. 9474, 2001 WL 314622 (E.D.N.Y. Mar. 30, 2001, which Defendants rely on for the proposition that Plaintiffs have not alleged facts establishing Helene Vecchia's "power to control the Plaintiff workers." *Bravo*, 2001 WL 314622, at *2. Notably, in *Bravo,* the court was analyzing a motion to dismiss - - not a summary judgment motion. There, the plaintiffs in an FLSA action alleged solely in a conclusory fashion that Donna Karen was the principal owner and chairperson of the Donna Karan defendants. *Id.* The court found that plaintiffs alleged no facts at all which would tend to establish Donna Karan's power to control the plaintiff workers. *Id.* That is a far cry from the allegations presented here. As the Court has noted above, material issues of fact exist here which warrant denial of Defendants' motion on this claim.

**B.    Whether Defendants Qualify as Plaintiff Alex Arevalo's "Employer"** he
       **Under the FLSA/NYLL**

The parties next dispute whether Plaintiff Alex Amir Arevalo was actually employed by

any of the named corporate Defendants in this action.  Defendants' counsel asserts that Arevalo

"possesses a bad memory" and also has an "admitted penchant for dishonesty."  Defs.' Mem.

at 4.  Counsel further pronounces that Plaintiff Arevalo "believes it is acceptable to lie if he

needs money and admits breaking the law to get what he needs."  *Id.* (citing Arevalo Tr. at 36,

44, 146).

Before delving further into this issue, the Court is compelled to address two matters not

related to the substantive issues in the motion.  First, the Court finds problematic the deposition

transcripts submitted as exhibits by Defendants' counsel.  Full transcripts were provided only for

the examinations of counsel's clients and not for the Plaintiffs.  The Plaintiffs' abbreviated

transcripts which were submitted show a pattern of cherry-picked excerpts -- very often single

pages -- with no context for the Court's review and an obvious desire to get in the record a single

answer from a Plaintiff deponent which was often misleading.  As a result, the Court had to rely

on the full transcripts submitted by plaintiffs' counsel and all of the deposition references in this

decision are to the Plaintiffs' exhibits.  This practice made the Court's job unnecessarily more

time-consuming and calls into question any claim of efficiency given the extensive papers

otherwise filed with this motion.

The second issue is far more serious.  Having reviewed the transcripts, the Court does not

draw the same conclusions as to the "facts" here as Defendants' counsel urges.  Many of defense

counsel's questions were posed in what can only be described as a bullying, harassing and

intimidating manner.[6]  That continuing conduct impacted the extent and content of the answers,

many of which the Court does not credit in light of the manner utilized in the questioning.  As to

the content of the questions, the two words which come to mind most immediately are

"shocking" and "appalling."  Among other things, Defendants' counsel exploited the language

difficulties of these second language speakers, notwithstanding the fact that an interpreter was

present to translate.  In violation of the Court's previous Orders, the transcripts also reveal

counsel's continuing attempts to subvert the protective order by burrowing into questions which

unmistakably implicated the immigration status of the witnesses.  Moving on from calling

virtually every Plaintiff a "liar" on the record – and far more than a single time – counsel's

behavior progressed to confusing, bullying, taunting, disrespecting, insulting, intimidating and

humiliating the deponents, including calling one a "moron."   Had the Court been made aware

that this was the nature and tenor of the Plaintiffs' depositions, the Court would have taken

---

[6]   The Court is compelled to add an Appendix to this decision based on this finding.  The deposition excerpts which the Court is addressing here are attached to this Memorandum Decision and Order as Appendix A.  Some of the questioning reflected in Appendix A, keeping in mind that this is an FLSA action, includes:  counsel's demand that a witness show him the contents of his wallet, followed by questions whether the witness had drugs in the wallet or a condom in the wallet.  Other questions include: if the witness has any children not with his wife; is the witness getting his money's worth from his attorneys; do you promise not to lie to me again; did you tell your wife that you lost your job because of your ego; if you don't tell the truth, your nose is going to grow like Pinocchio; you may want to ask your attorney if you should assert your rights to not incriminate yourself; asking if someone was as white as the Plaintiffs' attorney "because that's one white guy"; when you sue the man that gives you a living and provides food for you and your family, you give me the right to ask you all sorts of questions; does your wife lie to you; do your daughters lie to you; do you lie to her; do your attorneys know that you committed fraud; do you know the type of fraud that you committed is punishable by prison; whether those ramifications be with our wife in Honduras or the District Attorney's office here in New York, you are aware of that, are you not; and if your wife was to find out about all your lies and your fraud, there will be penalties to pay there as well, correct; but if you divorce her, you can go sleep with whoever you want; is it possible for you to stop lying; when you were dating [name redacted] was she married; two years ago when you were creating your daughter, was [name redacted] married to someone else.

immediate steps to address such unacceptable and violative conduct. Unfortunately, for reasons unknown to the Court, no one brought this matter to the Court's attention. The Court only became aware of these circumstances while reading the deposition transcripts after this motion was filed.

Turning back to the motion and the substantive arguments regarding Plaintiff Arevalo's status, Defendants reference a 2006 paycheck issued to Arevalo by "L&V Site Development" and not Defendant SPC. Defs.' Mem. at 4-5 (citing Ex. 16 attached to the Zabell/Pinks Decl., Ex. 16). Further, from 2007 to 2009, Defendants claim that Arevalo was an employee of "Cross Island Industries." *Id*. at 5. According to the Defendants, Arevalo's W-2 forms show that he was initially employed as a mechanic for an entity entitled "L&V Site Development" and later for "Cross Island Industries." *Id*. (citing Arevalo Tr. at 70-71; Exs. 16, 17 attached to the Zabell/Pinks Decl.). Defendants maintain that Arevalo's work inside the "shop" as a mechanic at those entities was "wholly dissimilar from that performed" by co-Plaintiffs in this action. *Id*. The sole basis for Arevalo's claim that he was employed by the same corporate entities as co-Plaintiffs, Defendants argue, is because his friends were employed by SPC. *Id*. Any attempt by Plaintiffs to assert a joint-employer/common enterprise argument necessarily fails according to Defendants' counsel because Arevalo "was employed as a mechanic, not by a paving company." *Id*. Defendants contend that there is no material issue of fact concerning Arevalo's lack of standing to bring this suit in light of his "admission" that his 2006 through 2009 W-2 forms all reflect other employers. Defendants also assert and rely upon Arevalo's unfamiliarity with the "corporate structure" of Defendant SPC. *Id*.

In opposition, Plaintiffs maintain that Alex Arevalo "performed services for Suffolk Paving and Suffolk Asphalt on a regular basis, often joining the other Plaintiffs in the field pouring Asphalt, and his checks were sometimes paid by Suffolk Asphalt." Pls.' Mem. at 7. Critically, Plaintiffs point out, Louis Vecchia - - the sole owner of Cross Island Industries and L&V Site Development - - "conceded that none of the named Plaintiffs ever worked for Cross Island Industries and that L&V Site Development only existed for a short time and is no longer in existence." *Id*. In this regard, Vecchia's testimony is in stark contrast with the position Defendants have taken in their motion papers that Arevalo *only* worked for L&V Site Development and later Cross Island Industries.

Plaintiffs maintain that all corporate entities owned by Louis Vecchia were "run as one entity" and that Mr. Vecchia had "ultimate managerial control." Pls.' Mem. at 7. Further, Plaintiffs' counsel asserts that the "various corporate entities' assets, plant, machinery and employees were intermingled and management was common to all." *Id*. at 7-8 (citing Pls.' Rule 56.1 Stat. ¶¶ 549-53, 556-61). By way of illustration, Plaintiffs maintain that "employees were often issued checks from both Suffolk Asphalt and Suffolk Paving and employees of one entity were paid from funds of the other entity." *Id*. at 8 (citing Pls. Rule 56.1 Stat. ¶¶ 551, 558; Wallace Aff. ¶ 36; L. Vecchia Tr. at 118-121, 123).

Although the Plaintiffs ask the Court to apply the "integrated enterprise test" to argue that all corporate entities owned by Mr. Vecchia were essentially a single entity, the Second Circuit has declined to apply this test to determine joint employer liability. *See Hart v. Rick's Cabaret Int'l, Inc.*, 967 F. Supp. 2d 901, 940 n.16 (S.D.N.Y. 2013). As the Court explained in *Chen*, "[t]he Second Circuit has not yet spoken…on whether the integrated enterprise / single employer

doctrine applies to hold a parent company liable as an employer for violations of the FLSA." 2012 WL 5871617, at *3; *see also Salomon v. Adderley Indus., Inc*., No. 11 Civ. 6043, 960 F. Supp. 2d 502, 2013 WL 4308569 (S.D.N.Y. Aug. 16, 2013).  As such, the Court will apply both the formal and functional economic realities test set forth by the Second Circuit in *Carter* and *Zheng*, respectively, to assess whether Cross Island Industries and L&V Site Development can be considered joint-employers with Suffolk Paving and Suffolk Asphalt.

The Second Circuit has held that in light of the "fact-intensive character of a determination of joint employment," any disposition of joint employer status at the summary judgment stage is not typically appropriate.  *See Barfield,* 537 F.3d at 143-44*; see also Zheng,* 355 F.3d at 76 n.13; *Hart*, 967 F.Supp.2d at 941.  After considering the economic reality of the relationship between the Defendant-entities and Plaintiff Arevalo under the totality of the circumstances, the Court finds genuine issues of fact regarding Defendants' employment of Arevalo.  For example, Suffolk Asphalt and Suffolk Paving and Cross Island Industries are all located at 30 North Dunton Avenue, Medford, New York and are all involved in the paving business.  *See* L. Vecchia Tr. at 12; McEvilly Tr. at 142; H. Vecchia Tr. at 12.  Further Louis Vecchia is the sole owner of Cross Island Industries as well as L&V Site Development.  Vecchia Tr. at 30-35.  Moreover, Vecchia testified that none of the Plaintiffs ever worked for Cross Island Industries, but could not confirm the number of individuals employed by Cross Island Industries.  *Id*. at 32.  Further, Arevalo testified that he worked as a mechanic on trucks owned by Defendants which displayed the Suffolk Paving business name - - not Cross Island Industries.  Arevalo Tr. at 94.

In addition, Arevalo testified that "Suffolk Paving is the whole company" but the checks issued to employees reflected different corporate entities. Arevalo Tr. at 84-85. When asked how he knew that Suffolk Paving was divided into "several names," Arevalo stated that employees would compare each other's paychecks, some of which showed Cross Island Industries whereas others stated other corporate names. *Id*. at 71. The Court also finds significant Helene Vecchia's testimony that she handled the payroll processes for Cross Island Industries and that the procedures "mirrored" those she applied at Suffolk Paving. H. Vecchia Tr. at 55. In view of the foregoing factors, the Court finds that material issues of fact exist as to whether Plaintiff Arevalo was employed by Defendants SPC and SAC – issues that cannot be resolved on summary judgment.

## C.        Plaintiffs' FLSA/NYLL Retaliation Claims

Defendants' counsel maintains that the Court should grant summary judgment on all of Plaintiffs' claims of unlawful retaliation under the FLSA and NYLL because Plaintiffs have not raised any material issue of fact demonstrating that they were subject to retaliatory discharge. Defs.' Mem. at 6. At the outset, Defendants point out that the "FLSA's anti-retaliation provision only protects employees who have '*filed* any complaint or instituted or caused to be instituted *any proceeding* or related to this chapter, or has testified or is about to testify in any *such proceeding*." *Id*. (quoting 29 U.S.C. § 215(a)(3)). First, with respect to Plaintiff Pracelis Mendez, Defendants maintain that he cannot state a claim for retaliation because there is no evidence demonstrating that he instituted a formal proceeding during the course of his employment. *Id.* at 6-8. Moreover, Defendants contend that summary judgment is warranted because Plaintiffs Carlos Escalante, Maynor Fajardo, Osmar Pagaoda, Edvin Rivera, Walter

Garcia, and Jose Castillo each fail to raise an inference of retaliatory discharge since they purportedly abandoned their positions with the Defendant companies. *Id*. at 8-12. Defendants also argue that (1) all retaliation claims stemming from Defendants' "lawful and good-faith opposition to [Plaintiffs'] applications for unemployment insurance benefits" must be dismissed, *id*. at 12-15; (2) Plaintiffs' claims of retaliation arising from defendants' "meritorious lawsuits" cannot survive summary judgment, *id*. at 15-18; and (3) Parcelis Mendez's claim that Defendants "somehow interfered with his subsequent employment" in retaliation for bringing the instant action fails to raise a material issue of fact, *id*. at 18.

In opposition, Plaintiffs point out that "direct evidence" of retaliation exists in the record, sufficient to defeat summary judgment, even without stating a *prima facie* claim of unlawful retaliation. Specifically, Plaintiffs point to evidence that Louis Vecchia was visibly upset and threatened retaliation if the Plaintiffs lodged complaints about their compensation. *See* Pls.' Mem. at 10-11. Further, Plaintiffs' counsel argues that Mendez was "terminated for organizing to file this lawsuit." *Id*. at 11-13. Counsel also contends that Plaintiffs Escalante, Fajardo, Pagaoda, Rivera, Garcia, and Castillo did not abandon their positions and, in any event, that question is inappropriate for determination on summary judgment. *Id*. at 13-14. As further evidence of retaliation, Plaintiffs cite the following examples: (1) Defendants' opposition to Plaintiffs' applications for unemployment insurance was motivated solely by the instant lawsuit, *id*. at 14-15; (2) the lawsuits filed in State Court to recover outstanding debts from Plaintiff only *after* this action was initiated were retaliatory, *id*. at 15-17; and (3) Defendants called Plaintiff Pracelis Mendez's subsequent employer during his deposition - - an act of retaliation which is

disputed by the Defendants. *Id*. at 17. In light of this conflicting testimony, Plaintiffs argue that this claim must survive summary judgment.

"Under the FLSA anti-retaliation provision, an employer is prohibited from discriminating against or discharging 'any employee because such employee has filed any complaint . . . under or related to this chapter.'" *Eschmann v. White Plains Crane Svc., Inc.*, No. 11 Civ. 5881, 2014 WL 1224247, at *10 (E.D.N.Y. Mar. 24, 2014) (quoting 29 U.S.C. § 215(a)(3)); *see also Santos v. ET & K Foods, Inc.*, 16 Civ. 7107, 2017 WL 9256490, at *3 (E.D.N.Y. June 27, 2017) (noting that Congress enacted the anti-retaliation provision in § 215(a)(3) "to prevent fear of economic retaliation from inducing workers quietly to accept substandard conditions, and to foster an atmosphere protective of employees who lodge such complaints") (quoting *Greathouse v. JHS Security Inc.*, 784 F.3d 105, 113 (2d Cir. 2015) (internal citations omitted)).

Defendants' basic argument here is reflective of the Second Circuit's 1993 decision in *Lambert v. Genessee Hospital*, 10 F.3d 46 (2d Cir. 1993) as to what constitutes "filing a complaint" under the anti-retaliation provision, § 215(a)(3) of the FLSA. In *Lambert*, the Second Circuit read § 215(a)(3) "to require that an employee pursuing a claim for unlawful retaliation have done more than voice an equal pay complaint to a supervisor." *Greathouse v. JHS Security Inc.*, 784 F.3d at 106 (citing *Lambert*, 10 F.3d at 55-56). Under *Lambert*, therefore, a plaintiff had to file a formal written complaint with a government agency to sustain an FLSA retaliation claim. *Id*. at 106 n.1 (citing *Nicolaou v. Horizon Media Inc*., 402 F.3d 325, 328 (2d Cir. 2005)). However, in its 2011 decision in *Kasten v. Saint-Gobain Performance Plastics Corp.*, 536 U.S. 1, 17, 131 S.Ct. 1325, 1336, 179 L.Ed.2d 379 (2011), the Supreme Court held

43

that with respect to a predicate for an FLSA retaliation claim, the phrase "filed any complaint" encompassed oral as well as written complaints so long as the complaint was sufficiently clear. *Kasten*, 536 U.S. at 17, 131 S.Ct. at 1336.

In *Greathouse*, the Second Circuit held that "*Kasten* overrules *Lambert*'s requirement that an employee seeking 215(a)(3)'s protections file a written complaint." *Greathouse,* 784 F.3d at 107. The court went on to confirm that ". . . today we overrule *Lambert* to the extent it holds that section 215(a)(3) requires an employee to have filed a complaint with a government agency as a predicate for an FLSA retaliation claim" so long as the complaint is sufficiently clear for a reasonable employer to understand it. *Id*. Defendants' argument that the FLSA anti-retaliation provision only protects employees who have filed formal complaints or instituted a formal proceeding is therefore no longer viable in light of *Kasten* and *Greathouse.*

To evaluate claims of unlawful retaliation under the FLSA and NYLL, courts apply the familiar three-step burden shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Mullins v. City of New York*, 626 F.3d 47, 53 (2d Cir. 2010); *Santos,* 2017 WL 9256490, at *3; *Lahcen v. Kiran Park Newsstand Inc*., No. 11 Civ. 5998, 2014 WL 3887222, at *6 (S.D.N.Y. Aug. 7, 2014). A plaintiff must set forth the following elements to establish a *prima facie* claim of unlawful retaliation: "(1) participation in protected activity known to the defendant, like the filing of a FLSA lawsuit; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action." *Mullins,* 626 F.3d at 53; *Eschmann,* 2014 WL 1224247, at *10; *Salazar v. Bowne Realty Assocs., L.L.C*., 796 F. Supp. 2d 378, 384 (E.D.N.Y. 2011) (noting that the standards for stating a retaliation claim under the FLSA and the NYLL "significantly

overlap" and require the same three elements).  In the event that a plaintiff has established a *prima facie* case of retaliation, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action.  *See Eschmann,* 2014 WL 1224247, at *10 *(citing *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010)).  If successful, the burden shifts back to the employee to produce evidence showing that the employer's proffered reason is pretextual.  *See Gorzynski,* 596 F.3d at 111.

As an initial matter, Plaintiffs contend that in view of direct evidence of retaliation exhibited by Louis Vecchia, the *McDonnell Douglas* burden-shifting framework is inapplicable here.  *See* Pls.' Mem. at 10.  As such, Plaintiffs argue that they may prevail without proving a *prima facie* case of retaliation.  *Id.* (citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002)); *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985) ("[T]he *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination."); *Greene v. Brentwood Union Free Sch. Dist.*, 966 F.Supp.2d 131, 139 (E.D.N.Y. Aug. 13, 2013) (noting that "plaintiff has failed to present direct evidence of Talley's discriminatory animus and that plaintiffs' claims are therefore subject to the *McDonnell Douglas* burden-shifting test").  However, Plaintiffs have provided no authority which demonstrates the application of the direct evidence approach in the context of an FLSA/NYLL retaliation claim.  All of the cases cited by the Plaintiffs address employment *discrimination* - - not retaliation.  *See* Pls.' Mem. at 10.  Moreover, the Court has found only one district court case from the Second Circuit in which the "direct evidence" alternative to the *McDonnell Douglas* test was mentioned (albeit in passing) but was ultimately not applied by the Court.  *See Macharie v. The Body Shop*, No. 03 Civ. 1510, 2003 U.S. Dist. LEXIS 23230, at *3 (E.D.N.Y. Nov. 25, 2003) ("Since plaintiff has not offered

any direct evidence of retaliation, his FLSA claim must be examined under the McDonnell Douglas burden-shifting framework.") (citing *Brock v. Casey Truck Sales, Inc.*, 839 F.2d 872, 876 (2d Cir. 1988). Thus, the Court will apply the traditional burden-shifting framework set forth in *McDonnell Douglas*.

### 1. Participation in Protected Activity

With respect to the first element of a prima facie case of unlawful retaliation, the question at the outset is whether the Plaintiffs engaged in protected activity. *Greathouse* makes clear that a plaintiff may bring an anti–retaliation claim under the FLSA for termination as a result of complaining to the employer about payroll violations. *Corpes v. Walsh Constr. Co.*, 130 F. Supp. 3d 638, 639 (D. Conn. 2015). And the language of the FLSA anti–retaliation provision itself, which, *Greathouse* confirms, is to effectuate "the FLSA's 'remedial purpose,' which warrants construing the statute 'broadly.'" *Cabrera v. CBS Corp.*, 17-CV-6011, 2018 WL 1225260, at *4 (S.D.N.Y. Feb. 26, 2018) (quoting *Greathouse,*784 F.3d at 114-15).

Defendants contend that, among other Plaintiffs, Pracelis Mendez never engaged in protected activity in the first instance and, at best, he lodged informal internal complaints which are insufficient as a matter of law. Defs.' Mem. at 6. Defendants also emphasize that Plaintiff Mendez's November 2009 lay-off occurred *before* the instant lawsuit was commenced on December 7, 2009 and, accordingly, his dismissal from employment could not have been causally connected to his wage and hour lawsuit. *Id*. at 6-7 (citing *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001) (explaining that adverse job actions which were already contemplated before a plaintiff engaged in protected activity do not create an inference of retaliation)).

In their opposition, Plaintiffs argue that Mendez's pre-termination internal complaints to Defendants regarding unpaid wages qualify as protected activity. *See* Pls.' Mem. at 8-10. Alternatively, counsel argues that Mendez's organizing work in initiating this lawsuit constitutes protected activity. *Id.* at 12. As noted above, it is now clear in this Circuit that internal complaints can constitute protected activity under the anti-retaliation provisions of § 215(a)(3). Therefore, this Court is bound by the "clear weight of authority in this circuit," beginning with *Greathouse*. *See, e.g., Cabrera v. CBS Corp.*, 17-CV-6011, 2018 WL 1225260, at *3 (S.D.N.Y. Feb. 26, 2018) ("After *Greathouse,* oral complaints may constitute protected activity for purposes of a § 215(a)(3) retaliation claim."); *Manswell v. Heavenly Miracle Acad. Servs., Inc.*, No. 14-CV-7114, 2017 WL 9487194, at *9 (E.D.N.Y. Aug. 23, 2017) ("Complaining to a supervisor, whether formally or informally, is considered protected activity, as is filing a complaint with the EEOC."), *report and recommendation adopted,* No. 14-CV-7114, 2017 WL 4075180 (E.D.N.Y. Sept. 14, 2017); 29 U.S.C. § 215(a)(3); Santos, 2017 WL 9256490, at *3; *Lopez v. Advantage Plumbing & Mech. Corp*, 15-CV-4507, 2016 WL 1268274, at *2 (S.D.N.Y. Mar. 31, 2016) ("As a result, Defendants' argument that internal complaints cannot, as a matter of law, form the basis for a retaliation claim is incorrect.").

The Court notes that various Plaintiffs testified during their depositions that they and others complained to Operations Supervisor Tommy McEvilly and Louis Vecchia throughout their employment, often on a weekly basis, of the ongoing failure to pay Plaintiffs their full wages, including overtime wages. *See, e.g.,* Deposition Transcript of Pracelis Mendez ("Mendez Tr."), attached as Exhibit O to the Affirmation in Opposition of Ian Wallace, Esq. ("Wallace Aff.") to Defendants' Motion for Summary Judgment, at 86-87, 253-256, 260, 310-312;

Deposition Transcript of Maynor Fajardo ("Fajardo Tr."), attached as Exhibit "K" to Wallace Aff. at 118, 140-41, 188; Deposition Transcript of Jose Martinez ("Martinez Tr."), attached as Exhibit "N" to Wallace Aff. at 125; Deposition Transcript of Edvin Rivera ("Rivera Tr."), attached as Exhibit J to Wallace Aff. at 79-80; Deposition Transcript of Carlos Escalante ("Escalante Tr."), attached as Exhibit P to the Wallace Aff. at 123. Further, Plaintiff Fajardo testified that he and the others did not complain to the union about not being paid proper overtime wages because "he [Vecchio] would say that he could let us go afterwards." Fajardo Tr. at 98.

The Court also points out Pracelis Mendez's testimony that he and others had made the Defendants aware of their complaints about their wages and what would happen before Mendez was terminated from his job. Mendez Tr. at 85-87. According to Mendez, when he complained to McEvilly about his wages, McEvilly told him "do whatever you have to do." *Id*. at 87. In addition, McEvilly told him that he put Mendez's overtime into the computer but that "Louis is in charge of checking what you're going to get paid or not." *Id*.

Significantly, Louis Vecchia admitted during his deposition that Plaintiffs Maynor Fajardo and Pracelis Mendez, among others, complained about their wages and the Defendants' failure to pay overtime before this lawsuit was filed in December 2009. For example, in referring to Mendez, Louis Vecchia testified as follows:

> Q.  Did Pracelis Mendez ever complain to you about not receiving overtime?
>
> A.  No, he got paid for the hours he worked.
>
> Q.  so he never complained to you, is that your testimony?
>
> A.  Did he ever complain to me?

48

Q.      Yes. Did he ever complain to you about not receiving overtime?

A.      I mean he could have. I mean if it was a week he didn't get an hour, usually we'd make it up the next week or whatever the time frame was.

Q.      So is it your testimony you don't remember?

A.      But we can never keep track of -- no, no. Some of the employees would come up and say hey, boss, you shorted me an hour last week, can I get it next week. Some of them come up to me and say hey, boss, you shorted me a whole day last week and if they could afford to wait till the next week, we'd do it the next week or if they needed it badly then, we'd say please give us the other check back and we'll redo their checks.

Q.      As you sit here today, do you recall Pracelis Mendez ever complaining to you about not receiving all the overtime he worked in a week?

A.      He -- yeah, he fraudulently tried to collect overtime, yes.

Q.      so are you saying that he complained to you about not receiving overtime?

A.      On a few occasions, yes.

Q.      Do you remember when those occasions were?

A.      The only times there was when the GPS was disconnected in his truck, we couldn't figure out whether he was lying or telling the truth.

Q.      Was this in 2009?

A.      I believe it was in eight and nine, whenever we even actually got it. There was a few different occasions.

L. Vecchia Tr. at 318-319. It is also important to note that during his deposition, Christopher

Vecchia testified that in 2008, "Renato" (Maynor Fajardo) and Pracelis Mendez complained that

they were owed overtime and that he believed those two influenced the other men to complain. Deposition Transcript of Christopher Vecchia ("C. Vecchia Tr."), attached as Exhibit R to the Wallace Aff., at 112-113. When asked how often they complained, Christopher Vecchia responded "[t]hey would complain at least once a week." *Id*. at 113.

In addition to complaining, the actions of Plaintiffs "in organizing to file a lawsuit are certainly protected activities." *Yu G. Ke v. Saigon Grill, Inc.*, 595 F. Supp. 2d 240, 262-63 (S.D.N.Y. 2008). Some evidence has been introduced of Mendez and other Plaintiffs organizing to initiate the instant lawsuit. Mendez was questioned about when the instant lawsuit was filed with this Court and Plaintiff testified that "[w]e saw paperwork" around September or October of 2009 - - prior to Mendez's termination in November 2009. Mendez Tr. at 83. Further, Mendez testified as follows when pressed again by Defendants' counsel regarding the timing of the Complaint:

> Q. So you were laid off before [you] served a copy of the complaint on Tommy;[7] is that correct?
>
> A. No, no, no. They gave the papers, but Tommy already knew what was going to happen because I was complaining about the overtime.
>
> Q. You were laid off before the complaint was served upon Suffolk Asphalt, Suffolk [Paving], and Louis Vecchia; correct?
>
> A. I don't remember, but as I said, I was complaining about overtime, and they already knew what was going to happen.
>
> \*\*\*
>
> Q. Did you stop working for defendants before or after the lawsuit was filed?

---

[7] "Tommy" refers to Operations Supervisor Tommy McEvilly.

> A. Well, we filed the lawsuit, we spoke with the attorneys before, but Louis Vecchia knew that I was asking for a lot. So in November, they left me at home and told me they were going to call me the following day. I called Tommy on Monday and what he said, that I had to call the boss, Louis.

Mendez Tr. at 86, 252.  This testimony raises a material issue of fact as to whether Mendez was organizing the other employees and, thus, was engaged in protected activity within the meaning of the FLSA.  In *Ke*, the court observed that "the wording of the cited provision appears to contemplate that the protected activity will usually precede the retaliatory action, but not exclusively so since the statute prohibits retaliation targeting an employee who is 'about to testify in any such proceeding.'"  595 F. Supp. 2d at 25 (quoting 29 U.S.C. § 215(a)(3)).  The record here also shows that Plaintiffs contacted the Department of Labor to discuss bringing claims against Defendants.   During his deposition, Plaintiff Jose Martinez testified as follows:

> Q. Who told you about this lawsuit?

> A. One day we were in the yard, and one of them was talking about that. A lot of us got together, a lot of us that used to work together get together, and they said something about the Labor Department, and then someone came from the Labor Department, so that was how we ***started*** the lawsuit.

Deposition Transcript of Jose Martinez ("Martinez Tr."), attached to the Wallace Aff. as Exhibit N at 90 (emphasis supplied).  Thus, the Court cannot hold, as a matter of law, that Mendez did not engage in protected activity within the meaning of Section 215 of the FLSA.

Given the Court's findings with respect to the FLSA, Mendez's claims of unlawful retaliation under the NYLL also necessarily survive summary judgment.  Under "Section 215(1)(a) of New York Labor Law, 'no employer shall discharge or retaliate against any employee because such employee has made a complaint to his or her employer regarding a

NYLL violation.'" *Aflalo v. Cantor Fitzgerald, L.P.,* 298 F. Supp 3d 688, 698 (S.D.N.Y. 2018) (quoting *Thompson v. Jennings & Hartwell Fuel Oil Corp.*, No. 14 CV 1857, 2015 WL 5437492, at *4 (E.D.N.Y. Aug. 27, 2015)). "The protection afforded to workers under the NYLL retaliatory termination provision is 'more broadly worded' than in the FLSA." *Id.* (quoting *Ke v. Saigon Grill, Inc.*, 595 F.Supp.2d at 263); *Payano v. CompassRock Real Estate LLC,* No. 13 Civ. 7967, 2014 WL 1909536, at *3 (S.D.N.Y. May 12, 2014) ("Unlike the FLSA, the NYLL expressly protects a complaint to an employer" and "'[a]n employee complaint ... need not make explicit reference to any section or provision of [the Labor Law] to trigger the protections' of Section 215.") (quoting NYLL § 215(1)(a)(i)). Though disputed some of the time by the Defendants, Mendez testified that he complained to them on multiple occasions about his overtime compensation. Based on the record presented by both sides, Defendants' position that none of the Plaintiffs were engaged in protected activity is clearly disputed by Plaintiffs' testimony that they were. This issue is properly left to a jury. For the foregoing reasons, Defendants' motion for summary judgment as to the unlawful retaliation claims under both the FLSA and the NYLL are DENIED.

### 2. *Employment Actions Disadvantaging the Plaintiffs, Causal Connections and Questions of Pretext*

To prove a retaliation claim, Plaintiffs must next show that they suffered an adverse employment action. An employment action is adverse if it "might have dissuaded a reasonable worker from making or supporting similar charges." *Mullins*, 626 F.3d at 53 (internal quotation marks and alterations omitted) (quoting *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68 (2006)). Plaintiffs allege that Defendants took an adverse employment action against them by failing to rehire them after a seasonal break in operations and by constructively discharging

them.  Defendants argue that Plaintiffs abandoned their jobs, and, in any event, the companies'

failure to rehire them could not constitute an adverse employment action because Plaintiffs

essentially were at-will employees who had no reasonable expectation that they would be

rehired.

First, with respect to Edvin Rivera, Defendants claim that "despite being provided a start

date for the 2010 paving season at the culmination of the prior season, he failed to show up at

defendants' place of business on the designated day (March 22, 2010) because he 'didn't have

the gas money to waste.'"  Defs.' Mem. at 9 (citing Rivera Tr. at 160-61, 173).  Defendants'

counsel contends that, like his co-Plaintiffs, Rivera left work at the end of the 2009 paving

season and "simply failed to return for the start of the 2010 paving season."  *Id*. (citing Rivera

Tr. at 173).  However, Defendants' interpretation of Rivera's testimony is skewed.  Rivera

testified that Operations Supervisor Tommy McEvilly advised him that he would start work on

March 20, 2010.  Rivera Tr. at 158.  However, Rivera testified that when he spoke to McEvilly,

McEvilly "didn't want to listen to me."  *Id*.  Significantly, Rivera stated that despite being

advised that the 2010 paving season would commence on March 20, 2010, Defendants did not

call him to start work as had been his previous experience.  *Id*. at 159.

It is well established that "an employer's failure to rehire constitutes an adverse

employment action for purposes of a retaliation claim." *Cabrera v CBS Corp.,* 2018 WL

1225260, at *6; *see Leibowitz v. Cornell Univ.*, 584 F.3d 487, 501 (2d Cir. 2009); *Weissman v.

Dawn Joy Fashions, Inc.,* 214 F.3d 224, 234 (2d Cir. 2000); *Zhengfang Liang v. Cafe Spice SB,

Inc.*, 911 F. Supp. 2d 184, 210-212 (E.D.N. Y 2012); *Caraccilo v. Village of Seneca Falls,* 582 F.

Supp. 2d 390, 415 n.12 (W.D.N.Y. 2008); *McFarlane v. Chao,* 2007 WL 1017604, at *23

(S.D.N.Y. Mar. 30, 2007). "Even an employer's discretionary decision not to hire an applicant or to terminate an at-will employee can constitute an adverse employment action, provided the employer's motive is to retaliate." *Cabrera*, 2018 WL 1225260, at *6 (citing *Leibowitz,* 584 F.3d at 501 n.4). Retaliation is precisely the motive Plaintiffs ascribe to Louis Vecchia as the basis for his decision not to re-hire them for the 2010 season. In light of the record here, the Court finds that material issues of fact exist regarding the question of adverse employment actions, specifically whether the Defendants fired the Plaintiffs for cause, terminated them for purportedly "abandoning" their jobs, or elected not to re-hire them in retaliation for the filing of the lawsuit. These questions cannot be resolved on summary judgment as to Plaintiff Edvin Rivera.

With respect to Carlos Escalante, Defendants maintain that he resigned from his position, citing an "undisclosed illness" and never purportedly called Defendants to notify them. *See* Defs.' Mem. at 9. Having reviewed Escalante's testimony, it appears that he became ill on December 9, 2009 (two days after the lawsuit was filed) and took leave. Escalante Tr. at 32. Although Escalante approached Louis Vecchia about working again during the start of the 2010 paving season, Vecchia did not follow up with Escalante. *Id*. at 37. Escalante testified that he was neither fired nor retaliated against by Suffolk Asphalt. *Id*. Instead, he subsequently obtained another job with Pioneer Asphalt. *Id.* at 32-33. In view of this record, the Court hereby GRANTS Defendants' motion for summary judgment on the retaliation claim brought by Carlos Escalante.

As to Plaintiff Osmar Pagoada, however, there are disputed material issues of fact concerning his separation from employment with Defendants. Again, Defendants maintain that

Pagoada voluntarily abandoned his position, having made no attempt to rejoin Defendants at the start of the 2010 paving season. Defs.' Mem. at 9-10. The following testimony, however, conflicts with Defendants' characterization of the evidence:

> Q. Are you claiming that Suffolk Paving terminated you in retaliation for complaints that you made?
>
> [Plaintiffs' Counsel]: Objection.
>
> A. No. After we filed the lawsuit, they didn't call me again.
>
> Q. Do you think they didn't call you again because of the lawsuit?
>
> [Plaintiffs' Counsel]: Objection.
>
> A. No, no, they didn't call me again.
>
> Q. Is that what you're claiming, that you no longer work at Suffolk Paving because you filed this lawsuit?
>
> [Plaintiffs' Counsel]: Objection.
>
> A. Yes. Since we filed a lawsuit, they realized -- they didn't call me again to work.

Pagoada Tr. at 88. Pagoada further testified that Defendants "didn't call me anymore because of the lawsuit" and "didn't give me any more work." *Id*. at 64. And despite Defendants' claim that it was Pagoada who refused to call Defendants to inquire about work during the 2010 paving season, Pagoada testified that it was Defendants who would call him. Following commencement of the lawsuit in December 2009, Pagoada received no calls regarding work at the start of the 2010 paving season. *Id.* 65-66. In view of these disputed issues of fact, the Court finds that Pagoada's retaliation claims cannot be resolved on summary judgment.

Next, Defendants' claim that despite being instructed to contact Louis Vecchia to secure work, Maynor Fajardo failed to do so. Defs.' Mem. at 10. Moreover, Defendants argue that Fajardo testified he was "unsure as to the actual reason for his alleged dismissal, choosing instead to rely upon representations of unnamed individuals and his co-Plaintiffs." *Id.* (citing Fajardo Tr. at 70-72). Louis Vecchia testified that Fajardo was discharged on September 15, 2009 after completing over 10 years of employment for "just a really bad attitude. Pls.' Mem. at 13 (quoting L. Vecchia Tr. at 327-328; Wallace Aff., Ex. X). When asked to discuss the reasons for Fajardo's termination, Vecchia testified as follows:

> Q.    How come you terminated Maynor Fajardo's employment?
>
> A.    Just a really bad attitude. Told him how to do the job. I mean that I can remember like it was yesterday because I was so disappointed in him. I pulled up to the job in Riverhead, his truck sitting there. I go why are you doing this where you know you weren't taught to do it this way, why are you doing it this way? Carlos was just shaking his head like, you know, you're getting screwed, boss and I just had enough. I had enough of his . . . just him and Mendez pretty much told my son that they run the company, we don't.

L. Vecchia Tr. at 327. Relying on the fact that this lawsuit was served in December 2009 and that Fajardo was terminated in September 2009, Defendants take the position that Fajardo's termination *preceded* his engagement in protected activity and so there is no causal connection. Fajardo testified, on the other hand, that he had been complaining regularly about the failure to pay proper wages. Fajardo Tr. at 70, 98, 214. Moreover, prior to filing the lawsuit, the Plaintiffs had sought assistance from an investigator at the DOL who met with them to discuss their wage complaints. *Id.* at 118, 141; Martinez Tr. at 90-91. The issues of fact raised here regarding timing of events and causal connections cannot be resolve on summary judgment.

56

Defendants also seek to dismiss Walter Garcia's retaliation claims, pointing out that Garcia did not contact Defendant Chris Vecchia to secure employment with Suffolk Asphalt after the end of the 2009 paving season. According to the Defendants, Garcia voluntarily abandoned his position. *See* Defs.' Mem. at 10-11. Defendants' counsel again challenges the veracity of the witness. However, the Court reiterates its serious concerns with the manner in which the questioning was being conducted by Defendants' counsel overall. Despite Defendants' characterizations of the testimony, the Court observes that Garcia provided testimony directly contradicting the Defendants' version of events leading to Garcia's separation from Defendants' employment:

> Q.     When did you get fired from Suffolk Paving?
>
> A.     The 19th of December.
>
> Q.     Of what year?
>
> A.      2009.
>
> Q.     How were you fired?
>
> A.     They never called me. They always called me to go shovel snow. In April, I was calling Louie Vecchia, and he would tell me next week, next week. Four weeks passed, and after that, he wouldn't answer, so then I went to the office, and I asked him if he had work for me, and he said no, that because of what was being done, he didn't need me anywhere.
>
> Q.     Meaning, because he didn't have the work for you; correct?
>
> A.     ***Because of this case***.

Garcia Tr. at 114 (emphasis supplied). In light of evidence suggesting that Plaintiff Garcia was terminated only five days after the service of the Summons and Complaint on December 14,

2009, the Court finds that there exist material issues of fact which precludes summary judgment on Garcia's claims of retaliation.

Defendants also seek to dismiss Plaintiff Jose Castillo's retaliation claims arising from his asserted termination. Castillo's testimony is problematic. Early on, Castillo testified that McEvilly advised him during the beginning of the 2010 paving season that they had "no work." Castillo Tr. at 12. He stated that the "whole group that is involved in this" lawsuit approached a Department of Labor ("DOL") representative based in Hempstead, New York in November of 2009 - - preceding Plaintiff's separation from Defendants. *Id*. at 11-12. When asked why he was no longer working at Suffolk Paving, Castillo responded "Yes, because we complained to the Department of Labor and he [Louis Vecchia] never gave us employment." Castillo Tr. at 10. However, further on in his testimony, the following exchange took place:

> Q. Are you suing Suffolk Paving because you believe they fired you in retaliation for filing a lawsuit or complaining about your wages?
>
> MR. MCNAMARA: Objection.
>
> Q. Probably, yes.
>
> A. So you are?
>
> MR. MCNAMARA: We have not asserted a retaliation claim on behalf of Mr. Castillo. If necessary, we're willing to stipulate to that on the record.
>
> MR. ZABELL: I'll allow you to stipulate to that on the record, but you're going to have to supplement that, like you did, with a written stipulation here in my office before we conclude today.
>
> MR. MCNAMARA: Okay, that's fine.
>
> Q. Mr. Castillo, do you understand what your lawyer just said?

A.     No.

Q.     He said you're lying to me.

MR. MCNAMARA:     Objection.

Q.     And you're not asserting a claim for retaliation. Are you aware of that?

A.     No.

*     *     *

Q.     Mr. Castillo, it was explained to you why your lawyer made a representation that you did not agree with, correct?

A.     I don't understand the question.

Q.     You understand that you're not suing for any retaliation claims, correct?

A.     Yes.

Q.     So as you're sitting here now, it is your position that you are not suing for any retaliation claims, correct?

A.     Only for the hours that he has not paid us.

Q.     No claim of retaliation, correct?

MR. MCNAMARA:     Objection.

A.     No.

Q.     No, not correct, or no, yes, correct?

MR. MCNAMARA:     Objection.

A.     Yes, correct.

Q.     Was it yes or no?

MR. MCNAMARA:     Objection.

| | |
|---|---|
| A. | Yes. |
| Q. | Si, what? I need you to explain in your own words for the record. |
| A. | Yes, there is no retaliation. |
| Q. | So when you testified before that there was a retaliation, you were mistaken, correct? |
| MR. MCNAMARA: | Objection. |
| A. | Yes, I didn't understand the question. |

Castillo Tr. at 25-28. Based on the totality of Castillo's testimony, as well as the colloquy between counsel about the stipulation, the Court finds that Castillo cannot sustain a claim for retaliation connecting his termination with his bringing this lawsuit and therefore Defendants' motion for summary judgment as to that claim is GRANTED.

The Court next addresses the question of whether Defendants' opposition to Plaintiff's unemployment insurance benefits following the initiation of this lawsuit was "lawful" and done in "good faith." Claims of retaliation originating from an employer's challenge to a plaintiff's unemployment benefits proceeding have previously been recognized by several courts. For example, in an earlier Report and Recommendation rendered by the Court in this case, this Court permitted the Plaintiffs to amend their complaint to include claims of retaliation based on the Defendants' challenge to Plaintiffs' eligibility for unemployment benefits. *See* DE 34; *see also* DE 42 (adopting Report and Recommendation[8]); *Stezzi v. Citizens Bank of P.A.*, 10 Civ. 4333, 2012 WL 4747900, at *4 (E.D. Pa. Oct. 4, 2012) (finding plaintiff's retaliation claims could proceed based on employer's appeal of plaintiff's application for unemployment benefits, but

---

[8] The Defendants did not file any objections to the Report and Recommendation.

noting that plaintiff would have to show that the employer's actions negatively affected her future employment opportunities); *Moore v. Shands Jacksonville Med. Ctr., Inc*., No. 09 Civ. 298, 2010 WL 5055838, at *2-3 (M.D. Fla. Dec. 3, 2010) (finding that Title VII retaliation claim could proceed where plaintiff alleged defendant made false statements in challenging plaintiff's unemployment benefits claim, citing broadened scope of what is to be considered an "adverse employment action" set forth in *Burlington Northern*); *Helfrich v. Lehigh Valley Hosp*., No. 03 Civ. 5793, 2003 WL 23162431, at *4 (E.D. Pa. Dec. 22, 2003) (permitting ADEA and ADA retaliation claims to proceed based on plaintiff's allegations that defendant retaliated against him by challenging his application for unemployment compensation benefits); *Wright v. Life Start Cntrs, Inc*., No. 00 Civ. 362, 2000 WL 1643781 (N.D. Ill. Oct. 20, 2000) (finding Title VII retaliation claim could proceed where plaintiff alleged defendants made false statements during her unemployment proceedings that she had been terminated for cause).

Defendants maintain that they engaged a "good faith" opposition to the unemployment insurance applications of Plaintiffs Edvin Rivera, Nelson Quintanilla, and Lerly Rodriguez. *See* Defs.' Mem. at 12. Plaintiff Rivera was denied benefits by the New York State Unemployment Insurance Appeals Board ("UIAB") after finding that he "refused a legitimate offer of employment from [D]efendants." Defs.' Mem. at 13. At the hearing, Defendants argued that Rivera failed to report to work and did not inquire about work opportunities during the 2010 paving season. *Id.* Further, Rivera could not be contacted in light of his failure to provide Defendants with a proper working telephone number. *Id.* Similarly, with respect to Nelson Quintanilla, Defendants opposed his application for unemployment insurance benefits because he allegedly did not want to work and went home. Defs.' Mem. at 14 (citing Quintanilla Tr. at

94, 96).  Defendants claim, without any factual basis, that Quintanilla left work because of his "ego."  *Id*.  Finally, Defendants claim that Lerly Rodriguez failed to remain in communication with Defendants and was thus unable to secure employment.  *Id*.  Further, Defendants point out that Rodriguez fails to set forth any causal connection between his lawsuit and their state court action against him since Rodriguez was denied unemployment benefits in August 2011 - - nearly two years after filing the December 9, 2009 lawsuit.  *Id*.  These arguments are plucked from deposition testimony which the Court has already found to be less trustworthy given the manner in which the questions were posed and the penchant of Defendants' counsel for not providing context when making such arguments.

Having reviewed the record, the Court finds genuine issues of fact on the question of retaliation stemming from Defendants' opposition to Plaintiff's unemployment insurance applications.  Significantly, Defendants did not oppose Plaintiffs' unemployment insurance applications until *after* this lawsuit was initiated.  Edvin Rivera testified that he received unemployment insurance annually (since paving work is seasonal and Plaintiffs applied yearly for unemployment insurance during the off-season) until they were "cut" by Louis Vecchia in 2010 after this action was commenced.  E. Rivera Tr. at 143-44.  Jose Castillo also testified that he previously received unemployment insurance on an annual basis during the off-season months of December through March.  J. Castillo Tr. at 45.  Over a period of years, the Defendants never contested those benefits.   Moreover, as reflected above, there is conflicting testimony regarding the circumstances of Plaintiffs' separation from employment with Defendants.  Accordingly, these material issues of fact are more appropriately reserved for determination by a jury.

Finally, the Court finds distinguishable the case law relied upon by Defendants to contend that their opposition to Plaintiffs' unemployment insurance applications was, as a matter of law, non-actionable.  For example, in *Barriera v. Bankers Trust*, No. 98 Civ. 3641, 2003 WL 22387099 (S.D.N.Y. Oct. 20, 2003), the court found that the employer was entitled to oppose the former employee's unemployment claim and, moreover, the employee alleged "no facts" to indicate that the employer "did more to oppose her unemployment benefits claim than characterize her departure from the company as a resignation."  *Barriera*, 2003 WL 22387099, at *7.  Moreover, in *Barriera*, despite the employer's opposition, the employee ultimately was awarded unemployment benefits.  *Id*. at *8.  In *Roman v. Cornell University,* 53 F.Supp.2d 223 (N.D.N.Y. Jun. 30, 1999), the court found that plaintiff offered no evidence that the employer opposed the unemployment benefits application for discriminatory reasons.  *Roman*, 53 F.Supp.2d at 245-46.  The employee in *Roman* could not show, for example, that the employer declined to oppose similar applications by those outside of her protected class (*i.e.,* non-Latinos). *Id*.  Here, by contrast, material issues of fact exist concerning Defendants' opposition to Plaintiffs' applications.  Defendants never previously opposed the Plaintiffs' claims for unemployment benefits at the end of a paving season – until the initiation of this action.  Likewise, the representations made by Defendants before the UIAB were vigorously contested by the Plaintiffs.  Based on these factors, the Court hereby DENIES Defendants' motion for summary judgment on the retaliation claims arising from Defendants' opposition to the unemployment benefit claims of Plaintiffs Quintanilla, Rivera, and Rodriguez.

Plaintiffs Fajardo and Mendez also allege that Defendants initiated retaliatory litigation against them to recover unpaid debts *solely* because Plaintiffs commenced this lawsuit against

the paving company. Defendants seek to dismiss these claims and base their motion for summary judgment on the contention that Plaintiffs cannot establish causation or pretext. *See* Defs.' Mem. at 15-18. To establish causation between the filing of this federal wage and hour action and the state court proceeding, Defendants maintain that Plaintiffs must show evidence of retaliatory animus or "very close" temporal proximity. *Id.* at 16 (citing *Gordon v. Bd. of Ed.*, 232 F.3d 111, 117 (2d Cir. 2000); *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)). With respect to temporal proximity, Defendants argue that the five-month period which elapsed from the filing of Plaintiffs' lawsuit and Defendants' commencement of their lawsuit against Fajardo and Mendez in April 2010 is too long to establish a causal connection as a matter of law. *Id.* (citing *Murray v. Visiting Nurse Svcs.*, 528 F.Supp.2d 257, 275 (S.D.N.Y. 2007); *Breeden*, 532 U.S. at 273; *Hollander v. Am. Cyanamid*, 895 F.2d 80, 85-86 (2d Cir. 1990); *Nicastro v. Runyon*, 60 F.Supp.2d 181, 185 (S.D.N.Y. 1999)). Secondly, Defendants contend that there is no evidence of retaliatory animus. *See id* at 16. The sole reason that the state action to recover unpaid debts from Fajardo and Mendez was initiated in April 2010 was, according to Defendants, because they had "abandoned their positions for the 2010 paving season" and commencing suit was necessary "after it became clear no additional payments would be forthcoming." *Id.*

In opposition, Plaintiffs assert that there is no "bright line" test for establishing temporal proximity in a claim for unlawful retaliation. *See* Pls. Mem. at 15-16. For example, in *Gorzynski v. Jetblue Airways Corp.*, the Second Circuit stated that "[t]hough this Court has not drawn a bright line defining, for the purposes of a prima facie case, the outer limits beyond which a temporal relationship is too attenuated to establish causation, we have previously held

that five months is not too long to find the causal relationship."  596 F.3d 93, 110 (2d Cir. 2010) (citing *Gorman-Bakos v. Cornell Coop. Extension of Schenectady Cnty.*, 252 F.3d 545, 555 (2d Cir. 2001)).  In his Reply, Defendants' counsel emphasizes that when a plaintiff is seeking to establish causation solely on the basis of temporal proximity and not retaliatory animus, the Court is bound by the Supreme Court's holding in *Breeden*, namely, that "[t]he cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be "very close."  Defs.' Reply at 9; *Breeden*, 532 U.S. at 273 (internal quotations omitted).

Having analyzed *Breeden* and *Gorzynski* in view of the record evidence, the Court finds that, at the very least, issues of fact exist regarding the causal connection between the Plaintiffs' December 2009 federal lawsuit and the April 2010 collection proceeding initiated by Defendants in state court.  As the Second Circuit has held, a five-month gap is not too attenuated to establish temporal proximity.  *See Gorzynski*, 596 F.3d at 110; *Gorman-Bakos*, 252 F.3d at 555; *see also Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.*, 444 F.3d 158, 168 (2d Cir. 2006) ("On the facts of this case, the lapse of only several months after the letter and several weeks after the press conference between the protected speech and adverse employment action is sufficient to support an allegation of a causal connection strong enough to survive summary judgment."); *Grant v. Bethlehem Steel Corp.,* 622 F.2d 43, 45-46 (2d Cir. 1980) (eight month gap between EEOC complaint and retaliatory act suggested causal relationship); *Ehrbar v. Forest Hills Hosp.*, 131 F. Supp. 3d 5, 35 (E.D.N.Y. 2015) (finding four and a half months between plaintiff's letter to CEO of college and her termination could raise some inference of a causation connection

between plaintiff's protected activity and her firing). The Court also points out that the timing of of the state court proceedings follows closely upon the time that the Plaintiffs would normally have been returning to work for the new season – work which Plaintiffs maintain they were prevented from doing by the Defendants.

Moreover, the Court finds that the causal connection in both Fajardo and Mendez's retaliatory litigation claims is not founded solely on temporal proximity, but also rests on evidence of retaliatory animus.[9] Thus, the time period between the protected activity and the adverse employment action need not be "very close" to warrant denial of summary judgment. For example, Fajardo testified that when Louis Vecchia learned of the lawsuit filed by Plaintiffs, Vecchia called Fajardo "at the moment he received the letter" and advised Fajardo that he would be suing him as well. Fajardo Tr. at 198. Fajardo, moreover, disputes that he "owed him [Vecchia] money for a truck." *Id*. at 199. Although Vecchia loaned Fajardo approximately $18,500 in 2008, Vecchia took possession of a Lincoln Navigator -- which Fajardo had previously purchased from Vecchia -- while Fajardo was abroad. *Id*. at 36-37, 39, 40-41, 47-48, 208. At the time Vecchia repossessed the vehicle, Fajardo had already paid $32,000 towards the purchase price and, according to Fajardo's testimony, Vecchia conceded that *he* owed Fajardo money in light of the record of payments already made by Fajardo. *Id*. at 40-41, 43-44, 49, 51-

---

[9] The Court also notes that within four days of being served with the Complaint, on December 18, 2009, the Defendants issued Plaintiffs Nelson Quintanilla, Rivera, Rodriguez and Castillo with disciplinary write-ups which Plaintiffs contend were unjustified. Pls.' Exs. 4, 5. Shortly thereafter, Defendants issued more write-ups. Pls.' Ex. 4. Although most Plaintiffs had been working for the Defendants for 5-10 years at the time, McEvilly testified that these were usually Plaintiffs' first disciplinary write-ups. McEvilly Tr. at 87-93. McEvilly acknowledged that he had issued only four or five write-ups throughout the entire period of employment of these Plaintiffs. *Id.*

86.   Significantly, Louis Vecchia did not pursue the alleged debt until July 2011, only after

Fajardo and others had commenced this suit.  *See* Wallace Aff. [DE 151], Ex. 88.

Further, Louis Vecchia's own testimony creates a material issue of fact whether the

lawsuits against Fajardo and Mendez were predicated on retaliatory animus.

> Q.      Why is it that you waited until after this lawsuit was filed to
> bring a lawsuit against Maynor for that loan?
>
> A.      Cause he always made me promises that he would pay it, so
> I guess like my wife would say, my ignorant kindness, I
> would let it go. I'd let things go I guess where I really
> shouldn't have. So it was a mistake on my part.
>
> Q.      So after he brought a lawsuit against you, is it fair to say
> you realized you didn't want to let it go anymore?
>
> A.      No. My wife had woken me up and said it's about time you
> started collecting money from these people that owe you
> money and we've been doing it ever since. It's not just this,
> it's everywhere. Too nice a guy just ask all your plaintiffs.

L. Vecchia Tr. at 306-07.  Moreover, Pracelis Mendez testified that he paid back the $25,000

loan he was given by Louis Vecchia through weekly paycheck deductions which ultimately

stopped once Mendez satisfied his obligations.  Mendez Tr. at 23-27, 90-93, 176, 180-181.

Despite this circumstance, however, Vecchia filed suit against Mendez five months after he

initiated this lawsuit.  Wallace Aff. [DE 151], Ex. 90.  Under the totality of the circumstances

here, the Court finds that a reasonable jury could conclude that the lawsuits initiated against

Fajardo and Mendez were causally related to their commencement of this wage and hour action

against the Defendants.

The Court further concludes that a reasonable jury could find that Defendants' proffered

legitimate non-retaliatory reason for suing Fajardo and Mendez were pretextual.  Defendants

claim that Plaintiffs abandoned their positions and that there was "no choice but to commence suit to recover substantial sums of money due and owing from [P]laintiffs Fajardo and Mendez as neither individual made arrangements to make [D]efendants whole prior to abandoning their positions." Defs.' Mem. at 17. Although the circumstances involving the alleged debts were evident for some time, Louis Vecchia never filed suit against these two Plaintiffs prior to their commencing this litigation. Moreover, the record shows that these two Plaintiffs had already satisfied part if not all of their debt obligations to Vecchia. As such, it is appropriately left to a finder of fact to determine whether the proffered reasons articulated by Defendants for recapturing their debts are pretextual. *See Spencer v. Int'l Shoppes, Inc.*, 902 F. Supp. 2d 287, 295-300 (E.D.N.Y. 2012) (finding genuine issues of fact that litigation commenced less than two months after filing of human rights complaint almost two years after the claims arose and seeking a high amount of damages was retaliatory).

Finally, the Court finds distinguishable *Mohamed v. Sanofi-Aventis Pharm.*, No. 06 Civ. 1504, 2009 WL 4975260 (S.D.N.Y. Dec. 22, 2009) which counsel relies upon to argue that Defendants had a reasonable and good-faith basis to pursue the state court litigation against these Plaintiffs. *See* Defs.' Mem. at 18. In *Mohamed*, the Court found that the counterclaims asserted by defendants for plaintiff's breach of his tuition assistance contract were not filed with retaliatory intent because there was no evidence in the record that "[d]efendants had the specific intent to interfere with [p]laintiff's protected rights." 2009 WL 4975260, at *25. The defendants in *Mohamed* sought tuition assistance reimbursement from other employees as well and had, in fact, made the same demands *before* plaintiff filed his discrimination action. *Id*. Here, by contrast, Defendants did not pursue the state court litigation against Mendez and Fajardo until

after they commenced this action. Moreover, Defendants have not shown that they similarly filed suit against other employees who are not parties to this lawsuit but who had similarly failed to reimburse loans issued by Louis Vecchia. As such, summary judgment as to the retaliatory litigation claim filed by Fajardo and Mendez is DENIED.

In the eleventh and final count of the Third Amended Complaint, Plaintiff Mendez asserts that Louis Vecchia contacted Mendez's subsequent employer, Capitol Concrete, in retaliation for his participation in this action. Specifically, Mendez alleges that during his deposition on September 13, 2011, Louis Vecchia called Mendez's then employer at Capitol Concrete in Mendez's presence in the deposition room. Two days later, Mendez claims that he was terminated from employment by Capitol Concrete. Compl. 169-172. Mendez thus alleges that he was retaliated against by Vecchia for participating in this lawsuit. *Id.* 175. Plaintiffs maintain that Defendant Louis Vecchia is a personal friend of George - - the owner of Capitol Concrete - - and his communication with George at Mendez's deposition was aimed at intimidating and threatening Mendez. *Id.* 168-171. Defendants contend that this claim is unfounded and solely attributed to Plaintiffs' "paranoia." Defs.' Mem. at 18. Defendants point to Louis Vecchia's phone records which were produced to Plaintiffs' counsel and which do not reflect a phone call from Vecchia to George at Capitol Concrete on the day in question - - September 13, 2011. *Id.* (citing Zabell/Pinks Aff., Exs. 61 and 78). Plaintiffs contend that Louis Vecchia made the call to George in the presence of Mendez during his deposition. Defendants deny that the call was ever made and have offered phone records to prove a negative. The closeness in time between this alleged call and Mendez's termination from his new job raises a question – one which ultimately requires a credibility determination. "Credibility determinations, the weighing of the evidence

. . . are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 2513, 91 L. Ed. 2d 202 (1986); *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."); *Burch v. City of New York,* 11CV284, 2016 WL 11430773, at *7 (E.D.N.Y. Apr. 22, 2016) ("Accordingly, '[a]ssessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment.'") (quoting *Jeffreys v. City of New York*, 426 F.3d 549, 553–54 (2d Cir. 2005)). The portion of Defendants' motion seeking summary judgment on Pracelis Mendez's claim of retaliation based on the alleged call from Louis Vecchia to Mendez's employer is DENIED.

## D. Plaintiffs' Claims of Overtime Violations Under the FLSA/NYLL

Section 207 of the FLSA mandates that employers must compensate their respective employees for hours worked in excess of 40 per week at a "rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1). The same holds true under New York law. *See* N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.2; *see also Chun Jie Yin v. Kim*, No. 07 Civ. 1236, 2008 WL 906736, at *4 (E.D.N.Y. Apr. 1, 2008) ("Like the FLSA, however, New York mandates that employers provide time-and-a-half compensation for their employees' work hours that exceed 40 hours per week."). It is of no consequence under the FLSA that an employer compensates its employees annually or weekly. *See* 29 C.F.R. § 778.109 ("The Act does not require employers to compensate employees on an hourly rate basis."). An employee who sues for overtime compensation bears the burden of proving that an employer did

not properly compensate him. *Anderson v. Mt. Clemens Pottery Co*., 328 U.S. 680, 686-87 (1946).

However, the FLSA requires employers to maintain accurate records of the hours and wages of their employees. *See* 29 U.S.C. § 211(c) (requiring every employer to "make, keep, and preserve such records of the persons employed by him and of the wages, hours, and other conditions and practices of employment maintained by him"); *see also* 29 C.F.R. § 516.2(a)(7) (requiring that employers maintain records of "[h]ours worked each workday and total hours worked each workweek" by employees). New York State maintains similar record keeping requirements for employers. *See* NYLL § 661 (requiring employers to establish and maintain payroll records "showing for each week worked the hours worked, the rate or rates of pay and basis thereof"); N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.6(a)(4) (requiring employers to establish, maintain and preserve, for not less than six years, weekly payroll records which show for each employee "the number of hours worked daily and weekly, including the time of arrival and departure for each employee working a split shift or spread of hours exceeding 10").

In situations where an employer's payroll records are inaccurate or inadequate, "an employee has carried out his burden if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Anderson*, 328 U.S. at 687; *see also Reich v. S. New Eng. Telecomms. Corp*., 121 F.3d 58, 66 (2d Cir. 1997) (concluding that when a defendant fails to maintain the required employment records, the employee may "submit sufficient evidence from which violations of the Act and the amount of an award may be reasonably inferred") (internal quotation marks omitted); *Indergit v. Rite Aid Corp.*, 52 F. Supp. 3d 522, 525 (S.D.N.Y. 2014) ("The Court is not persuaded that reliance upon a plausibly

representative sample of testimony, alongside other non-testimonial materials, cannot give rise to a reasonable inference of violation of FLSA and the NYLL.). "As courts have found, a plaintiff can meet this burden 'by relying on recollection alone.'" *Santillan v. Henao*, 822 F. Supp. 2d 284, 294 (E.D.N.Y. Sept. 30, 2011) (quoting *Doo Nam Yang v. ACBL Corp.*, 427 F. Supp. 2d 327, 335 (S.D.N.Y. 2005)) (collecting cases). "The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence." *Anderson*, 328 U.S. at 687-88; *see also Ramirez v. Rifkin*, 568 F. Supp. 2d 262, 273 (E.D.N.Y. 2008) (stating that after plaintiff meets his initial burden, "[t]he burden then shifts to the employer to show that the inference is not reasonable."). A similar standard to *Anderson* is applied in deciding overtime claims under New York law. *See Park v. Seoul Broad. Sys. Co.*, No. 05 Civ. 8956, 2008 WL 619034, *8 n.13 (S.D.N.Y. Mar. 6, 2008). However, the New York standard places a more demanding burden on employers than the FLSA. *See Padilla v. Manlapaz*, 643 F. Supp. 2d 302, 307 (E.D.N.Y. 2009) (concluding that after an employee has established his or her burden, "[t]he burden then shifts to the employer to prove by a preponderance of the evidence that the plaintiff was properly paid for the hours worked"); *see also Jiao v. Shi Ya Chen*, No. 03 Civ. 165, 2007 WL 4944767, at *3 (S.D.N.Y. 2007) (finding that if an employer is unable to meet its burden under the FLSA, it could not satisfy the burden under New York law).

Here, Defendants' principal and owner Louis Vecchia testified that he was unaware whether Defendants kept handwritten timesheets. L. Vecchia Tr. at 85-86. Moreover, Vecchia testified that he never instructed his Operations Supervisor, Tommy McEvilly, to retain those records. *Id.* Vecchia further testified that he was unsure whether McEvilly actually kept such

timekeeping records. *Id.* Further, several Plaintiffs testified to witnessing Louis Vecchia and Tommy McEvilly destroying the Plaintiffs' handwritten timesheets. Pagoada Tr. at 115, 158-160; Mendez Tr. at 107-108, 126, 294. Pagoada testified that Vecchia would tear up handwritten timesheets after they had been completed and provided to management. Pagoada at 115. Pagoada testified further that he saw with "his own eyes" the active destruction of timesheets by Louis Vecchia. *Id.* at 158-160. Plaintiff Arevalo also testified regarding the document destruction:

> Q.  Who burned the papers?
>
> A.  Helene, Louis's wife, she burned a lot of papers in a can -- what do you call it? Like a can, a garbage can. They poured in gasoline, and they ripped up a lot of papers. A lot of papers were burned there, and then in the back in the yard, they buried a ton of rubber.
>
>          *       *        *
>
> Q.  When did you see it?
>
> A.  That was about four months after.
>
>          *       *        *
>
> A.  Four months before they fired me, those papers were burned. Afterward, I realized that when they were going to send me my papers so that I could do my taxes, George spoke to me. George called me saying that he needed my Social Security number to fill out income taxes, and I said why, because I've been working here, and it must be in your file. Those files were burned over there.

Arevalo Tr. at 159-161. In reply, Helene Vecchia submitted an affidavit contradicting this account:

> At no point in time have I, in any capacity, destroyed, altered, or secreted any information regarding Defendants' payroll practices and/or procedures, or any information pertaining to any employee

> of Defendants including, but not limited to, the named Plaintiffs in
> this action.

*See* Affidavit of Helene Vecchia ¶ 2.  At the very least, then, the dueling accounts create a

material issue of fact as to this time sheets and recordkeeping.

During his deposition, Louis Vecchia could not confirm whether Defendants had a written

record retention policy.  L. Vecchia Tr. at 95-97.  His wife Helene testified that she does not

believe that Suffolk Asphalt has any written record retention policies governing exactly how

long the time and payroll records should be kept.  H. Vecchia Tr. at 70-71.  Thus, in light of the

absence of proper timekeeping records, the Court will rely upon Plaintiffs' representation of the

hours that went uncompensated to assess whether they are supported by a "just and reasonable

inference." *Anderson*, 328 U.S. at 687.

Notwithstanding attempts by Defendants' counsel to improperly discredit, undermine, and

attack the Plaintiffs' credibility as previously discussed by the Court, Plaintiffs' testimony and

proffered evidence create a just and reasonable inference that Plaintiffs were not paid overtime in

accordance with the requirements of the FLSA and NYLL.  Plaintiffs testified that they were

required to report to work no later than 6:30 a.m. and as early as 5-5:30 a.m. depending on their

respective positions.  *See* Quintanilla Tr. at 20, 27, 29-30, 128-129, 138; Amaya Tr. at 103; J.

Quintanilla Tr. at 33-34, 42-43, 59; Castillo Tr. at 54, 108; Quinteros Tr. at 99-100; Galeano Tr.

at 78; Pagoada Tr. at 70, 72, 82, 90-93, 112-115, 164-168, 175-176; Arevalo Tr. at 96-98, 110.

The record shows that until the commencement of the instant lawsuit, Plaintiffs were regularly

required to report for work at Defendants' facility before their shift to perform preparatory work

and obtain their work schedules.  Specifically, Plaintiffs were directed to arrive at 6 a.m. to load

the Defendants' trucks with tools and materials.  They would then be advised of their work site

for that particular day.  Quintanilla Tr. at 25; Amaya Tr. at 51, 62-64, 106; J. Quintanilla Tr. at 33-34, 38, 102; Castillo Tr. at 53-54; Quinteros Tr. at 74-76, 99-110; Galeano Tr. at 68-71. Rarely did Plaintiffs report directly to their work sites.  *Id*.  Vecchia testified that "it's possible" that Plaintiffs were required on occasion to start work at Defendants' facility or "yard" as early as 5:30 a.m.  L. Vecchia Tr. at 112, 115.  For example, Fajardo and Escalante explained that they often arrived to work as early as 5:30 a.m. – 6:30 a.m. to "mark" the work site for paving - - a process which could take up to one hour (these two were the exceptions and all other Plaintiffs had to report directly to the main facility - - not the work site).  Fajardo Tr. at 66-67, 80, 82-83, 106-107, 132-133; Escalante Tr. at 70-71, 75.  Work schedules in the record evidence shows that Plaintiffs were required to be on the job at 5:30 a.m. and paving no later than 6 am.  Wallace Aff., Ex. 6.  In addition to the preparatory work, Plaintiffs were responsible for chauffeuring other workers to and from the work site while driving Defendants' vehicles which contained tools, materials, and fuel.  Among those Plaintiffs who engaged in these chauffeuring duties were Quintanilla, Escalante, Mendez, Garcia, and Rodriguez.  *See* Quintanilla Tr. at 21-22, 24, 43; Galeano Tr. at 44; Amaya Tr. at 50-51; Mendez Tr. at 147, 185-186; Rodriguez Tr. at 45-46. According to Plaintiffs, the work day concluded at approximately 6:30 p.m. or 7 p.m. depending upon the particular project that was to be completed.  Plaintiffs rarely, if ever, stopped working at 4 p.m.  N. Quintanilla Tr. at 64, 128-129; Amaya Tr. at 62; J. Quintanilla Tr. at 43-44; Galeano Tr. at 78-79; Pagoada Tr. at 91; Rivera Tr. at 185.  Plaintiffs contend that they performed between 50 and 70 hours of work per week without being compensated for overtime hours (at either the regular rate or overtime rate).  *See* Rodriguez Tr. at 100, 102.

Plaintiffs also argue that they are entitled to recover wages for the time they arrived at Defendants' facility to complete prep work until the time they were chauffeured back to the Medford, New York facility from the worksite. *See* Rodriguez Tr. at 119-120. Plaintiffs were directed to do prep work in the yard such as loading materials, tools, and refueling upon their arrival at the facility. *See* Fajardo Tr. at 121-122, 140. If the "preparatory activities" cited by Plaintiffs formed an integral part of the principal activity" of their respective jobs, there remains at least an issue of fact whether those activities should have been "regarded as work and as compensable" under the FLSA. *See Perez v. G&P Auto Wash*, 930 F. Supp. 2d 423, 430 (E.D.N.Y. 2013) (quoting 29 C.F.R. § 790.8(b)(2)); *see also Mitchell v. King Packing Co.,* 350 U.S. 260, 262-63, 76 S. Ct. 337, 100 L. Ed. 282 (1956) (finding that butchers should be compensated for the time spent before and after their shifts sharpening their knives because having "razor sharp" knives was "an integral part of and indispensable to the various butchering activities for which they were principally employed"); *Kosakow v. New Rochelle Radiology Assocs., P.C.*, 274 F.3d 706, 718 (2d Cir. 2001) (reversing grant of summary judgment when questions of material fact existed as to whether x-ray technicians' pre-shift activities, which included turning on, warming up, and testing the x-ray machine, which were undisputedly "necessary for the proper performance of her job," needed to be completed before the office opened).

Moreover, although not raised by Defendants, the Court finds that such pre-shift work activities are not as a matter of law *de minimis* and, hence, non-compensable. "[I]n determining whether time should be excluded from compensation as de minimis,"the Court must examine the following factors: '(1) the practical administrative difficulty of recording the additional time; (2)

the size of the claim in the aggregate; and (3) whether the claimants performed the work on a regular basis.'" *G&P Auto Wash*, 930 F. Supp. 2d at 431 (quoting *Kosakow*, 274 F.3d at 719). Given the foregoing testimony, the Court finds that Plaintiffs' appeared for work up to 30 minutes early on a regular basis and such time would not be administratively impracticable to compute. As such, the Court finds that the question of whether such pre-shift work is compensable should be determined by a finder of fact.

At various points in the case, testimony elicited from Plaintiffs revealed that they were paid by the day and not by the hour. For example, Plaintiff Javier Quintanilla was advised by Louis Vecchia that he was to be paid on a daily not on an hourly basis. *See* J. Quintanilla Tr. at 88. Jose Castillo testified that he was compensated at $100 per day at several points during his employment with Defendants. *See* Castillo Tr. at 30-31. Further, Plaintiffs also testified that they did not take lunch and often did not take breaks either. According to Louis Vecchia, Plaintiffs were not obligated to take lunch and, in any event, there was no scheduled time to take lunch. *See* L. Vecchia Tr. at 327.

Plaintiffs recorded their hours by completing timesheets that were provided to them by Defendants. On a weekly basis, Plaintiffs personally handed their timesheets to Operations Supervisor Tommy McEvilly or Louis Vecchia. *See* Wallace Aff., Ex. 1; Fajardo Tr. at 150-152; Quinteros Tr. at 68-70; Galeano Tr. at 94-95; Rivera Tr. at 147; Perez Tr. at 97, 124; Mendez Tr. at 287-288; Escalante Tr. at 111. Christopher and Louis Vecchia testified that the Plaintiffs recorded their hours on these timesheets in order to have them processed for payroll and Vecchia stated that he would occasionally review these records. *See* C. Vecchia Tr. at 82-84; L. Vecchia Tr. at 67-71, 77-79, 82-85; Wallace Aff., Ex. 1. Pracelis Mendez testified that one of

Defendants' managers, Dominick Testa, and Operations Supervisor McEvilly claimed that all of the hours recorded by Plaintiffs were accurate, but Louis Vecchia would ultimately decide the precise number of hours Plaintiffs would be compensated. *See* Mendez Tr. at 87, 260-262.

Although Plaintiff were able only to retain a minority of their timesheets, those records comport with Plaintiffs' own testimony about being compelled to work at least 10-20 uncompensated overtime hours per week. *See* Quintanilla Tr. at 64, 128-129; Amaya Tr. at 55, 61-62; J. Quintanilla Tr. at 58-61; Castillo Tr. at 35, 52, 81, 86, 110; Quinteros Tr. at 56, 120-122; Galeano Tr. at 54-55, 77-78, 116-117, 126-128; Pagoada Tr. at 70, 72, 82, 90-93, 112-115, 164-168, 175-176; Rodriguez Tr. at 54-56, 100-102; Rivera Tr. at 146, 177. Plaintiffs have offered evidence which shows material issues of fact regarding Defendants' underreporting of the overtime hours actually worked by Plaintiffs. Several of the Plaintiffs testified that, until the initiation of this lawsuit, they were significantly underpaid for their overtime hours. Nelson Quintanilla, for example, testified that he was paid overtime only a "few times" during his employment with Defendants. *See* Quintanilla Tr. at 36-37, 110, 120. Plaintiff Amaya testified that he was rarely paid one to three hours of overtime. *See* Amaya Tr. at 46, 59, 61, 80-84. Javier Quintanilla testified that he was paid about two hours of overtime during his employment. *See* J. Quintanilla Tr. at 58, 93-94. Other Plaintiffs also testified as to the chronic underpayment of overtime they experienced during their employment with Defendants. *See* Galeano Tr. at 55, 116, 127; Pagoada Tr. at 71, 111, 131-132, 141, 166-168; Rodriguez Tr. at 41-44; Rivera Tr. at 79-83, 146, 177; Fajardo Tr. at 53, 60-61, 97, 134-136, 171-172, 179; Perez Tr. at 93-94, 132, 168-169, 172; Garcia Tr. at 18, 31, 72, 85; Martinez Tr. at 63-64, 68-69; Mendez Tr. at 32-33, 76. Plaintiffs have also provided evidence of discrepancies between the hours reported on the

computer generated timesheets (which already underreported the hours reflected in Plaintiffs' handwritten timesheets) and the paystubs received by Plaintiffs. Given the foregoing information, the Court finds a just and reasonable inference that Plaintiffs were not compensated in accordance with applicable state and federal wage and hour laws.

The record evidence shows that Defendants conceded there were discrepancies in the amount of hours reported by Plaintiffs and the actual overtime hours for which Plaintiffs were compensated. To make up for such discrepancies, Louis Vecchia purportedly reimbursed Plaintiffs with cash payments. However, Defendants have not produced any evidence that such cash payments were actually made to Plaintiffs. *See* L. Vecchia Tr. at 121; H. Vecchia Tr. at 53-54, 69-71. Moreover, later in his deposition testimony, Louis Vecchia could not recall how certain Plaintiffs were reimbursed for the difference between the hours reported in Defendants' computerized timesheets and those they were actually paid as reflected on their paystubs. *See* L. Vecchia Tr. at 365, 372, 374-375, 379-380, 382, 385-390, 392-393, 399-400.

Plaintiffs have met their burden under *Andersen*. The Court finds, however, that Defendants have not come forward with evidence that (1) Plaintiffs' inference is unreasonable under the FLSA or (2) Plaintiffs were properly paid by a preponderance of evidence under the NYLL. Rather, Defendants point to the instances when Plaintiffs were compensated with overtime but do not address the Plaintiffs' contentions regarding the underreported hours. *See* Defs.' Mem. at 19-27. Instead, Defendants' counsel attempts to discredit Plaintiffs' testimony by characterizing several of the Plaintiffs as "liars." Even considering these questionable characterizations of the Plaintiffs' testimony, the Court is not in a position to weigh credibility at

the summary judgment stage and DENIES Defendants' motion for summary judgment on all unpaid overtime claims under the FLSA and NYLL.

### E.      Whether Plaintiffs Have Standing to Sue for Prevailing Wage Violations

Defendants argue that Plaintiffs' third cause of action for prevailing wage violations should be dismissed because Plaintiffs "fail to cite to specific contractual provisions between [D]efendants and the State or City of New York requiring the payment of prevailing wages." Defs.' Mem. at 28 (citing *Seidal v. Hoffman Floor Covering Corp.*, No. 09 Civ. 4027, 2012 WL 3064153 (E.D.N.Y. Jul. 26, 2012)).  Plaintiffs argue that NYLL § 220(3)(a) requires that all construction contracts entered into with a public entity "shall contain a provision that each laborer, workman or mechanic, employed by such contractor, subcontractor or other person about or upon such public work, shall be paid the wages herein provided."  As such, Plaintiffs maintain that the laborers, workmen, and mechanics employed by Defendants are third-party beneficiaries to these contracts.  *See* Pls.' Mem. at 19.  Moreover, Plaintiffs point out that a plaintiff is not obligated to produce the specific public works contract at issue to survive summary judgment on a prevailing wage claim.  *Id.* (citing *Ramos v. Simplexgrinnel LP*, 796 F.Supp.2d 346, 363-67 (E.D.N.Y. 2011)).

Under New York law, "'[a] party asserting rights as a third-party beneficiary must establish (1) the existence of a valid and binding contract between other parties, (2) that the contract was intended for his benefit and (3) that the benefit to him is sufficiently immediate, rather than incidental, to indicate the assumption by the contracting parties of a duty to compensate him if the benefit is lost.'"  *Seidel v. Hoffman Floor Covering Corp.*, No. 09 Civ. 4027, 2012 WL 3064153, at *2 (E.D.N.Y. Jul. 26, 2012) (quoting *Madeira v. Affordable Hous.*

*Found., Inc.*, 469 F.3d 219, 251 (2d Cir. 2006)). "Further, in New York laborers may ordinarily assert third-party beneficiary claims to enforce the 'prevailing wage' provision that Section 220 requires of public works contracts." *Id.* (citing *Cox v. NAP ConsTr. Co.*, 891 N.E.2d 271, 274 (2008)).

Like Plaintiffs here, plaintiffs in *Seidel* argued that "because Section 220 requires the prevailing wage provision to appear in public works contracts, it doesn't matter whether the prevailing wage language actually appeared in the contracts." *Seidel*, 2012 WL 3064153, at *3. However, *Seidel* pointed to language in the New York Court of Appeals decision in *Fata v. S.A. Healy Co.* - - a case relied upon the Plaintiffs - - which held "that if the obligation of the defendant to pay wages not less than the prevailing rate existed only by fiat of the Legislature, the remedy provided by the Legislature for violation of the obligation it has created would be exclusive." *Id.* (quoting *Fata v. S.A. Healy Co.*, 46 N.E.2d 339, 340 (1943)). Further, more recent cases in New York have held that a breach of contract claim under these circumstances requires that the language of Section 220 regarding the prevailing wage be inserted into the contract. *Id.* (citing *Maldonado v. Olympia Mech. Piping & Heating Corp.*, 8 A.D.3d 348, 350 (2d Dep't 2004); *Jara v. Strong Steel Door, Inc.*, 2008 WL 3823769, at *4 (Kings Cnty. Sup. Ct. Aug. 15, 2008).

Here, the Court finds Judge Gold's reasoning in *Ramos* to be instructive. There, Judge Gold addressed whether plaintiffs' third-party breach of contract prevailing wage claim could withstand summary judgment despite the absence of the actual contract in record evidence. *Ramos*, 796 F. Supp. 2d 346. In answering that question in the affirmation, the Court considered the following factors: (1) Section 220 requires all public works contracts to contain prevailing

wage clauses; (2) Federal Rule of Evidence 1004 allows a party to use secondary evidence to prove the contents of a writing where the writing "is not closely related to a controlling issue," and (3) there was no dispute that the alleged contracts were public works contracts or that the defendants were required to pay the prevailing wage on at least some of the alleged contracts. *Id*.

The same set of circumstances is presented here. Although the actual contract was not produced in discovery, the parties do not dispute that at least some of the contracts at issue were subject to New York prevailing wage laws and Defendants at least attempted to compensate Plaintiffs with the statutorily mandated prevailing wage (*see* Defs.' Mem. at 28-32). Thus, in light of evidence in the record that Defendants' underreported Plaintiffs' hours, including work on prevailing wage projects, (*see* Amaya Tr. at 126-127; Galeano Tr. at 68; Pagoada Tr. at 131-133; Rivera Tr. at 75), the Court finds material issues of fact warranting denial of Defendants' motion for summary judgment on Plaintiffs' claims for prevailing wage violations.

F.      **Whether Plaintiffs' Breach of Contract, Unjust Enrichment, and *Quantum Meruit* Claims Survive Summary Judgment**

Finally, the Plaintiffs seek to bring claims for breach of contract, unjust enrichment, and *quantum meruit* as an alternative to their claims under the FLSA and NYLL. Defendants argue that Plaintiffs' breach of contract claims are preempted by the FLSA where the claims are grounded on the same facts. *See* Defs.' Mem. at 33-34. At the time this motion was filed, the Second Circuit has not directly addressed this issue. *See Sosnowy v. A. Perri Farms, Inc*., 764 F. Supp. 2d 457, 467 (E.D.N.Y. 2011). In *Sosnowy*, the district court found that "Congress struck the intended balance between the purpose of the FLSA and the vindication of its provisions, and therefore allowing additional remedies for duplicative claims would serve as an obstacle to the

enforcement of the FLSA." *Id.* at 467 (citing *Chen v. Street Beat Sportswear, Inc*., 364 F. Supp. 2d 269, 293 (E.D.N.Y. 2005)). Nonetheless, the Court went on to analyze the state common law causes of action and whether they were preempted. The plaintiff in *Sosnowy* had asserted that his breach of contract claim was based on the parties' employment relationship and not on the FLSA. *Id.* at 469. On that issue, the court stated that it "does not deny the possibility that the parties had an implied contract to provide the Plaintiff with overtime compensation separate and apart from the Defendants' obligations under the FLSA requirements. However, the allegations in the complaint are insufficient to state a claim in so far as the Plaintiff 'identif[ies] no specific consideration, contractual terms or obligations independent of the federal and state statutory obligation underlying their other statutory causes of action' . . . and '[t]he allegations of the complaint do not demonstrate the existence of an independent, enforceable agreement.'" *Id.* at 469-470 (quoting *Krichman v. J.P. Morgan Chase & Co*., No. 06-CV-15305, 2008 WL 514-8769, at *4 (S.D.N.Y. Dec. 8, 2008). Here, the same holds true for plaintiffs' allegations in the Third Amended Complaint. *See* Compl. ¶¶ 115-119.

It appears that the Second Circuit has still not directly addressed whether common law claims for overtime are preempted by the FLSA. *See Contrera v. Langer*, 314 F. Supp. 3d 562, 571 (S.D.N.Y. 2018). In acknowledging that fact, the court in the recent *Contrera* case pointed out that other courts have held where a state common law claim is based upon the same facts as an FLSA cause of action, "the duplicative state law claim is preempted by the FLSA and must be dismissed." *Contrera*, 314 F. Supp. 3d at 571 (quoting *Sampson v. MediSys Health Network, Inc.*, No. 10-CV-1342, 2012 WL 302-7838, at * 8 (E.D.N.Y. July 7, 2012)). The court went on to find that "the FLSA preempts state common law causes of action where 'the FLSA and

common-law claims are grounded in the same facts.'" *Id.* (quoting *Chen*, 364 F.Supp.2d at 293). Notably, however, the court ultimately concluded that plaintiffs' breach of contract claim was preempted to the extent that it sought overtime wages, *but not with respect to "straight time" wages*. *Id.* at 573 (emphasis supplied).

The Plaintiffs acknowledge that the "breach of contract, unjust enrichment, and quantum meruit claims . . . are asserted as alternative relief to Plaintiffs' FLSA and NYLL claims." *See* Pls.' Mem. at 21. This Court finds the reasoning of *Contrera* persuasive. The breach of contract allegations in the Third Amended Complaint are conclusory and do not demonstrate the existence of an independent, enforceable agreement. For that reason, the motion for summary judgment as to that claim is GRANTED. However, to the extent the Plaintiffs have stated a claim for unpaid straight time, that claim will proceed. With respect to the quantum meruit and unjust enrichment claims, the Court finds that the allegations likewise are conclusory and are also duplicative of the FLSA claims. Moreover, these claims are preempted by the FLSA. *Sosnowy*, 764 F. Supp. 2d at 470; *Guerrero v. JP Morgan Chase & Co.*, No. 09-CV-388, 2010 WL 457144, at *4 (E.D. Tex. Feb. 5, 210). Therefore, Defendants' motion for summary judgment on the unjust enrichment and quantum meruit claims is GRANTED.

## VII. CONCLUSION

Based upon the foregoing information and analysis, Defendants' motion for summary judgment is GRANTED, in part, and DENIED, in part, consistent with this Order, as follows:

1. Defendants' motion for summary judgment dismissing the claims against Helen Vecchia is DENIED;

2. Defendants' motion to the extent it seeks to dismiss Alex Arevalo's claims on the grounds that he was not an employee is DENIED;

3.    Defendants' motion for summary judgment as to the unlawful retaliation claims under both the FLSA and the NYLL are DENIED;

4.    Defendants' motion for summary judgment claiming that Plaintiffs failed to raise an inference of retaliatory discharge because they abandoned their positions is DENIED as to Plaintiffs Edvin Rivera, Osmar Pagoada, Maynor Fajardo, and Walter Garcia but GRANTED as to Plaintiffs Carlos Escalante and Jose Castillo;

5.    Defendants' motion for summary judgment on the retaliation claims arising from Defendants' opposition to the unemployment benefit claims of Plaintiffs Quintanilla, Rivera, and Rodriguez is DENIED;

6.    Defendants' motion for summary judgment as to Plaintiffs Fajardo and Mendez's retaliatory litigation claim is DENIED;

7.    Defendants' motion seeking summary judgment on Pracelis Mendez's claim of retaliation based on the alleged call from Louis Vecchia to Mendez's employer is DENIED;

8.    Defendants' motion for summary judgment on all unpaid overtime claims under the FLSA and NYLL is DENIED;

9.    Defendants' motion for summary judgment on Plaintiffs' claims for prevailing wage violations is DENIED;

10.   Defefndants' motion for summary judgment as to the breach of contract claim for overtime wages is GRANTED; however, the motion as to the breach of contract claim for unpaid straight time is DENIED;

11.   Defendants' motion for summary judgment as to the unjust enrichment and quantum meruit claims is GRANTED.


**SO ORDERED.**

Dated:  Central Islip, New York
        February 22, 2019


                                    /s/ A. Kathleen Tomlinson
                                    A. KATHLEEN TOMLINSON
                                    U.S. Magistrate Judge